**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| THE GREENBRIER COMPANIES, INC.; GREENBRIER CENTRAL, LLC; GREENBRIER-CONCARRIL, LLC; GREENBRIER LEASING COMPANY LLC; GREENBRIER-GIMSA, LLC; GUNDERSON-GIMSA S.A. de C.V.; and GUNDERSON-CONCARRIL S. de R.L. de C.V.,<br>Plaintiffs,<br>v.<br>THE UNITED STATES,<br>Defendant. | Court No. 26-04550 |

# COMPLAINT

Plaintiffs, The Greenbrier Companies, Inc. and its subsidiaries Greenbrier Central, LLC; Greenbrier-Concarril, LLC; Greenbrier Leasing Company LLC; Greenbrier-GIMSA, LLC; Gunderson-GIMSA S.A. de C.V.; and Gunderson-Concarril S. de R.L. de C.V. (collectively "Greenbrier"), by and through counsel, allege as follows upon actual knowledge with respect to themselves and their own acts, and upon information and belief as to all other matters:

## PRELIMINARY STATEMENT

1. For decades, freight rail cars built in North America have moved across the United States-Mexico border on the North American rail network without formal entry. As reflected in statutory provisions and the Harmonized Tariff Schedule of the United States ("HTSUS"), Congress decided that to facilitate commerce across the border, North American rail cars and their attached components would be exempt from entry and therefore not subject to the payment of duties that would otherwise apply. Reflecting that legislative judgment, U.S. Customs and Border Protection ("CBP" or "Customs") and the U.S. Department of Commerce ("Commerce") have also

previously stated that North American rail cars and their components admitted across the border are exempt from entry requirements and are therefore not subject to the payment of duties.

2. Greenbrier relied on that settled statutory and regulatory framework, as has the rest of the domestic rail industry. As recently as 2023, in three separate memoranda that defined the scope of relevant antidumping and countervailing duty orders on freight rail couplers, Commerce made clear that Customs lacks any legal authority to assess antidumping or countervailing duties on couplers attached to entry-exempt rail cars.

3. Greenbrier has been forced to file this lawsuit because Customs has now unlawfully and unreasonably reversed course, targeting Greenbrier for selective enforcement of purported legal requirements that do not exist. Contrary to the statutory requirements and in excess of its statutory authority, Customs has cast aside Congress's judgment and declared for the first time that Greenbrier's rail cars must be entered (and that tens of millions of dollars in duties are owed retroactively on the couplers attached to them). Meanwhile, because the agency has failed to justify its position and has not followed required procedures, others in the domestic industry continue to bring their rail cars across the border without being subject to entry requirements and without paying duties, causing Greenbrier substantial competitive harm.

4. On May 18, 2026, Customs' Trade Remedy Law Enforcement Directorate ("TRLED") issued a determination asserting that Greenbrier had evaded antidumping and countervailing duty orders on certain freight rail couplers from Mexico and the People's Republic of China (the "AD/CVD orders") by failing to formally "enter" Mexican-manufactured rail cars to which subject freight-rail couplers were attached when the rail cars crossed into the United States. *See* Attachment A, Trade Remedy Law Enforcement Directorate, EAPA Case No. 8183 – Notice of Determination as to Evasion (May 18, 2026) ("TRLED Det.").

5. On July 1, 2026, Greenbrier exercised its right to seek timely review by the Office of Trade, Regulations and Rulings ("ORR") under 19 U.S.C. § 1517(f), and on September 25, 2026, Customs entered a final administrative determination affirming TRLED's decision. *See* Attachment B, CBP, ORR, EAPA Case No. 8183 – Administrative Review (Sept. 25, 2026) ("CBP Det."). Customs' final determination is unlawful, an abuse of discretion, and arbitrary and capricious. It fails to address the serious legal errors identified in Greenbrier's administrative appeal, fails to justify the agency's unauthorized change in position, ignores extensive record evidence, and offers no reasoned explanation for attempting to target a single market participant with sweeping changes in trade policy that violate Congress's commands and contravene settled regulatory understandings.

6. Customs' unexplained 180-degree change in position cannot be reconciled with the plain text of the governing statutes and regulations, with longstanding practice, or with the basic requirements of fair notice and reasoned administrative decision-making. The May 18, 2026 determination and the September 25, 2026 final administrative determination (collectively, the "Determination") are unlawful and should be set aside for at least six reasons.

7. ***First***, the Determination exceeds Customs' lawful authority and is contrary to law because it violates the Harmonized Tariff Schedule of the United States, the regulations governing entry into the United States, and binding statements made by Commerce, which all provide that couplers attached to North American freight rail cars are not subject to entry and, as a result, are not subject to AD/CVD duties.

8. ***Second***, the Determination exceeds Customs' lawful authority and is contrary to law because it violates the plain text of the governing statutes and regulations, which exempt rail

cars and their attached couplers from entry and duties where, as here, they qualify as instruments of international traffic.

9. ***Third***, the Determination is arbitrary and capricious and an abuse of discretion because it represents an unreasonable, unacknowledged, and unexplained departure from decades of existing policy and practice. The Determination fails to respond to record evidence and significant objections, is not supported by substantial record evidence, and is irrational and unreasoned.

10. ***Fourth***, even if Customs had authority to change policy going forward (which it does not), the agency's attempt to impose retroactive duties is unlawful and arbitrary and capricious, and it violates Greenbrier's due process rights. Customs has not provided regulated parties with fair notice, and it is unlawfully targeting Greenbrier with tens of millions of dollars in potential duties while failing to apply the same requirements to other companies that bring rail cars into the United States.

11. ***Fifth***, Customs lacks authority to assess retroactive AD/CVD duties on rail cars (or their attached couplers) that were not entered for consumption into the United States. As the record demonstrates, not only is Customs' decision an unauthorized break from statutory requirements and legal precedent, it is fundamentally contrary to settled practice and heretofore accepted entry procedures. Confirming Customs' radical break from precedent and practice, the electronic entry data interchange systems used by licensed customs brokers and the rail manifest systems used by rail carriers were developed and maintained based on the understanding that Mexican-originating rail cars and their attached couplers transported into the United States are not subject to entry requirements.

12. ***Sixth***, even if Customs had authority to require Greenbrier to enter its rail cars (and their attached couplers), the Determination is invalid and contrary to law for an additional reason: Couplers attached to rail cars do not lawfully qualify as "covered merchandise" within the scope of the AD/CVD orders because the couplers are not capable of causing injury to the domestic industry that is cognizable under the trade laws. *See Wabtec Corp. v. United States*, Slip Op. 26-122 (Ct. Int'l Trade Oct. 8, 2026); *see also* 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1). Customs abused its discretion and acted contrary to law in failing to refer that question to Commerce under 19 C.F.R. § 165.16.

## JURISDICTION AND STANDARD OF REVIEW

13. This Court has jurisdiction in accordance with 28 U.S.C. § 1581(c) for any civil action commenced under Section 517 of the Tariff Act of 1930, 19 U.S.C. § 1517.

14. Greenbrier brings this action under 19 U.S.C. § 1517(g), which provides for judicial review by this Court of TRLED's final determination under 19 U.S.C. § 1517(c) and CBP's administrative review determination under 19 U.S.C. § 1517(f).

## PARTIES

15. Plaintiff The Greenbrier Companies, Inc. is incorporated in Oregon.

16. The Greenbrier Companies, Inc. is the parent of plaintiffs Greenbrier Central LLC; Greenbrier-Concarril, LLC; Greenbrier Leasing Company LLC; Greenbrier-GIMSA, LLC; Gunderson-GIMSA S.A. de C.V.; and Gunderson-Concarril S. de R.L. de C.V.

17. Defendant United States is the statutory defendant under 28 U.S.C. § 1581(c). *See* 19 U.S.C. § 1517(g).

## STANDING

18. Greenbrier is an entity "determined to have entered ... covered merchandise through evasion" in an administrative proceeding initiated by Customs under the Enforce and Protect Act ("EAPA"). Greenbrier has standing to bring this action under 19 U.S.C. § 1517(g)(1).

19. Greenbrier participated in the EAPA investigation, including by filing an administrative appeal. Greenbrier is an interested party within the meaning of 19 U.S.C. § 1517(a)(6).

20. Following Customs' interim measures and subsequent affirmative determination as to evasion, Greenbrier is subject to AD/CVD duties on shipments covered by the EAPA investigation and is therefore adversely affected or aggrieved by agency action within the meaning of section 702 of the Administrative Procedure Act, as amended. *See* 5 U.S.C. § 702. As an adversely affected or aggrieved party, Greenbrier has standing under 28 U.S.C. § 2631(i).

21. As the direct target of Customs' regulation under its AD/CVD orders, Greenbrier's standing is self-evident. Greenbrier also has standing because, as a result of Customs' departure from statutory requirements and failure to follow required procedures, Greenbrier has suffered and continues to suffer concrete economic and competitive injury.

## TIMELINESS

22. This action was timely filed on October 15, 2026.

23. An action under 28 U.S.C. § 1581(c) based on 19 U.S.C. § 1517 must be commenced within thirty business days after Customs completes its administrative review under 19 U.S.C. § 1517(f). *See* 19 U.S.C. § 1517(g)(1).

24. Customs completed its administrative review on September 25, 2026. The thirtieth business day after September 25, 2026, is November 9, 2026.

## GENERAL ALLEGATIONS

25. Greenbrier manufactures freight rail cars in the United States. Freight rail cars are unpowered railway vehicles used to transport cargo, goods, and commodities as part of a train.

26. Consistent with Congress's desire to facilitate trade between the United States, Mexico, and Canada, Greenbrier also manufactures rail cars in Mexico that are transported by rail carriers into the United States as instruments of commerce and for sale or lease to customers.

27. New rail cars transit to the United States not in isolation but as part of coordinated movements by common carrier railroads. The railroads assemble train sets that combine up to hundreds of rail cars for coordinated transit in international traffic along the North American rail network and into the United States.

28. One component of a freight rail car is a "coupler," a mechanical device, located at both ends of a rail car, that is used to connect the car to other cars that together form a train.

29. For years, the rail industry has understood that, under the statutory provisions implementing the North American Free Trade Agreement ("NAFTA") and the United States-Mexico-Canada Agreement ("USMCA"), rail cars like Greenbrier's that originate in Mexico and are transported into the United States (*i.e.*, USMCA-originating rail cars) are exempt from formal entry requirements.

30. Consistent with the statutory provisions and the plain terms of the Harmonized Tariff Schedule of the United States, Commerce made clear—when defining the scope of the relevant AD/CVD orders in memoranda on which Greenbrier was entitled to rely—that rail cars and their attached couplers are exempt from entry requirements.

31. This action arises because for the first time ever, and apparently only with respect to Greenbrier, Customs seeks to violate statutory requirements and depart from precedent by

asserting that rail cars that are transported into the United States must be entered and duties paid on their attached couplers.

**A. The Statutory and Regulatory Framework**

32. The nation's trade laws have long distinguished between (1) the formal "entry" of merchandise into the United States, and (2) the admission into the United States of NAFTA/USMCA-qualifying rail cars and rail cars that qualify as instruments of international traffic, which are not subject to formal entry requirements.

33. "Entry" is a term of art that refers to the "documentation or data required by" Customs "or the act of filing" the same. 19 C.F.R. § 141.0a(a). "Entry" is also the point at which Customs determines whether "merchandise may be released from {Customs'} custody" and "assess{es} duties," if any are owed, "on the merchandise." 19 U.S.C. § 1484(a)(1)(A), (a)(1)(B)(i).

34. Congress tied the obligation to deposit duties to the act of entry by making clear that any obligation to deposit duties occurs "at the time of entry" (or a set time afterward). 19 U.S.C. § 1505. If no entry occurs or is required, there is no obligation to deposit or assess duties.

35. Although the general rule is that "{a}ll merchandise imported into the United States is required to be entered," 19 C.F.R. § 141.4(a), Congress concluded that, under certain circumstances, products may be admitted into the United States without being subject to entry requirements—and, therefore, without the assessment of duties (and without becoming subject to any AD/CVD orders). *See* 19 U.S.C. §§ 1484(a)(1)(B)(i), 1505. As relevant here, Congress included two statutory exemptions to encourage, and reduce frictions to, commerce between the United States, Mexico, and Canada. *See* S. Rep. No. 103-189, at 100–01 (Nov. 18, 1993).

36. ***First***, a statutory provision entitled "Entry Not Required for Locomotives and Railway Freight Cars" provides that "railway freight cars (provided for in heading 8606) on which no duty is owed are not subject to the entry or release requirements for imported merchandise set forth in Sections 448 and 484 of the Tariff Act of 1930." Pub. L. No. 103-182, § 681(b)(1), 107 Stat. 2057, 2217–18 (1993).

37. The statute's reference to "heading 8606" is a reference to a heading in Chapter 86 of the Harmonized Tariff Schedule for "Railway or tramway freight cars, not self propelled{.}" Congress revised Chapter 86 of the Tariff Schedule to include an "Additional U.S. Note" "railway freight cars (provided for in heading 8606) on which no duty is owed are not subject to the entry or release requirements for imported merchandise set forth in Sections 448 and 484 of the Tariff Act of 1930." HTSUS, Chapter 86, Additional U.S. Note 1. No duty is owed on USMCA-qualifying freight cars classified within heading 8606 of the Harmonized Tariff Schedule.

38. By exempting rail cars from entry requirements, Congress also exempted their constituent components. Under the Harmonized Tariff Schedule's "General Rules of Interpretation" and "General Notes," which guide its application, Congress instructed that "composite goods ... made up of different components ... shall be classified as if they consist{ } of the material or component which gives them their essential character." HTSUS, Gen. R. of Interpretation 3(b).

39. The contents of the Harmonized Tariff Schedule are binding because they are "statutory provision{s} enacted by Congress." *Forest Labs., Inc. v. United States*, 476 F.3d 877, 882 (Fed. Cir. 2007). The schedule "governs the classification of imported goods and merchandise and provides the applicable tariff rates" for all merchandise imported into the United States. *StarKist Co. v. United States*, 29 F.4th 1359, 1361 (Fed. Cir. 2022) (quotation marks omitted).

40. ***Second***, Congress exempted "instruments of international traffic" (or "IITs") from entry requirements. *See* 19 U.S.C. § 1322(a) ("Vehicles and other instruments of international traffic … shall be excepted from the application of the customs laws to such extent and subject to such terms and conditions as may be prescribed in regulations or instructions of the Secretary of the Treasury."). An article qualifies as an instrument of international traffic if it is a substantial holder or container, is suitable for and capable of repeated use, and is used in significant numbers in international traffic. *See* U.S. CBP, What Every Member of the Trade Community Should Know About: Instruments of International Traffic (Aug. 2012) ("CBP IIT Handbook"), *available at* https://tinyurl.com/wdwaa73v. The statute states that IITs "such as containers, lift vans, rail cars and locomotives, truck cabs and trailers, etc. are exempt from formal entry procedures." Pub. L. No. 103-182, § 681(b)(1), 107 Stat. at 2217–18; 19 C.F.R. § 141.4(b)(3) (listing exception).

41. Congress designed these two exemptions to have overlapping effects: The first provides that a rail car and its components are exempt from entry—and thus not subject to an obligation to deposit duties—if the rail car is listed as duty "free" under the Harmonized Tariff Schedule. The second provides that, regardless of whether a rail car is designated as duty free on the Harmonized Tariff Schedule, no entry is required if the rail car qualifies as an IIT. Recognizing the need to facilitate the flow of trade, Congress expressed "concern{ } that {Customs} not substitute new entry requirements for the old requirements or issue regulations that will make compliance difficult." S. Rep. No. 103-189, at 100–01.

42. These important exemptions are binding and in effect. Congress has been clear that the provisions of the Harmonized Tariff Schedule and each amendment to that schedule "shall be considered to be statutory provisions of law for all purposes." 19 U.S.C. § 3004(c)(1).

43. Customs has implemented these statutory exemptions almost verbatim in its regulations. The regulations exempt from entry "Railway locomotives classified in heading 8601 or 8602, HTSUS, and freight cars classified in heading 8606, HTSUS, on which no duty is owed." 19 C.F.R. § 141.4(b)(4). The regulations also exempt "{i}nstruments of international traffic described in § 10.41a and § 10.41b(b) of this chapter, under the conditions provided for in those sections." *Id.* § 141.4(b)(3). As reflected in regulations, "{l}ocomotives and other railroad equipment, trucks, buses, taxicabs, and other vehicles used in international traffic" are exempt from entry requirements. 19 C.F.R. § 10.41(a), (d).

44. Longstanding agency guidance reinforces the regulations. A 2000 Customs Directive instructs that "{n}ew locomotives, railcars, and other railroad equipment (but not parts), built in Mexico or Canada for use in the U.S., do not require that an entry be filed in order to qualify for carrying merchandise or passengers between points in the U.S., per the specific cite in 19 CFR 141.4(b)(4)." Attachment G, Directive No. 3550-075, Instructions for Handling the Entry of Locomotives, Railcars, and Other Railroad Equipment into the U.S., § 4.1 (Mar. 7, 2000) (rev. Mar. 2002) (the "Customs Directive") (also stating that "new locomotives or railcars arriving empty" do not require an entry).

**B. Antidumping and Countervailing Duties**

45. In addition to the tariffs set by Congress in the Harmonized Tariff Schedule—what are referred to as "normal customs duties," 19 U.S.C. § 1673e(a)(3)—Congress has authorized the Commerce to impose targeted "antidumping" and "countervailing" duties on certain articles if and when they are entered into the United States for consumption.

46. Unlike normal customs duties intended to raise revenue, Congress authorized antidumping ("AD") duties to counter the effects in specific markets of "foreign companies selling goods below fair value {to} undercut domestic producers selling those same goods at market

prices." *Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1046 (Fed. Cir. 2012). Before imposing antidumping duties, the International Trade Commission conducts an investigation "to determine whether an industry in the United States suffers injury from the imports at issue," and, if it finds such an injury, "Commerce issues an antidumping order" upon separately finding that the subject goods have been sold at less than fair value. *Id.* at 1047.

47. Similarly, Commerce may impose countervailing duty ("CVD") orders when it determines that a "foreign government is providing a countervailable subsidy with respect to the manufacture, production, or export of the subject merchandise" and after the {International Trade Commission} finds that the "countervailable subsidy injures a domestic industry." *Trans Tex. Tire, LLC v. United States*, 519 F. Supp. 3d 1289, 1295 (Ct. Int'l Trade 2021) (quotation marks omitted).

48. The scope of what particular goods are covered by specific antidumping and countervailing duty orders is defined only after a formal investigation is complete. *See* 19 U.S.C. §§ 1673–1673a; *Sioux Honey*, 672 F.3d at 1048. Commerce defines the binding scope of its investigations in its orders and through "scope rulings, memoranda," and other documents. 19 C.F.R. § 351.225(k)(1)(i)(C). "The authority to clarify the scope of AD and CVD orders rests solely with Commerce," *OTR Wheel Eng'g, Inc. v. United States*, 37 C.I.T. 409, 414 (2013), and parties are entitled to rely on statements made by Commerce as to what merchandise is or is not subject to an AD/CVD order, *Fedmet Res. Corp. v. United States*, 755 F.3d 912 (Fed. Cir. 2014).

49. Antidumping and countervailing duties do not apply to items that are admitted into the United States but are not entered for consumption. *See Titanium Metals Corp. v. United States*, 19 C.I.T. 1143, 1145 (1995) ("{T}he assessment of AD/CV duties is restricted to merchandise entered, or withdrawn from warehouse, for consumption" (quotation marks omitted)).

50. The scope of Commerce's AD/CVD orders cannot be defined to cover merchandise that does not cause cognizable injury to the domestic industry under 19 U.S.C. §§ 1671, 1673.

**C. The AD/CVD Investigation and Commerce's 2023 Memoranda**

51. In light of these statutory and regulatory requirements, it has long been understood that (1) freight rail cars that are not subject to duties under the Harmonized Tariff Schedule are not required to be entered, and (2) freight rail cars serving as instruments of international traffic are also not required to be entered. It has also been understood that, because such freight rail cars and their components are not entered or subject to duties, they are also not subject to antidumping and countervailing duty orders.

52. In September 2022, the Coalition of Freight Coupler Producers (the "Coalition") petitioned Commerce to commence an AD/CVD investigation into certain freight rail couplers from Mexico and the People's Republic of China. *See* 87 Fed. Reg. 64444, 64445 (Oct. 25, 2022); 87 Fed. Reg. 64440, 64440–41 (Oct. 25, 2022).

53. The Coalition alleged that freight rail couplers from China and Mexico were being, or were likely to be, sold in the United States at less than fair value, and that couplers from China benefitted from countervailable subsidies. The Coalition further alleged that, when sold to consumers, the couplers materially injured, or threatened to materially injure, the domestic industry.

54. The Coalition's petition culminated in the antidumping and countervailing duty orders on freight rail couplers that are at issue in these proceedings. *See* Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Antidumping Duty Order, 88 Fed. Reg. 45138 (July 14, 2023); Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Countervailing Duty Order, 88 Fed. Reg. 45135 (July 14, 2023); *see*

*also* Certain Freight Rail Couplers and Parts Thereof From Mexico: Antidumping Duty Order, 88 Fed. Reg. 78308 (Nov. 15, 2023) (applying same scope language).

55. In three memoranda issued between March and May 2023, Commerce clarified which products ultimately would be subject to the payment of AD/CVD duties in response to arguments made by the Coalition seeking to expand the ultimate AD/CVD orders' scope. All three documents made findings consistent with the settled principle (and statutory command) that rail cars (and their attached couplers) that do not *enter* the United States are not subject to duties and do not trigger application of the AD/CVD orders.

56. ***The March 2, 2023 Memorandum.*** A March 2, 2023 memorandum described meetings between Commerce and Customs to clarify the scope of the AD/CVD orders. *See* Attachment C, U.S. Dep't of Com., Certain Freight Rail Couplers and Parts Thereof from Mexico and the People's Republic of China: Video Calls with Customs and Border Protection (Mar. 2, 2023) ("March 2 Mem."). The memorandum explained that "if a freight rail car is exempt from entry under 19 C.F.R. § 141.4(b)(3) and (b)(4), the exemption extends to the rail car's constituent components," such as couplers. *Id.* at 2.

57. Commerce explained that couplers "are considered a constituent component of freight rail cars ... so long as the couplers are attached to, or a part of, the exempted rail cars." *Id.* Commerce emphasized that Customs lacks "the legal authority to subject freight rail couplers to AD/CVD if the couplers are attached to freight rail cars which are exempt from entry under 19 C.F.R. § 141.4(b)(3) or (b)(4)." *Id.*

58. The memorandum distinguished "rail couplers { } imported independently of a freight car," which are subject to entry and therefore trigger the AD/CVD orders. *Id.* The memorandum included as an attachment an email from Customs that distinguished between

independently imported couplers, which are classified under HTSUS 8607.30.1000, from couplers that are "attached to finished railcars" and classified under HTSUS 8606.10.0000 (and other provisions in 8606). *Id.*, Attachment 1.

59. ***The March 28, 2023 Memorandum.*** On March 28, 2023, Commerce issued a Preliminary Scope Decision that further clarified that couplers attached to rail cars are generally *within* the scope of the AD/CVD orders *but also* expressly stated that the orders apply *only if* the subject merchandise "*enters*" the United States—either independently or as attached to a rail car. *See* Attachment D, U.S. Dep't of Com., Freight Rail Couplers from Mexico and the People's Republic of China: Preliminary Scope Decision 10 (Mar. 28, 2023) ("Preliminary Scope Decision") ("{T}he dumping law authorizes Commerce to examine … {coupler} sales *if they enter* the United States *for consumption* ...." (emphasis added)).

60. Commerce explained that couplers that cross into the United States attached to rail cars are not a permanent part of the rail car and may "in some instances later lose their exempt status" and enter the United States for consumption. *Id.* at 17. But Commerce was also explicit that, unless and until such an entry occurs, the AD/CVD orders do not apply: Commerce "can only order ... the posting of AD/CVD cash deposits on subject merchandise *entered, or withdrawn from warehouse, for consumption* into the United States." *Id.* at 19 (emphasis added).

61. ***The May 15, 2023 Memorandum.*** Commerce's May 15, 2023 Final Scope Decision reinforced the March 2, 2023 Memorandum and the Preliminary Scope Decision—again in explicit terms that distinguished between couplers attached to *exempt* rail cars and couplers attached to rail cars entered for consumption. *See* Attachment E, U.S. Dep't of Com., Freight Rail Couplers from Mexico and the People's Republic of China: Final Scope Decision Memorandum (May 15, 2023) ("Final Scope Decision").

62. Commerce explained that "*if* a freight railcar is subject to entry (*i.e.*, *not exempt from entry under 19 CFR 141.4(b)(3) or (b)(4)*), and an attached freight rail coupler is within the scope of an AD/CVD order, *then* a formal (type 03) consumption entry is required to assess and collect ADs/CVDs on the coupler for entry into the United States." *Id.* at 15 (emphases added).

63. The memorandum also clarified that the AD/CVD orders do not apply to couplers that are not subject to entry requirements. Commerce stated that it was "*not* instructing {Customs} to apply ADs/CVDs to freight rail couplers that *do not enter* the United States for consumption *nor does the scope purport to cover non-consumption entries*." *Id.* (emphasis added).

**D. Proceedings Under the Enforce and Protect Act ("EAPA")**

64. The rail cars that Greenbrier's affiliates manufacture in Mexico have couplers attached and mounted to them. In the ordinary course, Greenbrier's rail cars travel to the United States by rail, connected by couplers attached to the rail cars, to be used in international traffic, on the North American rail network.

65. Greenbrier's newly built rail cars qualify as, and are certified as, originating goods under the USMCA.

66. Customs validated the originating status of Greenbrier's rail cars during the EAPA verification process and through separate, routine inquiry that preceded the EAPA investigation. Greenbrier's newly built rail cars are immediately in use by rail carriers on the North American rail interchange system when transiting to customers.

67. Because of the statutory exemptions set by Congress, and in reliance on settled legal requirements and Commerce's statements, Greenbrier has not historically entered its rail cars at the border. Greenbrier has understood that the rail cars are exempt from entry and that the rail cars' exempt status also exempts their attached component parts, including the couplers that connect the cars into a train.

68. Greenbrier's understanding is confirmed by longstanding administrative practice. As described below, the electronic entry data interchange systems used by licensed customs brokers and the rail manifest systems used by rail carriers were not able to process formal entry of rail cars at the time of Customs' EAPA determination because the systems have been developed and maintained in the intervening decades based on the same understanding—namely, that rail cars and their attached couplers that are transported into the United States are not subject to entry requirements.

69. On March 5, 2025, invoking Commerce's antidumping and countervailing duty orders on couplers, the Coalition filed a confidential EAPA allegation against Greenbrier. (It supplemented the allegations on April 18, 2025.) Seeking effectively to relitigate the same arguments that Commerce rejected in its 2023 memoranda, the Coalition alleged that Greenbrier's practice constituted evasion of the AD/CVD orders. The Coalition argued that the AD/CVD orders apply to freight rail couplers attached to Greenbrier's finished rail cars produced in Mexico, even if those rail cars were exempt from entry. The Coalition also alleged that Greenbrier failed to declare loose couplers as subject to duties under the AD/CVD orders.

70. The Coalition's allegations did not acknowledge or address any of the 2023 memoranda issued by Commerce and the agency's clear statements that the AD/CVD orders do not apply when freight rail couplers are not subject to entry requirements because they are attached to rail cars.

71. On August 20, 2025, Customs issued a notification of initiation of the EAPA investigation. In doing so, Customs stated that "entries covered by an EAPA investigation are those entries of allegedly covered merchandise made within" a year of the receipt of an allegation

and that "{e}ntry is defined as an 'entry, or withdrawal from warehouse for consumption, of merchandise into the customs territory of the United States.'"

72. On October 10, 2025, Greenbrier submitted a letter asking TRLED to dismiss the EAPA investigation, noting that the 2023 memoranda had not been cited.

73. Greenbrier responded to requests for information, made voluntary factual submissions, and was subject to an onsite verification process. Greenbrier then submitted written opening and rebuttal arguments. *See* Greenbrier's Submission of Written Arguments, EAPA Case No. 8183 (Mar. 12, 2026); Greenbrier's Submission of Response to Written Arguments, EAPA Case No. 8183 (Mar. 27, 2026).

74. Greenbrier argued that the agency had no jurisdiction because EAPA investigations cover only merchandise that is subject to entry.

75. On the merits, Greenbrier argued that its rail cars were exempt from entry as IITs under 19 C.F.R. § 141.4(b)(3) and as duty-free rail cars under 19 C.F.R. § 141.4(b)(4). Greenbrier explained that—on the basis of the statutory requirements, Customs' precedent, and the 2023 Commerce memoranda—because its rail cars were exempt from entry, their constituent components (including the attached couplers) were also exempt as a matter of law.

76. Greenbrier further emphasized that, even if Customs had statutory authority to change its policies, it could not make that change retroactively or in an enforcement action, and that it would instead need to follow proper procedures to provide notice and seek public comment and to apply any new requirements equally to all market participants, including not only Greenbrier but also its competitors.

77. Greenbrier also explained that if Customs did not dismiss the EAPA investigation because Greenbrier's couplers are attached to rail cars that are exempt from entry, it must

determine whether the attached couplers are "covered merchandise" because they do not cause harm to the domestic industry and are therefore not properly within the scope of the AD/CVD orders. Accordingly, at a minimum, Customs could not make any finding of an EAPA violation without first referring that question to Commerce under 19 C.F.R. § 165.16.

78. ***TRLED's Determination.*** On May 18, 2026, TRLED issued a determination. *See* Attachment A, TRLED Det.

79. As to the loose couplers or parts, after a searching investigation, out of 85 entries examined as part of the investigation, Customs identified only a single unintentional discrepancy, which Customs acknowledged had subsequently been corrected. *See* Gunderson-GIMSA S.A. de C.V.'s Response to the Manufacturer RFI at 18 (Oct. 6, 2025). There is no dispute between the parties that loose, in-scope couplers (*e.g.*, not affixed to a rail car) are subject to formal entry. TRLED made no finding of evasion as to shipments of loose couplers.

80. TRLED nonetheless concluded that Greenbrier had evaded the AD/CVD orders with respect to couplers attached to exempt rail cars.

81. TRLED agreed that Greenbrier's *rail cars* were exempt from entry under 19 C.F.R. § 141.4(b)(4), which exempts rail cars "classified in heading 8606, HTSUS, on which no duty is owed." But TRLED *disagreed* as a matter of law that the rail cars' exemption applied equally to those rail cars' attached couplers. TRLED reasoned in circular fashion that, because couplers are within the scope of the AD/CVD orders when entered, they are not merchandise "on which no duty is owed," and thus they—and their rail cars to which they are attached—are not exempt from entry under § 141.4(b)(4). TRLED thus reversed the required statutory analysis and countermanded the statements made by Commerce in its 2023 memoranda. Instead of asking, as Congress intended, whether merchandise is subject to entry requirements and duties under the

Harmonized Tariff Schedule, which is the trigger for applying AD/CVD orders, TRLED took the unprecedented position that a rail car to which an item that falls within the purported scope of AD/CVD orders has been attached must be entered even if under the statutory requirements, the rail car is exempt from entry and customs duties.

82. TRLED further asserted that the § 141.4(b)(3) exemption for IITs does not apply because, in its view, Greenbrier's rail cars are "foreign" "containers."

83. In announcing this conclusion, TRLED failed to address the regulatory provisions making clear that rail cars are "domestic" if they are "regularly imported into{} the United States." 19 C.F.R. § 123.12(d); *see also* CBP IIT Handbook at 18 ("railroad equipment manufactured in or regularly imported into the U.S. are considered 'domestic'"). Nor did it address record evidence confirming that "at least since 1943, the Customs regulations" have defined "the domestic status of railroad equipment (including railcars)" to be "if they are regularly imported (including via IIT) into the United States and if they are not formally entered into another country nor used in foreign local traffic." *See* Greenbrier's Voluntary Information Submission (Dec. 1, 2025), Exhibit VIS-1 at 2.

84. TRLED's May 18, 2026 determination provided that "CBP will henceforth require {Greenbrier to make} formal entries for" freight rail couplers and parts thereof ("FRCs") including "consumption entries for the railcars, to which the FRCs are affixed," the "submi[ssion of] proper accompanying documentation and all AD/CVD duties," and that Greenbrier "rectify any noncompliance with provisions of admission railcars, to which FRCs are affixed, that entered the United States during the {period of investigation}." Attachment B, TRLED Det. at 27.

85. On July 1, 2026, Greenbrier timely sought administrative review. Customs acknowledged receipt on July 2, 2026.

86. ***Customs' Final Administrative Determination.*** On September 25, 2026, Customs issued its final administrative determination in response to Greenbrier's request for administrative review, affirming the May 18, 2026 determination. *See* Attachment B, CBP Det.

87. As to whether the rail cars qualified for exemption from entry as duty free under the Harmonized Tariff Schedule, Customs asserted that "Greenbrier fail{ed} to identify … any record evidence that Greenbrier's rail cars with {freight rail couplers} from Mexico mounted to them qualify for preferential treatment under the USMCA." *Id.* at 14. Customs did not mention the extensive evidence submitted by Greenbrier, including evidence demonstrating that Greenbrier's rail cars qualify as, and are certified as, originating goods under the USMCA.

88. Customs also asserted that "the fact that subject {freight rail couplers} are attached to a rail car does not take them outside the scope of the AD/CVD Orders" and accordingly "Greenbrier's rail cars are not excepted from entry pursuant to 19 C.F.R. § 141.4(b)(4), and entry must also be filed for the {freight rail couplers} attached thereto." Attachment B, CBP Det. at 15. Customs did not identify any statutory authority or provide any reasoned basis for jettisoning the positions taken in Commerce's 2023 memoranda and its earlier 2000 Customs Directive.

89. As to the IIT status of Greenbrier's rail cars, Customs appeared to announce a new basis for stating that the rail cars are subject to the AD/CVD orders. Customs stated that Greenbrier failed to meet its burden that its rail cars were "used in international traffic," asserting that new, empty rail cars are not IITs. *Id.* at 13–14 (quotation marks omitted).

90. In reaching this conclusion, Customs ignored decades of precedent and extensive record evidence demonstrating that Greenbrier's rail cars qualify as IITs. Customs instead suggested (incorrectly) that Greenbrier "does not have visibility into the ultimate U.S. customer's use of their rail cars" and, without mentioning record evidence to the contrary, asserted that

Greenbrier had not demonstrated that its rail cars were used in "international traffic." *Id.* (quotation marks omitted). Nothing in the regulatory scheme requires that Greenbrier as the seller know exactly how the buyer will use the rail car for it to qualify as an IIT. Nonetheless, according to Customs, merely because the rail cars crossed the U.S.-Mexico border for sale or lease to customers, the rail cars were not "used in international traffic." *Id.* (quotation marks omitted). Nor does any portion of this regulatory scheme suggest that new, empty rail cars from Mexico are not "used in international traffic" when a common carrier railroad assembles them into a train set with any number of other rail cars transiting into the United States via the North American rail network.

### E. Greenbrier Attempts to Make Formal Entry of Rail cars

91. Following TRLED's determination, both on its own and through counsel, Greenbrier repeatedly engaged with Customs to confirm the formal entry process it was being asked to follow, first, with the EAPA case team at TRLED, and second, with senior officials at the Automotive & Aerospace Center of Excellence and Expertise. *See* Attachment F, Letter from King & Spalding LLP to CBP ORR (Sept. 14, 2026) ("Sept. 14 Letter").

92. Had the statute or regulations required the entry of rail cars, as Customs asserted, there would have been an established process for entering the rail cars and depositing duties. In fact, however, there was no viable process for making such formal entries with respect to rail cars as they crossed the border.

93. Greenbrier repeatedly asked Customs to clarify the procedures for entry, and it became clear that no adequate procedures existed. Relevant stakeholders (including licensed customs brokers, railroads, and even Customs' border officials) confirmed that formal entry at the key ports of entry along the Southern border was not possible or would not be processed. *See* Attachment F, Sept. 14 Letter at 2.

94. Through August 2026, Customs offered limited guiding procedures, but the agency's guidance remained substantially inadequate.

95. Entry was not possible because applicable Customs personnel at the key port of entry in Eagle Pass, Texas, publicly stated that they would not process rail car entries unless and until they receive further instructions from Customs' headquarters.

96. Formal entry also was not possible for rail cars crossing the border because the broker and rail carrier computer systems that transmit electronic entry and manifest data could not transmit the required data. It was thus impossible to follow the instructions in TRLED's EAPA determination.

97. Greenbrier is unaware of any company that was able to do so before issuance of the Determination.

## SPECIFIC ALLEGATIONS

### A. The Determination Violates the Statutory Entry Exemption for Rail Cars Under the Harmonized Tariff Schedule

98. Section 681(b)(1) of the NAFTA Act added a provision to the Harmonized Tariff Schedule providing that "railway freight cars (provided for in heading 8606) on which no duty is owed are not subject to the entry or release requirements for imported merchandise set forth in sections 448 and 484 of the Tariff Act of 1930." Pub. L. No. 103-182, § 681(b)(1), 107 Stat. at 2217–18; *see also* HTSUS, Chapter 86, Additional U.S. Note 1.

99. The regulations adopt that statutory language almost verbatim, excepting from entry "{r}ailway locomotives classified in heading 8601 or 8602, HTSUS, and freight cars classified in heading 8606, HTSUS, on which no duty is owed." 19 C.F.R. § 141.4(b)(4).

100. Section 8606 of the Harmonized Tariff Schedule is also clear that no "duties" are owed on USMCA-qualifying rail cars and their attached couplers. Although the general duty rate

for heading 8606 is 14 percent ad valorem, rail cars (like Greenbrier's) that qualify as originating goods under the United States-Mexico-Canada Agreement are entitled to a "free" rate of duty. *See* Attachment A, TRLED Det. at 25 n.224; HTSUS 8606 ("Special" Duty Rate).

101. The Harmonized Tariff Schedule's General Rules of Interpretation further confirm that a rail-car-coupler composite good is treated as a rail car, not as a separate (loose) coupler. *See Kalle USA, Inc. v. United States*, 273 F. Supp. 3d 1319, 1326 (Ct. Int'l Trade 2017) ("The 'General Rules of Interpretation govern classification of merchandise under the HTSUS ....'" (quoting *Honda of Am. Mfg., Inc. v. United States*, 607 F.3d 771, 773 (Fed. Cir. 2010))), *aff'd*, 923 F.3d 991 (Fed. Cir. 2019).

102. Commerce's 2023 memoranda, which recognized that AD/CVD duty deposits would not be collected when subject couplers were attached to rail cars excluded from entry, established when the AD/CVD orders would apply and were issued in accordance with applicable statutory and regulatory requirements.

103. The Determination concludes that couplers "attached to rail cars are subject to the payment of antidumping and countervailing duties" and "{c}onsequently, Greenbrier's rail cars are not freight cars 'on which no duty is owed' under 19 C.F.R. § 141.4(b)(4)." Attachment B, CBP Det. at 15. That conclusion violates governing statutory provisions and regulations, cannot be reconciled with the Harmonized Tariff Schedule, and exceeds Customs' lawful authority by seeking to change the scope of the AD/CVD orders.

104. The Determination asserts that there was no "record evidence that Greenbrier's railcars with {couplers} from Mexico mounted to them qualify for preferential treatment under the USMCA." *Id.* at 14. That assertion is baseless, arbitrary, and unreasoned.

105. Customs' assertion is flatly contrary to TRLED's earlier finding that Greenbrier's freight cars are duty free under the HTSUS. *See* Attachment A, TRLED Det. at 25 n.224. It also is contrary to record evidence, which the Determination does not address or even mention.

106. Greenbrier provided USMCA certifications, and CBP examined those certifications at verification and did not identify any discrepancies. CBP had also previously confirmed the validity of USMCA certifications issued by Greenbrier with respect to the originating status of its rail cars manufactured in Mexico.

107. The Determination suggests that AD/CVDs are "duties" within the meaning of the NAFTA Act § 681 and 19 C.F.R. § 141.4(b)(4) and, as a result, any merchandise within the scope of AD/CVD orders is subject to entry requirements. *See* Attachment B, CBP Det. at 15 (Freight rail couplers "attached to rail cars are subject to the payment of antidumping and countervailing duties. Consequently, Greenbrier's rail cars are not freight cars 'on which no duty is owed' under 19 C.F.R. § 141.4(b)(4)."). That reverses the order of the analysis that Congress required and is both unlawful and contrary to statutory requirements.

108. Congress directed parties to reference specific sections of the Harmonized Tariff Schedule to determine whether a rail car and its attached components are duty free. The text of the exemption ("freight cars classified in heading 8606, HTSUS, on which no duty is owed") makes the inquiry classification-specific: for freight cars, the question is, first, whether the article is "classified in heading 8606," and, second, whether any "duty is owed" on that classification. AD/CVDs are not listed on the Harmonized Tariff Schedule and, as a matter of plain text, are not relevant to the analysis that Congress required.

109. Nor does it make sense to interpret the word "duty" in this context to encompass duties that apply under AD/CVD orders. AD/CVD orders apply only if and when products are

entered—which is when the unfair trade practices that AD/CVD orders are designed to address come into play. Congress relied on the Harmonized Tariff Schedule to allow all parties to understand when rail cars and other instruments of commerce are (or are not) subject to entry requirements.

110. The statute authorizing AD/CVDs explicitly *distinguishes* AD/CVDs from "normal customs duties on {} merchandise." 19 U.S.C. §§ 1671e(a), 1673e(a). Case law and agency precedent are in accord that AD/CVDs do *not* qualify as ordinary "customs duties." *See APEX Exps. v. United States*, 777 F.3d 1373, 1379 (Fed. Cir. 2015) ("Commerce considers antidumping duties as distinct from normal selling expenses and customs duties."); *Dynacraft Indus., Inc. v. United States*, 24 C.I.T. 987, 992 (2000) ("antidumping and countervailing duties were never intended to be regular or general duties"); CBP Ruling HQ H244253 (Sept. 4, 2014) ("antidumping and countervailing duties are not the same as customs duties").

111. Customs' approach would undermine Congress's intent and the scope determinations that Commerce made when issuing the AD/CVD orders. Congress deliberately exempted certain rail cars from entry by reference to the Harmonized Tariff Schedule. Congress did so to streamline commerce by rail at the border. *See* S. Rep. No. 103-189, at 100–01 (exemptions passed to address the concern that "entry requirements on locomotives and rail cars have been burdensome since equipment repeatedly crossing the border for subsequent use in domestic service in the United States must be entered each time"). If Customs could order the entry of goods that Congress exempted by rewriting AD/CVD orders, Congress's authority would be illusory.

**B. The Determination Violates the Statutory Entry Exemption for Instruments of International Traffic**

112. Greenbrier's rail cars also fall under the statutory exemption for IITs. *See* Pub. L. No. 103-182, § 681(c), 107 Stat. at 2218. Congress added Note 4 to Subchapter III of Chapter 98 of the Harmonized Tariff Schedule, which provides that "{i}nstruments of international traffic, such as containers, lift vans, *rail cars* and locomotives, truck cabs and trailers, etc. are exempt from formal entry procedures." HTSUS ch. 98, subch. III, note 4 (emphasis added).

113. That statutory language is straightforward and dispositive: Greenbrier's rail cars (and their attached couplers) qualify as IITs because they routinely travel between Mexico and the United States and satisfy the definition of IITs under the statute, regulations, and guidance. *See* Attachment A, TRLED Det. at 23–24 (describing rail cars and their travel into the U.S.); Attachment G, Customs Directive ¶ 4.4 (noting all rail cars "in common commercial" use in North America "will eventually be used in international traffic").

114. Greenbrier's rail cars operate within the North American rail network, a continent-wide interchange system governed by the Interchange Agreement. Administered by the Association of American Railroads, the agreement establishes rigorous construction and maintenance standards for freight railroads, interchange freight car owners, and running repair agents throughout North America. These uniform standards allow rail cars and locomotives to move among carriers and undergo repairs without undue delay, supporting continuous transportation across the United States, Canada, and Mexico. The Interchange Agreement reflects a longstanding commercial reality recognized by Congress, CBP regulations, and U.S., Canadian, and Mexican transportation authorities: rail equipment functions as transportation equipment in international traffic, not as merchandise subject to repeated entry formalities whenever it crosses a border.

115. Customs' refusal to recognize Greenbrier's IIT status is unlawful, arbitrary, and unreasonable.

116. Greenbrier's rail cars are "domestic" as the term is used in the regulations because they are "regularly imported into{} the United States." 19 C.F.R. § 123.12(d). "{R}egularly imported" is not defined in the regulations, but the rail cars are regularly imported under any ordinary understanding of that term because they are regularly admitted into the United States in their use in international traffic. *See Regularly*, Merriam-Webster.com (Oct. 14, 2026), https://www.merriam-webster.com/dictionary/regularly.

117. As Customs has previously acknowledged, all rail cars "in common commercial" use in North America "will eventually be used in international traffic." Attachment G, Customs Directive ¶ 4.4.

118. Sales by Greenbrier in connection with the rail cars' admission (but not entry) into the United States do not change the rail cars' "domestic" status. Analogous Customs rulings make clear that goods do not lose IIT status by virtue of a sale as long as, post-sale, they continue to be used in international traffic. *See* CBP Entry Ruling HQ 223423 (Dec. 2, 1991); CBP Entry Ruling HQ 224192 (Oct. 13, 1992).

119. When the rail cars are brought into the United States, whether empty or not, they are instruments of international traffic under precedent, policy statements, and practice, and, accordingly, are not subject to entry requirements (and, hence, no AD/CVD orders apply).

120. Where, as here, a rail car is the type of rail car used in international traffic, it qualifies unless an exception applies under 19 C.F.R. § 10.41(d). That exception only applies to "Foreign-owned" rail cars and, therefore, does not apply to Greenbrier's rail cars. Moreover, no contrary finding was made. It makes no sense to apply a different, more restrictive standard to rail

cars—particularly because Congress designated rail cars as IITs. *Cf.* 19 C.F.R. § 10.41a(a) (providing that certain vehicles and containers qualify as IITs when "arriving (whether loaded *or empty*) in use *or to be used* in the shipment of merchandise in international traffic" (emphasis added)).

**C. The Determination Is an Unreasoned Imposition of Retroactive Duties That Violates Decades of Practice and Basic Requirements of Due Process**

121. The Determination announced a new rule that is contrary to Customs' longstanding practice and policy. Customs' failure to explain in any meaningful way the reason for its departure (a) is unreasonable and arbitrary and capricious, 19 U.S.C. § 1517(g)(2)(B); and (b) violates Greenbrier's due process rights because it deprives Greenbrier of fair notice while imposing retroactive assessments, U.S. Const. amend. V.

122. In concluding that Greenbrier's rail cars are subject to duties, Customs disregarded (a) its own Directive from 2000 stating that rail cars built in Mexico or Canada for use in the United States (even if shipped empty) are not subject to entry, and thus not subject to duties, *see* Attachment G, Customs Directive ¶ 4.1; and (b) memoranda issued in 2023 by Commerce defining the scope of the AD/CVD orders and stating that Customs did not have authority to assess duties on couplers attached to rail cars. *See* Attachments C, March 2 Mem.; D, Preliminary Scope Decision; E, Final Scope Decision.

123. Greenbrier and others were entitled to rely on the statements made in those documents and precedents, and Customs' Determination seriously undermines those established reliance interests without following the procedures or providing the reasoned explanation that the law requires.

124. For more than 25 years, Customs' 2000 Directive has provided that "{n}ew locomotives, railcars, and other railroad equipment (but not parts), built in Mexico or Canada for

use in the U.S., *do not require that an entry be filed* in order to qualify for carrying merchandise or passengers between points in the U.S., per the specific cite in 19 CFR 141.4(b)(4)." Attachment G, Customs Directive ¶ 4.1 (emphasis added). Greenbrier adhered to that directive, and it was correct to do so.

125. The Directive's parenthetical excluding "parts" can only be read to refer to unattached or freestanding parts (as opposed to parts that are attached to or part of a rail car) because only loose parts are imported under their own classifications under the Harmonized Tariff Schedule. *See, e.g.*, HTSUS 8607.19.03 (axles); HTSUS 8607.19.12 (wheels); HTSUS 8607.21.10 (air brakes); HTSUS 8607.30.10 (couplers).

126. That is also the only reading that coheres with Commerce's and Customs' longstanding application of the Harmonized Tariff Schedule. For example, in the initiation of the underlying AD/CVD investigations, Commerce acknowledged that couplers "attached to finished rail cars may also enter under HTSUS statistical reporting numbers 8606.10.0000, 8606.30.0000, 8606.91.0000, 8606.92.0000, 8606.99.0130, {or} 8606.99.0160," 87 Fed. Reg. at 64444—all statistical suffixes within HTSUS heading 8606 which applies to rail cars. Commerce and Customs have interpreted § 141.4(b)(4) in this way for years.

127. The Customs Directive also provides that the entry exemption for new rail cars "includes new locomotives or railcars *arriving empty*, new railcars arriving with a loaded shipment, and used equipment being sold or transferred from a foreign carrier to a domestic carrier." Attachment G, Customs Directive § 4.2 (emphasis added).

128. The Customs Directive further distinguishes between components of an *assembled* rail car and a rail car's "loaded shipment." *Id.* § 4.3. Section 4.3 provides that "{i}f arriving with a loaded shipment, the new locomotive or railcar will not require an entry, but the shipment may."

*Id.* (emphasis added). In other words, in the case of a locomotive pulling new rail cars carrying loose couplers, the loose couplers—*i.e.*, the "shipment"—could well require entry, but the couplers in use as part of the freight train would not. Attachment G, Customs Directive §§ 4.2, 4.3.

129. TRLED brushed aside the 2000 Customs Directive on the view that the directive was purportedly "replaced by guidance set forth in the August 2012 CBP Informed Compliance Publication on IIT (CBP IIT Handbook)." Attachment A, TRLED Det. at 16 n.154. That was clear error. Nothing in the Handbook purports to replace or supersede the 2000 Directive; the Directive is not mentioned at all. *See generally* CBP IIT Handbook. The Handbook reiterates that its "guidance related to foreign locomotives and foreign railroad equipment does not apply to such locomotives and equipment that are already exempt from entry or payment of duty under 19 C.F.R. § 141.4(b)(4)." *Id.* at 18–19.

130. As Greenbrier explained in briefing for the administrative review, there was no merit to Customs' position that the 2000 Customs Directive had been revoked. In its final administrative determination, Customs did not address its 2000 Customs Directive other than to note that the Coalition (Alleger) alleged that the 2000 Customs Directive was superseded. Attachment B, CBP Det. at 9. There was no such finding by Customs in the Final Administrative Determination.

131. Customs also violated and impermissibly departed without reasoned explanation from Commerce's 2023 memoranda clarifying the scope of the AD/CVD orders.

132. The 2023 memoranda recognize that AD/CVD orders trigger duty deposit obligations *only if* the subject merchandise is entered into the United States for consumption. If a product, article, or instrument of international traffic is not entered, the AD/CVD orders do not apply, and no duties under those orders are owed. *See* Attachment D, Preliminary Scope Decision

at 19 (Commerce "can only order the suspension of liquidation of and the posting of AD/CVD cash deposits on subject merchandise entered, or withdrawn from warehouse, for consumption into the United States").

133. The 2023 memoranda further recognized that couplers are *not* entered for consumption if the rail car to which they are attached is exempt from entry, *even if* the couplers would otherwise fall within the scope of the AD/CVD orders. *See* Attachment E, Final Scope Decision at 15 (holding that the coupler must be entered and AD/CVDs assessed only if *both* "a freight rail car is subject to entry (*i.e.*, not exempt from entry under 19 CFR 141.4(b)(3) or (b)(4)), *and* an attached freight rail coupler is within the scope of an AD/CVD order" (emphasis added)).

134. Moreover, because non-entered articles are not within the scope of the AD/CVD orders, Customs "*lack{s} the legal authority* to subject freight rail couplers to AD/CVD if the couplers are attached to freight rail cars which are exempt from entry under 19 C.F.R. § 141.4(b)(3) or (b)(4)." Attachment C, March 2 Mem. at 2 (emphasis added); *see also* Attachment E, Final Scope Decision at 15 ("nor does the scope purport to cover non-consumption entries").

135. It is a fundamental tenet of trade law that "importers have a right to be informed about customs rules and regulations, as well as interpretive rulings, and to expect certainty that the Customs Service will not unilaterally change the rules without providing importers proper notice and an opportunity for comment." *Int'l Custom Prods., Inc. v. United States*, 748 F.3d 1182, 1187 (Fed. Cir. 2014) (quotation marks omitted). It is also a fundamental rule of administrative law that, when reliance interests are at stake, an agency cannot change policy and precedent without providing a reasoned explanation for changing its position. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). The Determination also departs from more than 25 years of guidance without even acknowledging that it is changing course.

136. In this case, Customs' about-face upends years of settled expectations and imposes significant and impermissible retroactive liability for conduct Greenbrier had no warning could be a source of liability.

137. Even assuming Customs could lawfully exercise authority without violating the statutory requirements, such a dramatic policy shift requires full-dress notice-and-comment, including an acknowledgment and an explanation for its change in approach. The relevant statutory provisions state that interpretive rulings that would "have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions" may be adopted only following notice-and-comment requirements. 19 U.S.C. § 1625(c).

138. In this case, Customs rejected these mandatory procedural steps while acknowledging that it was using this evasion proceeding to adopt a prospective policy shift. *See, e.g.*, *Int'l Custom Prods.*, 748 F.3d at 1189 (holding that action by Customs to reclassify all pending and future white sauce entries effectively revoked a prior ruling letter and was void because the agency failed to comply with 19 U.S.C. § 1625(c)'s notice-and-comment requirements).

139. The Determination is also a textbook due process violation because the agency reversed its decades-long understanding of the relevant statutory scheme, depriving Greenbrier of fair notice and imposing retroactive penalties for conduct previously deemed permissible. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155–56 (2012); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994).

## CLAIMS FOR RELIEF

## COUNT I

### Agency Action Not in Accordance With Law and in Excess of Statutory Authority 19 U.S.C. § 1517(g)(2); 5 U.S.C. § 706

140. Greenbrier realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 139 above, as if fully stated here.

141. Under § 1517(g)(2)(B), a court must set aside agency action that is not in accordance with law or in excess of statutory authority. *See* 19 U.S.C. § 1517(g)(2); 5 U.S.C. § 706. It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). When an agency fails to follow the statutory text, it does not act in accordance with law. *See id.* An agency action is invalid if it exceeds the power conferred upon the agency by the statute. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 104–05 (2015).

142. Moreover, Commerce defines the binding scope of its AD/CVD investigations in its orders and through "scope rulings, memoranda," and other documents. 19 C.F.R. § 351.225(k)(1)(i)(C). "The authority to clarify the scope of AD and CVD orders rests solely with Commerce." *OTR Wheel Eng'g*, 37 C.I.T. at 414. Customs has no authority to change the scope of the AD/CVD orders or to extend the orders to impose duties on out-of-scope merchandise as determined by Commerce. *See* 19 C.F.R. § 165.16(a).

143. The relevant statutory provisions and the plain text of the Harmonized Tariff Schedule require that USMCA-originating freight rail cars are exempted from entry and duties. *See* Pub. L. No. 103-182, § 681(b)(1) & (c), 107 Stat. at 2217–18; 19 C.F.R. § 141.4(b)(4).

144. Commerce's 2023 memoranda define the scope of the AD/CVD orders as not encompassing rail cars and their attached couplers, which are exempt from entry. *See* Attachments C, March 2 Mem.; D, Preliminary Scope Decision; E, Final Scope Decision.

145. The Determination is not in accordance with law and exceeds Customs' lawful authority because it imposes duties—and requires both the prospective and retrospective payment of AD/CVD duty deposits and duties—on couplers attached to freight rail cars that are not themselves subject to duties or entry under the Harmonized Tariff Schedule.

146. The Determination is also not in accordance with law and exceeds Customs' lawful authority because it seeks to change the scope of the AD/CVD orders in violation of Commerce's binding scope rulings and memoranda.

**COUNT II**

**Agency Action Not in Accordance With Law and in Excess of Statutory Authority**
**19 U.S.C. § 1517(g)(2); 5 U.S.C. § 706**

147. Greenbrier realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 146 above, as if fully stated here.

148. A court must set aside agency action that is not in accordance with law or in excess of statutory authority. *See* 19 U.S.C. § 1517(g)(2); 5 U.S.C. § 706. It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp.*, 573 U.S. at 328. When an agency fails to follow the statutory text, it does not act in accordance with law. *See id.* An agency action is invalid if it exceeds the power conferred upon the agency by the statute. *See Perez*, 575 U.S. at 104–05.

149. Greenbrier's rail cars fall under the NAFTA Act's exemption for IITs. *See* Pub. L. No. 103-182, § 681(c), 107 Stat. at 2218. Congress added Note 4 to Subchapter III of Chapter 98 of the HTSUS, which provides that "{i}nstruments of international traffic, such as containers, lift

vans, *rail cars* and locomotives, truck cabs and trailers, etc. are exempt from formal entry procedures." HTSUS ch. 98, subch. III, note 4 (emphasis added).

150. The Determination impermissibly and unlawfully requires Greenbrier to submit to formal entry procedures and pay duties on rail cars that are exempt because they qualify as IITs.

**COUNT III**

**Agency Action That Is Arbitrary and Capricious and an Abuse of Discretion**
**19 U.S.C. § 1517(g)(2); 5 U.S.C. § 706**

151. Greenbrier realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 150 above, as if fully stated here.

152. A court must set aside agency action that is arbitrary and capricious, an abuse of discretion, inconsistent with the requirements of reasoned decision-making, or without observance of procedure required by law. *See* 19 U.S.C. § 1517(g)(2); 5 U.S.C. § 706.

153. An action is arbitrary and capricious if an agency fails to articulate a satisfactory explanation for its actions, fails to respond adequately and reasonably to comments and objections, or departs from precedent without a reasoned or reasonable explanation.

154. An action is also arbitrary and capricious if an agency ignores relevant record evidence or takes positions that are not supported by evidence in the record. An action is an abuse of discretion when the agency relies on factual findings that are not supported by substantial evidence.

155. It is a fundamental tenet of trade law that "importers have a right to be informed about customs rules and regulations, as well as interpretive rulings, and to expect certainty that the Customs Service will not unilaterally change the rules without providing importers proper notice and an opportunity for comment." *Int'l Custom Prods.*, 748 F.3d at 1187 (quotation marks omitted).

156. Customs has not acted consistent with the requirements of reasoned decision-making because it has not adequately responded to objections, provided a reasoned justification for its departure from precedent, or reasonably explained its new policy position.

157. Customs has also not acted consistent with the requirements of reasoned decision-making because its Determination is not supported by substantial record evidence and because it ignores and is inconsistent with relevant record evidence.

158. Customs has also not acted consistent with the requirements of reasoned decision-making because its Determination seeks to change legal requirements without providing proper notice and an opportunity for comment.

159. Accordingly, even if Congress had granted Customs authority to impose entry requirements on rail cars and duties on their attached couplers, notwithstanding the requirements of the Harmonized Tariff Schedule and Commerce's scope rulings, as reflected in its 2023 memoranda, the agency has not exercised that authority consistent with the requirements of reasoned decision-making and the Constitution's separation of powers.

160. The Determination cannot be allowed to stand because it is arbitrary and capricious and an abuse of discretion.

## COUNT IV

### Unreasonable and Impermissible Retroactive Agency Action
### U.S. Const. amend. V; 19 U.S.C. § 1517(g)(2); 5 U.S.C. § 706

161. Greenbrier realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 160 above, as if fully stated here.

162. A court must set aside agency action that is contrary to law and contrary to any constitutional right, power, privilege, or immunity. *See* 19 U.S.C. § 1517(g)(2); 5 U.S.C. § 706(2).

163. When Congress authorizes an agency to make certain determinations, the agency must demonstrate that it is acting reasonably and within the scope of that authority. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020). Agency action is arbitrary and capricious if the agency "change{s} its course" but fails to "supply a reasoned analysis" for the change. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

164. The Due Process Clause of the U.S. Constitution requires fair notice and prohibits retroactive duties or penalties. U.S. Const. amend. V.

165. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fox Television Stations*, 567 U.S. at 253. "{A}gencies should provide regulated parties 'fair warning of the conduct" a regulation "prohibits or requires" and not take actions that result in "unfair surprise." *Christopher*, 567 U.S. at 156 (citations omitted). Due process "also protects the interests in fair notice and repose that may be compromised by retroactive" government action. *Landgraf*, 511 U.S. at 266.

166. For decades, Customs has directed that freight rail cars manufactured in North America and their attached couplers are exempt from duties. *See* Attachment G, Customs Directive § 4.1 (emphasis added); *see also id.* § 4.4 (applying same principles for IITs); Attachments C, March 2 Mem.; D, Preliminary Scope Decision; E, Final Scope Decision.

167. Greenbrier imported rail cars connected by in-use couplers, and the rail cars themselves were exempt from entry. *See* Attachment A, TRLED Det. at 25 & n.224 (acknowledging that the rail-car-coupler composite is listed in HTSUS 8606, which qualifies the rail cars for a "free rate of duty"). Because the couplers were "attached to freight rail cars which are exempt from entry," Greenbrier correctly treated the couplers as also exempt. Attachments C,

March 2 Mem. at 2; D, Preliminary Scope Decision; E, Final Scope Decision. The Determination upends that longstanding policy without sufficient reasoned analysis for the change and without adequately responding to significant objections raised by Greenbrier.

168. The Determination cannot be allowed to stand because it violates due process and does not follow procedures necessary to impose massive retroactive liability for conduct that was lawful when it occurred.

## COUNT V

### Agency Action Not in Accordance With Law and in Excess of Statutory Authority 19 U.S.C. § 1517(g)(2); 5 U.S.C. § 706

169. Greenbrier realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 168 above, as if fully stated here.

170. CBP's Determination requires the recovery of retroactive duties for rail cars that were transported into the United States but that were not formally entered and, under then-existing procedures and electronic systems, were not capable of being entered.

171. Because articles for which entry is not required are not within the scope of the AD/CVD orders, Customs "*lack{s} the legal authority* to subject freight rail couplers to AD/CVD if the couplers are attached to freight rail cars which are exempt from entry under 19 C.F.R. § 141.4(b)(3) or (b)(4)." Attachment C, March 2 Mem. at 2 (emphasis added); *see also* Attachment E, Final Scope Decision at 15 ("nor does the scope purport to cover non-consumption entries").

172. The Determination and any collection of AD/CVD duties or deposits thereon cannot be allowed to stand because the Determination is not in accordance with law and in excess of statutory authority.

## COUNT VI

**Agency Action That Is Arbitrary and Capricious and an Abuse of Discretion and Not in Accordance With Law**
**19 U.S.C. § 1517(g)(2); 5 U.S.C. § 706**

173. Greenbrier realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 172 above, as if fully stated here.

174. Couplers attached to rail cars are not lawfully within the scope of Commerce's AD/CVD investigations because they do not cause injury cognizable in the United States by reason of import. 19 U.S.C. § 1673d(b)(1); *see also id.* § 1671d(b)(1); *see also Wabtec Corp. v. United States*, Slip Op. 26-122.

175. Moreover, including couplers that are attached to rail cars as being within the scope of Commerce's AD/CVD orders is impermissible. The AD/CVD orders cannot apply to products that cannot cause injury by reason of import. The inclusion of both attached couplers and loose, unattached couplers within the scope of products covered by a material injury determination masks that attached couplers cannot cause injury by reason of import. *See Wabtec Corp. v. United States*, Slip Op. 26-122.

176. Because it is not possible for couplers attached to rail cars to cause cognizable injury to domestic industry by reason of import, and because Commerce has never justified including attached couplers within the scope of its AD/CVD orders, Customs should have referred the question to Commerce under 19 C.F.R. § 165.16 before finding an EAPA violation. Customs' failure to take that step is arbitrary, capricious, and an abuse of discretion.

## PRAYER FOR RELIEF

WHEREFORE, Greenbrier requests that the Court enter the following relief:

A. A declaration that TRLED's May 18, 2026 determination and Customs' September 25, 2026 final administrative determination are contrary to law and in excess of Customs' statutory

authority because they violate the statutory exemptions for USMCA-originating freight rail cars in the Harmonized Tariff Schedule of the United States and are therefore null, void, and unenforceable.

B. A declaration that TRLED’s May 18, 2026 determination and Customs’ September 25, 2026 final administrative determination violate the statutory exemptions for instruments of international traffic and are therefore null, void, and unenforceable.

C. A declaration that TRLED’s May 18, 2026 determination and Customs’ September 25, 2026 final administrative determination are arbitrary and capricious and an abuse of discretion and are therefore null, void, and unenforceable.

D. A declaration that TRLED’s May 18, 2026 determination and Customs’ September 25, 2026 final administrative determination attempt to impose retroactive liability, violating the Fifth Amendment’s Due Process Clause, and are therefore null, void, and unenforceable.

E. A declaration that TRLED’s May 18, 2026 determination and Customs’ September 25, 2026 final administrative determination, which purport to require the recovery of retroactive duties for rail cars that were transported into the United States but that were not formally entered, are not in accordance with law and are in excess of statutory authority.

F. A declaration that TRLED’s May 18, 2026 determination and Customs’ September 25, 2026 final administrative determination are arbitrary, capricious, and an abuse of discretion because couplers attached to rail cars are not lawfully within the scope of Commerce’s AD/CVD investigations.

G. Enter an order enjoining Customs from imposing further duties pursuant to TRLED’s May 18, 2026 determination or Customs’ September 25, 2026 final administrative determination unless and until the agency complies with any procedures required by law.

H. Enter an order requiring Customs to return any and all AD/CVD duties and deposits, other duties, and fees that have been unlawfully imposed and deposited with Customs with respect to rail cars to which couplers were attached that are covered by this action.

I. Enter an order requiring an award of fees and costs, plus interest accruing thereon, under 28 U.S.C. § 2412.

J. Grant such other and further relief as the Court may deem appropriate.

Dated: October 15, 2026

Respectfully submitted,

/s/ *J. Michael Taylor*

J. Michael Taylor
Ashley C. Parrish
Patrick J. Togni
Daniel L. Schneiderman
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500

*Counsel for The Greenbrier Companies, Inc. and its subsidiaries Greenbrier Central, LLC; Greenbrier-Concarril, LLC; Greenbrier Leasing Company LLC; Greenbrier-GIMSA, LLC; Gunderson-GIMSA S.A. de C.V.; and Gunderson-Concarril S. de R.L. de C.V.*

# Attachment A

1300 Pennsylvania Avenue, NW
Washington, DC 20229

U.S. Customs and Border Protection

**May 18, 2026**

**PUBLIC VERSION**

Coalition of Freight Coupler Producers
c/o Daniel B. Pickard
Buchanan Ingersoll & Rooney PC
1700 K Street, N.W., Suite 300
Washington, DC 20006-3807
daniel.pickard@bipc.com

The Greenbrier Companies, Inc.
c/o Patrick J. Togni
King & Spalding
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006-4706
ptogni@kslaw.com
tservice@kslaw.com

**RE: EAPA Case 8183 – Notice of Determination as to Evasion**

---

To the Counsel and Representatives of the above-referenced entities:

Pursuant to an examination of the record in Enforce and Protect Act (EAPA) Investigation 8183, U.S. Customs and Border Protection (CBP) has determined there is substantial evidence that The Greenbrier Companies, Inc.[1] (Greenbrier) evaded the antidumping (AD) duty order A-201-857 on certain freight rail couplers and parts thereof (FRCs) from Mexico and/or the antidumping (AD) duty order and countervailing duty (CVD) orders, A-570-145 and C-570-146, on FRCs from the People's Republic of China (China) (collectively, the *FRC Orders*).[2] CBP determined that there is substantial evidence that Greenbrier evaded the *FRC Orders* by failing to file entries for consumption for FRCs imported into the United States. As a result, no cash deposits were applied to the merchandise at the time of entry. The basis for CBP's determination is explained below.

---

[1] The Greenbrier Companies, Inc. (formerly Gunderson) is the parent company of Greenbrier Central LLC (Greenbrier Central), Greenbrier Concarril S.de R.L. de C.V (Greenbrier Concarril), Greenbrier Leasing Company LLC (Greenbrier Leasing), Greenbrier-GIMSA, LLC (Greenbrier-GIMSA), Gunderson-GIMSA S.A. de C.V. (Gunderson GIMSA) and Gunderson Concarril S.A. de C.V (Gunderson Concarril).

[2] *See Certain Freight Rail Couplers and Parts Thereof from Mexico: Antidumping Duty Order, 88 FR 78308 (November 15, 2023); Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Antidumping Duty Order,* 88 FR 45138 (July 14, 2023)*; and Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Countervailing Duty Order,* 88 FR 45135 (July 14, 2023).

The *FRC Orders* define the scope of covered merchandise as follows:[3]

> Freight railcar couplers are composed of two main parts, namely knuckles and coupler bodies but may also include other items (*e.g.*, coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and rotors). The parts of couplers that are covered by the order include: (1) E coupler bodies, (2) E/F coupler bodies, (3) F coupler bodies, (4) E knuckles, and (5) F knuckles, as set forth by the Association of American Railroads (AAR). The freight rail coupler parts (*i.e.*, knuckles and coupler bodies) are included within the scope of the order when imported separately. Coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and rotors are covered merchandise when imported in an assembly but are not covered by the scope when imported separately.
>
> Subject freight railcar couplers and parts are included within the scope whether finished or unfinished, whether imported individually or with other subject or non-subject parts, whether assembled or unassembled, whether mounted or unmounted, or if joined with non-subject merchandise, such as other non-subject parts or a completed railcar. Finishing includes, but is not limited to, arc washing, welding, grinding, shot blasting, heat treatment, machining, and assembly of various parts. When a subject coupler or subject parts are mounted on or to other non-subject merchandise, such as a railcar, only the coupler or subject parts are covered by the scope.
>
> The finished products covered by the scope of this order meet or exceed the AAR specifications of M-211, "Foundry and Product Approval Requirements for the Manufacture of Couplers, Coupler Yokes, Knuckles, Follower Blocks, and Coupler Parts" and/or AAR M-215 "Coupling Systems," or other equivalent domestic or international standards (including any revisions to the standard(s)).
>
> The country of origin for subject couplers and parts thereof, whether fully assembled, unfinished or finished, or attached to a railcar, is the country where the subject coupler parts were cast or forged. Subject merchandise includes coupler parts as defined above that have been further processed or further assembled, including those coupler parts attached to a railcar in third countries. Further processing includes, but is not limited to, arc washing, welding, grinding, shot blasting, heat treatment, painting, coating, priming, machining, and assembly of various parts. The inclusion, attachment, joining, or assembly of non-subject parts with subject parts or couplers either in the country of manufacture of the in-scope product or in a third country does not remove the subject parts or couplers from the scope. …

## I. Background & Procedural History (Pre-Interim Measures)

*Allegations, Formal Receipt, and Initiation*

[3] *Id.*

On March 5, 2025, the Coalition of Freight Coupler Producers (the Alleger)[4] filed an EAPA allegation against Greenbrier, and on April 18, 2025 it supplemented the allegation.[5] On April 24, 2025, in accordance with 19 C.F.R. § 165.12(a), the Trade Remedy Law Enforcement Directorate (TRLED), within CBP's Office of Trade, acknowledged receipt of the properly filed Allegation.[6]

To support its Allegation, the Alleger provided:

1. An affidavit from Names and Title affirming Greenbrier imported couplers into the United States without paying the applicable AD/CVD duties based on [Person] conversations with officials from [ Name and Action ].[7]

2. A [ Information from Source report regarding Greenbrier's business activities, notably:

   - Greenbrier has significant manufacturing operations in Mexico for the production of new railcars.[8]
   - The company had plans in 2024 to deliver 25,000 cars globally and has a sizeable presence in the North American railcar market, holding a 39 percent overall share of the order portfolio of around 37,000 railcars among U.S. manufacturers that year.[9]
   - Greenbrier [ Information from Source .][10]
   - A copy of [ Information from Source ].[11]

---

[4] The Alleger's members include McConway & Torley, LLC (a producer of the domestic like product in the United States) and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial Service Workers International Union; therefore, it qualifies for interested party status pursuant to 19 U.S.C. § 1517(a)(6) and 19 C.F.R. §165.1.

[5] *See* the Alleger's letters, "Certain Freight Rail Couplers and Parts Thereof from Mexico and the People's Republic of China: Request for an Investigation under the Enforce and Protect Act," dated March 5, 2025 (March 5, 2025 Allegation); and "Certain Freight Rail Couplers and Parts Thereof from Mexico and the People's Republic of China: Supplemental Information to Request for an Investigation under the Enforce and Protect Act," dated April 18, 2025 (April 18, 2025 Allegation Supplement) (collectively, Allegation).

[6] *See* Email from CBP, "EAPA Case 8183 – Official Receipt of Allegations," dated April 24, 2025.

[7] *See* Allegation Supplement at Exhibit 4.

[8] *See* Allegation at Exhibit 1A for Greenbrier website, "Gunderson Rail Services Changes Name to Greenbrier Rail Services" indicating that "Greenbrier Rail Services operates one of the largest railcar service networks in North America with 35 strategically located facilities specializing in railcar repair and maintenance, complete wheel services, axle finishing, and the manufacturing and sale of freight car components, such as doors, cushioning units, couplers, yokes, and associated parts" in addition to building "new railroad freight cars in its three manufacturing facilities in the U.S. and Mexico and marine barges at its U.S. facility."

[9] *Id*. at Exhibit 4.

[10] *Id*.

[11] *Id*.

- According to the [ Information from Source ] to which couplers are attached.[12]

3. Trade data indicating Greenbrier imported individual FRCs from Mexico under HTS code 8607.30 during the period of investigation.[13]

Accordingly, CBP determined that the evidence on the record reasonably suggested that Greenbrier failed to declare that the Mexican-origin and/or Chinese-origin FRCs were covered merchandise on entry to the United States to evade paying duties pursuant to the *FRC Orders*. Consequently, CBP initiated the investigation on May 15, 2025, against Greenbrier shipments of merchandise that are alleged to be entered for consumption into the customs territory of the United States through evasion.[14] The shipments covered by this period of investigation (POI) are those entered for consumption, or withdrawn from warehouse for consumption, from April 24, 2024, through the pendency of this investigation.[15]

## II. <u>Interim Measures & Post Interim Measures</u>

*Interim Measures*

Not later than ninety (90) calendar days after initiating an investigation under EAPA, TRLED will decide, based on the record of the investigation, if there is reasonable suspicion that merchandise covered by an AD or countervailing duty (CVD) order was entered into the United States through evasion.[16] CBP need only have sufficient evidence to support a reasonable suspicion that the importer alleged to be evading entered merchandise covered by an AD or CVD order into the United States by a materially false statement or act, or material omission that resulted in the reduction or avoidance of applicable AD or CVD cash deposits or other security. If reasonable suspicion exists, CBP will impose interim measures pursuant to 19 U.S.C. § 1517(e) and 19 C.F.R. § 165.24.

After initiation, CBP issued three CF-28s to Greenbrier Central and Gunderson Concarril,[17] and conducted research on inconsistencies in Greenbrier trade data.[18] After evaluating the information on the record, CBP issued its Notice of Initiation of an Investigation and Interim Measures on August 20, 2025.[19] TRLED determined that there was a reasonable suspicion that Greenbrier failed to declare entries of covered merchandise as type 03, thus avoiding payment of

[12] *Id.*
[13] *See* Allegation at page 13 and Allegation Supplement at Exhibit 1.
[14] *See* CBP Memorandum to the File, "Initiation of Investigation for EAPA Case Number 8183," dated May 15, 2025 (Initiation Memo). *See also* 19 U.S.C. § 1517(b)(1); 19 C.F.R. § 165.15.
[15] *See* TRLED letter titled, "Notice of Initiation of Investigation and Interim Measures - EAPA Case 8183" (NOI), dated August 20, 2025.
[16] *See* 19 U.S.C. § 1517(e); *see also* 19 C.F.R. § 165.24(a).
[17] *See* June 6, 2025 CF-28 requests for information for entries [ Code ]9435, [ Code ]3566, and EMK-0135[ #s ].
[18] *See* CBP Memorandum to File, "Supplemental Information to the Administrative Record of EAPA Case 8183," dated August 11, 2025.
[19] *See* NOI.

the applicable cash deposits on those entries.[20] TRLED's findings were based on the record evidence at the time, namely the information provided in the Allegation—an affidavit from an [ Information from Source ] declarant; information from [Information from Source ]; [ Information from Source ]; and trade data showing that Greenbrier imported individual FRCs from Mexico during the POI. TRLED also found multiple discrepancies between the Allegation's trade data and official CBP records, including a lack of detailed merchandise descriptions and inconsistent treatment of shipments containing merchandise with the same description.[21]

*Requests for Information (RFI)*

On August 27, 2025, CBP issued requests for information (RFI) to Greenbrier Central (railcar manufacturer in the United States) and Gunderson-GIMSA (railcar manufacturer in Mexico).[22] On September 4, 2025, CBP issued individual RFIs to Chinese suppliers Ningbo Tuoxing Precision Casting Co., Ltd. (Ningbo Tuoxing or Supplier I), Rizhao Jintai Machinery Manufacture Co., Ltd. (Rizhao Jintai or Supplier II), and Sichuan Y&J Industries Co., Ltd. (Sichuan Y&J or Supplier III).[23] On September 16, 2025, Greenbrier Central and Gunderson-GIMSA requested extensions to submit the RFI responses, which CBP granted.[24] On September 22, 2025, Ningbo Tuoxing and Sichuan Y&J requested extensions and on September 24, 2025, Rizhao Jintai requested an extension, which CBP granted.[25]

*Letters for the Record*

On October 10, 2025, CBP received a letter from Greenbrier's counsel requesting that CBP dismiss the EAPA investigation, arguing that there is no statutory basis for invoking EAPA.[26] Greenbrier asserted that the investigation was initiated based on inaccurate allegations and clear omissions by the Alleger, leading CBP to erroneously conclude that initiation under EAPA was appropriate."[27] In the letter, Greenbrier included copies of Commerce's preliminary and final scope determinations for the *FRC Orders*.[28] Greenbrier also included a copy of a March 2, 2023

---

[20] *Id.*
[21] *See* NOI; *see also* Allegation at page 13 and Allegation Supplement at Exhibit 1.
[22] *See* CBP's RFI questionnaire to Greenbrier and Gunderson-GIMSA, "EAPA 8183 Request for Information," dated August 27, 2025.
[23] *See* CBP's RFI Questionnaires to Chinese Supplier I, Supplier II and Supplier III, "EAPA 8183 Request for Information, dated September 4, 2025.
[24] *See* CBP Memos granting extension of time for Greenbrier and Gunderson-GIMSA, "EAPA Case No. 8183 — Response to Greenbrier Central, LLC's September 16, 2025 and Request for Extension to Submit RFI Response," dated September 18, 2025.
[25] *See* CBP Memos granting extension of time for Supplier I, Supplier II and Supplier III: "EAPA Case No. 8183 – Response to [ Name ] September 22, 2025, Request for Extension to Submit RFI Response," dated September 22, 2025; "EAPA Case No. 8183 – Response to [ Name ] September 18. 2025, Request for Extension to Submit RFI Response," dated September 22, 2025; and "EAPA Case No. 8183 – Response to [ Name ] September 24, 2025, Request for Extension to Submit RFI Response," dated September 24, 2025, respectively.
[26] *See* Greenbrier's letter titled, "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China – Greenbrier Central's Request To Dismiss Investigation," dated October 10, 2025 (October 10th Greenbrier's EAPA Case Dismissal Request).
[27] *Id.*
[28] *Id.* at Attachments 1 and 2.

Memo that Commerce issued regarding video calls with CBP, whereby CBP officials explained how rail cars could be exempt from entry requirements under 19 C.F.R. § 141.4(b)(3) and (b)(4) and how administering the *FRC Orders* could be difficult.[29]

On October 20, 2025, CBP received a letter from the Alleger opposing Greenbrier's request for dismissal.[30] The Alleger noted that [ Transaction ], which then [ Movement Process ].[31] The Alleger argued that [ Description] does not qualify for status as instruments of international traffic (IIT) because [ Transaction Process ]; therefore, this makes the [Items] subject to entry requirements and payment of duties pursuant to AD/CVD orders.[32]

Furthermore, the Alleger contended that the Commerce March 2, 2023 Memo does not constitute a final agency decision regarding the issues at stake because Commerce issued its Final Scope Decision Memorandum on May 15, 2023, after the March 2, 2023 Memo.[33] According to the Alleger, the Commerce Final Scope Decision Memo clarified that FRCs attached to freight railcars are included in the scope of the AD/CVD investigation and therefore subject to duties.[34] As the Alleger highlighted, Commerce stated: "there is no reason for Commerce to not apply its practice, because the scope is clearly written to include freight rail couplers attached to railcars that enter the United States for consumption, and we find no overarching reason to modify the scope of the investigations."[35]

*RFI Responses — Greenbrier*[36]

On October 2, 2025, CBP received a timely RFI response from Greenbrier Central.[37] Greenbrier Central clarified that it does not prepare its own audited financial statements; rather its parent,

---

[29] *Id.* at 4-5 and Attachment 3 for Commerce Memorandum to the File "Certain Freight Rail Couplers and Parts Thereof from Mexico and the People's Republic of China: Video Calls with Customs and Border Protection," dated March 2, 2023 (Commerce March 2, 2023 Memo).
[30] *See* the Alleger's response letter, "Certain Freight Rail Couplers and Parts Thereof from Mexico and the People's, Republic of China: Response to Request to Dismiss EAPA Investigation," dated October 20, 2025 (Alleger's Response to October 10th EAPA Case Dismissal Request).
[31] *Id.*
[32] *Id.* at 3.
[33] *Id.* at 4, citing Memorandum to James Maeder, Deputy Assistant Secretary, AD/CVD Operations From Erin Bengal, Director, Office III, AD/CVD Operations "Freight Rail Couplers from Mexico and the People's Republic of China: Final Scope Decision Memorandum," dated May 15, 2023 (Commerce Final Scope Decision Memo), included at Attachment 1 of October 10th Greenbrier's EAPA Case Dismissal Request.
[34] *Id.*
[35] *Id.* *See also* Commerce Final Scope Decision Memo, stating "CBP has not identified any overarching administrability concerns with assessing ADs/CVDs on freight rail couplers attached to freight railcars that enter the United States for consumption. CBP explained that if a freight railcar is subject to entry (*i.e.*, not exempt from entry under 19 C.F.R. § 141.4(b)(3) or (b)(4)), and an attached freight rail coupler is within the scope of an AD/CVD order, then a formal (type 03) consumption entry is required to assess and collect ADs/CVDs on the coupler for entry into the United States," included at Attachment 1 of October 10th Greenbrier's EAPA Case Dismissal Request.
[36] *See* Greenbrier's RFI response, "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China – Greenbrier Central LLC's Response To The Importer Request For Information ("RFI")," dated October 2, 2025 (October 2nd Greenbrier's RFI Response).
[37] *Id.*

The Greenbrier Companies, prepares consolidated audited financial statements for all its affiliates, which include the results for Greenbrier Central.[38] The audited consolidated financial statements indicated that Greenbrier's operations include: design, manufacturing, the provision of freight railcar wheel services, railcar maintenance, sales of new railcars, sale of railcar component parts, regulatory compliance services, and leasing and fleet management services for the North American market.[39] Through affiliated companies, The Greenbrier Companies also produce rail and industrial components and hold an ownership stake in a railcar manufacturer in Brazil.[40] Greenbrier stated it operates in three segments: 1) Manufacturing; 2) Maintenance Services; and 3) Leasing and Management Services.[41]

CBP issued Greenbrier Central a first supplemental RFI (SRFI) on October 17, 2025, a second SRFI on October 27, 2025, and a third SRFI on November 21, 2025.[42] CBP granted Greenbrier's requests[43] for extensions of the deadlines to submit the responses until November 10, 2025, November 21, 2025, and December 5, 2025, respectively.[44]

On November 10, 2025, CBP received Greenbrier Central's timely response to the first SRFI.[45] Greenbrier reported that during the POI, Greenbrier Central produced [#s ] new freight railcars in the United States, which required a total of [#s ] freight rail couplers, as each railcar requires two couplers.[46] Specifically, " [ Describing Production

].[47]

Greenbrier also explained in its first SRFI response that Greenbrier Central [
Describing Transaction

].[48]

[38] *Id*. at 13 of 2265 at Exhibit II-2c for the consolidated audited financial statements for The Greenbrier Companies from August 31, 2024, and August 31, 2023. Greenbrier Central does not produce its own audited financial statements.
[39] *Id.*
[40] *Id*. at 141-142 of 2265 at Exhibit II-2c, pg. 4-5.
[41] *Id*. 472-3 of 2265.
[42] *See* CBP's SRFI questionnaire to Greenbrier, "EAPA 8183 - Supplemental Request for Information," dated October 17, 2025; *see* CBP's SRFI questionnaire to Greenbrier, "EAPA 8183 – Second Supplemental Request for Information," dated October 27, 2025; and *see* CBP's SRFI questionnaire to Greenbrier, "EAPA 8183 – Revised Third Supplemental Request for Information," dated November 21, 2025.
[43] See Letters from Greenbrier Central requesting extensions of time to submit SRFIs, dated October 22, 2025, November 4, 2025, November 13, 2025, and November 24, 2025.
[44] See CBP Memos to File granting Greenbrier Central extensions of time to submit SFRIs, dated October 27, 2025, November 7, 2025, November 17, 2025, and November 24, 2025.
[45] *See* Greenbrier's 1st SRFI response, "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China – Greenbrier Central LLC's Response To The Importer First Supplemental Request For Information ("SRFI")," dated November 10, 2025 (Greenbrier's 1st SRFI response).
[46] *Id*. at 2.
[47] *Id.*
[48] *Id.*

Greenbrier stated that it does not [ Transaction Movement ].[49] According to Greenbrier, because a railcar is a complete article that is not subject to formal entry, there is no requirement to separately declare components of the railcar.[50] Specifically, Greenbrier noted that "CBP officials explained that if a freight railcar is exempt from entry under {19 C.F.R. § 141.4(b)(3)} and/or {19 C.F.R. § 141.4(b)(4)}, the exemption extends to the railcar's constituent components.[51] Thus, freight rail couplers are considered a constituent component of freight railcars, rendering the couplers exempt from entry so long as the couplers are attached to, or a part of, the exempted railcars."[52]

On November 19, 2025, the Alleger submitted comments in response to Greenbrier's and Gunderson-GIMSA's first SRFI responses, including questions it wanted CBP to ask in additional requests for information.[53] The Alleger argued that the evidence provided in the SFRI's clearly shows that [ Name and Process ] do not meet the definition of what qualifies for use of the entry exemption.[54] The Alleger also argues that the Commerce March 2, 2023 Memo is not a final agency decision and memorializes a conversation that occurred before the final scope determination for the *FRC Orders* was issued.[55]

On November 21, 2025, CBP received Greenbrier's timely response to the second SRFI, which provided coupler data, including inventory movement schedules of [ Process ] for Greenbrier Central, Gunderson-GIMSA, and Gunderson Concarril.[56]

On December 1, 2025, the Alleger submitted comments in response to Greenbrier's and Gunderson-GIMSA's second SRFI responses.[57] According to the Alleger, there were several inconsistencies in the responses. Specifically, the Alleger asserted that Greenbrier [Description ] whether [ Description ] are involved in the entry of freight rail couplers, [ Noun] is identified as the importer of record, and Greenbrier's affiliates are involved in the sale of railcars with mounted couplers, while continuing to [ Action ].[58] Additionally, the Alleger asserted that Greenbrier itself states that [Noun ] affiliates sell railcars with mounted FRCs in its second SRFI responses, which suggests that

---

[49] *Id.* at 8.
[50] *Id.*
[51] *Id.*, citing the October 10th Greenbrier's EAPA Case Dismissal Request at Attachment 3, which contains a copy of the Commerce March 2, 2023 Memo.
[52] *Id.*
[53] *See* the Alleger's response letter, "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China: Comments on Greenbrier and GIMSA Responses to CBP's First Supplemental Requests For Information," dated November 19, 2025.
[54] *Id.* at 7.
[55] *Id.* at 7-8. *See also* October 10th Greenbrier's EAPA Case Dismissal Request at Attachment 1.
[56] *See* Greenbrier Central's 2nd SRFI response submission — "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China – Greenbrier Central LLC's Response To The Importer Second Supplemental Request For Information ("SRFI")," dated November 21, 2025 (Greenbrier Central's 2nd SRFI response) at 6-7 and Exhibit 2S-3 & 4
[57] *See* the Alleger's comments responding to the 2nd SRFI, "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China: Comments on Greenbrier and GIMSA Responses to CBP's Second Supplemental Requests For Information," dated December 1, 2025.
[58] *Id.*

Greenbrier is the [ Noun ] for couplers entering the United States from its [ Relation ].[59]

On December 5, 2025, Greenbrier submitted a timely response to the third SRFI, providing clarification on railcar movement from the [ Nouns ].[60] Greenbrier explained the following regarding the railcar transactions:

> "[ Name and Describing the Process from Beginning to End
>
> ]. U.S. Customs, itself has recognized "the common industry practice that any locomotive or railcar in common commercial use will eventually be used in international traffic with Canada or Mexico during its regular use." … Thus, railcars from Mexico for which train sheets have been prepared properly cross into the United States as IITs."[61]

In its response, Greenbrier also noted that it understands that the railroad trains present a manifest and/or train sheet data to CBP for clearance and release when arriving from Mexico.[62] Greenbrier further understands that U.S. rail carriers move the railcars to a destination in the United States in coordination with the ultimate U.S. customer, who holds title to and bears the risk of loss of the railcars.[63] Greenbrier maintained that it uses reasonable care and is well aware of the active AD/CVD orders.[64]

Greenbrier reaffirmed that each railcar contains two couplers, and there is one knuckle per coupler.[65] Greenbrier stated that it generally procures finished freight rail couplers for use on railcars and, thus, does not have information regarding the origin of knuckles

---

[59] *Id*. at 2-3. *See also* Greenbrier Central's 2nd SRFI response at Exhibit 2S-1.

[60] *See* Greenbrier Central's 3rd SRFI response submission — "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China – Greenbrier Central LLC's Response To The Amended Importer Third Supplemental Request For Information ("SRFI")," dated December 5, 2025 (Greenbrier Central's 3rd SRFI response).

[61] *Id*. at 1.

[62] *Id*. at 2.

[63] *Id*. at 2.

[64] *Id*. at 3.

[65] *Id*. at 7.

that are included in such couplers.[66] Greenbrier stated that it does not have visibility into the ultimate U.S. customer's use of their railcars.[67]

Regarding the sales process, Greenbrier explained that [ Names and Transaction Process

].[70] Greenbrier further explained that [ Transaction Process

].[71] Generally, [ Transaction Process

].[72] Exhibit S-8c & 10 of GIMSA's First SRFI Response, dated November 10, 2025, includes [ Transaction Process

]."[73] [ Transaction Process

]."[74]

*RFI Responses — Gunderson-GIMSA*

On October 6, 2025, CBP received Gunderson-GIMSA's timely RFI response.[75] Gunderson-GIMSA S.A. de RL de CV, now Gunderson-GIMSA S.A. de C.V., was established in 2006 [ Transaction

], to manufacture new railcars in Frontera, Mexico.[76] Gunderson-GIMSA S.A. de RL de CV was restructured in 2012, and its correct name is Gunderson-GIMSA, S.A. de C.V.[77] Gunderson-GIMSA explained that its main business is to manufacture railcars in Mexico [ Transaction Process

].[78]

---

66 *Id.* at 7.
67 *Id.*
68 *Id.* at 9.
69 *Id.* at 9.
70 *Id.*
71 *Id.*
72 *Id.*
73 *Id.*
74 *Id.*
75 *See* Gunderson-GIMSA RFI response, "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China – Gunderson GIMSA S.A. de C.V.'s Response To The Manufacturer Request For Information ("RFI")," dated October 6, 2025 (October 6th Gunderson RFI response).
76 *Id.* at 3.
77 *Id.*
78 *Id.*

On October 17, 2025, October 28, 2025, and November 21, 2025, CBP issued SRFIs to Gunderson-GIMSA.[79] CBP granted Greenbrier's requests[80] for extensions of the deadlines to submit the responses until November 10, 2025, November 21, 2025, and December 5, 2025, respectively.[81]

On November 10, 2025, CBP received Gunderson-GIMSA's timely first SRFI response, providing the number of railcars manufactured and the FRC usage during the POI.[82] Gunderson-GIMSA indicated that it primarily sources new couplers from [ Names ].[83] Gunderson-GIMSA also [ Transaction and Names ].[84]

Gunderson-GIMSA clarified in the response that as a [ Process for Movement ].[85] Gunderson- GIMSA provided [Process for Movement ].[86] Gunderson-GIMSA [ Process for Movement ].[87]

Similarly, as Greenbrier previously stated, the freight forwarder [ Names and Process for Movement ].[88] ].[89] [ Names and Process for Movement ].[90]

On November 21, 2025, CBP received Gunderson-GIMSA's timely second SRFI response, which clarified that Gunderson-GIMSA's operations include manufacturing, final assembly,

---

[79] *See* CBP's SRFI questionnaire to Gunderson-GIMSA, "EAPA 8183 - Supplemental Request for Information," dated October 17, 2025; *see* CBP's SRFI questionnaire to Gunderson-GIMSA, "EAPA 8183 – Second Supplemental Request for Information," dated October 28, 2025; and *see* CBP's SRFI questionnaire to Gunderson-GIMSA, "EAPA 8183 – Revised Third Supplemental Request for Information," dated November 21, 2025.
[80] See Letters from Gunderson-GIMSA requesting extensions of time to submit SRFIs, dated October 22, 2025, November 4, 2025, November 13, 2025, and November 24, 2025.
[81] See CBP Memos to File granting Gunderson-GIMSA extensions of time to submit SFRIs, dated October 27, 2025, November 7, 2025, November 17, 2025, and November 24, 2025.
[82] *See* Gunderson-GIMSA's 1st SRFI response submission, "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China – Gunderson GIMSA S.A. de C.V.'s Response To The Manufacturer First Supplemental Request For Information ("SRFI")," dated November 10, 2025 (Gunderson-GIMSA 1st SRFI).
[83] *Id.* at 2-3.
[84] *Id.* at 3.
[85] *Id.* at 5.
[86] *Id.* at 5.
[87] *Id.*
[88] *Id.*
[89] *Id.* at 5-6.
[90] *Id.*

maintenance, and sale of complete railroad freight and tank cars, as well as the purchase and sale of railroad parts and components.[91] Similarly, Gunderson-Concarril operates two locations with similar functions.[92] [ Transaction Process by Names ].[93] The company explained that [ Name and Status Location ] and further that, besides GIMSA itself, [ Name, Location and Transaction Status ].[94]

On December 1, 2025, the Alleger submitted comments in response to Greenbrier's and Gunderson-GIMSA's second SRFI responses, noting discrepancies and insufficient and contradictory information.[95] For example, the Alleger highlighted that Greenbrier provided an exhibit that [ Descriptive ] any of the [#s] listed entities are involved in the formal or informal entry of freight rail couplers.[96] Greenbrier reported that [ Relation ] – including [ Name ] – are involved both in the attachment of couplers to railcars and the subsequent sales of railcars with couplers but also reports that [Noun] of the affiliated companies are the U.S. importer of record for the FRCs.[97] Greenbrier's supplier of [ Noun ] has previously indicated that it is [ Noun ], so [ Noun ] appears to be taking ownership of this position.[98] Identifying the [ Noun ] for each entry is essential for customs compliance.[99]

Greenbrier, the Alleger noted, indicates its affiliated entities are involved in sales of railcars with couplers mounted, specifically: [ List of Names ].[100] Exhibit 2S-1 describes [ Name and Action ].[101] The Alleger contended that this is of particular relevance to this investigation because Greenbrier has continued to insist that the railcars it enters into the United States with FRCs attached are [ Status ].[102]

---

[91] *See* Gunderson-GIMSA's 2nd SRFI response submission — "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China – Gunderson GIMSA S.A. de C.V.'s Response To The Manufacturer Second Supplemental Request For Information ("SRFI")" (Gunderson-GIMSA 2nd SRFI response), dated November 21, 2025.
[92] *Id.* at 6 Part I, Question 2.
[93] *Id.* at 7 Part I, Question 3.
[94] *Id.* at 7 Part I, Question 3.
[95] *See* Alleger's comments letter — "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China: Comments on Greenbrier and GIMSA Responses to CBP's Second Supplemental Requests For Information," dated December 1, 2025.
[96] *Id.* at 2.
[97] *Id.*
[98] *Id.* at 2-3.
[99] *Id.* at 2-3.
[100] *Id.* at 3.
[101] *Id.*
[102] *Id.*

On December 5, 2025, CBP received Gunderson-GIMSA's timely third SRFI response, clarifying railcar movement from the manufacture to the U.S. ultimate consignees.[103] Specifically, "[ Name and Transaction Process

] ."[104]

Gunderson-GIMSA repeated what it stated in its 1st SRFI response, namely that [ Name and Movement Process

] .[105] [ Movement Process

].[106] Generally, [ Movement Process

].[107]

Gunderson-GIMSA explained that it does not have visibility into the ultimate U.S. customer's use of its railcars.[108] It reaffirmed that each railcar contains two couplers and there is one knuckle per coupler.[109] Gunderson-GIMSA generally procures finished FRCs for use on railcars; thus, it does not have information regarding the origin of knuckles that are included in such couplers.[110]

On December 15, 2025, the Alleger submitted comments in response to Greenbrier's and Gunderson-GIMSA's third SRFI responses.[111] The Alleger urged CBP to apply adverse inferences in the investigation because, according to the Alleger, both Greenbrier's and Gunderson-GIMSA's RFI submissions failed to provide information that is critical to CBP's investigation.[112]

*Other RFI Responses*

<u>Supplier I: Ningbo Tuoxing</u>

---

[103] *See* Gunderson-GIMSA's response at Question 1, page 1, "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China – Gunderson GIMSA S.A. de C.V.'s Response To The Amended Manufacturer Third Supplemental Request For Information ("SRFI")," dated December 5, 2025 (Gunderson-GIMSA 3rd SRFI response).
[104] *Id.* at 9.
[105] *Id*. at 1.
[106] *Id.*
[107] *Id*. at 9.
[108] *Id*. at 7.
[109] *Id.*
[110] *Id.*
[111] *See* Alleger's comments letter, "EAPA Case No. 8183: Certain Freight Rail Couplers and Parts Thereof from Mexico & The People's Republic of China: Comments on Greenbrier Central LLC's and Gunderson GIMSA S.A. de C.V.'s Third SRFI Responses," dated December 15, 2025.
[112] *Id.*

On September 29, 2025, CBP received a timely RFI response from Chinese Supplier I, Ningbo Tuoxing, located in Ningbo, Zhejiang, China.[113] In its RFI response, Ningbo Tuoxing stated that it did not manufacture, sell, or export any FRCs, knuckles, coupler bodies, or any other parts thereof during the POI.[114] Ningbo Tuoxing stated it supplies entirely different precision-casting components (using the water-glass shell process) of carbon steel, low-alloy steel, and stainless-steel components, which fall outside the scope of the *FRC Orders*.[115] Ningbo Tuoxing said its primary products are mechanical parts for the automotive, mining, heavy machinery, engineering machinery, general machinery, and agricultural machinery industries.[116]

Supplier II: Rizhao Jintai

On October 12, 2025, CBP received a timely RFI response from Chinese Supplier II, Rizhao Jintai, located in the Rizhao Economic Development Zone in Shandong, China.[117] Per its RFI response, Rizhao Jintai is a Sino-foreign joint venture founded at the end of 2005.[118] The company is a mechanical processing enterprise that integrates mold manufacturing, precision forging, mechanical processing, heat treatment and finished product packaging.[119] The scope of Rizhao Jintai's business is developing, manufacturing, and selling various high-end slings, automotive parts, rail transit parts, and other forging products.[120] Rizhao Jintai sold covered merchandise and other parts to Greenbrier during the POI.[121]

Supplier III: Sichuan Y&J

On October 10, 2025, CBP received a timely RFI response from Chinese Supplier III, Sichuan Y&J, located in Chengdu, China.[122] Sichuan Y&J states that since April 24, 2024, to the present, it has exported 11 parts to Greenbrier.[123] The 11 parts consist of four categories: (1) adaptors, valve pneumatic outlets right and left handles assembled on the hopper cars; (2) bodies of bottom outlet valves used on tank cars; (3) long and short handles mounted on hatch covers; and (4) support fixed on the cars to fasten the rod.[124] Sichuan Y&J said it is dedicated to supplying customized mechanical parts and components and engineering solutions, covering various sectors of oil and gas, construction and mining, water works and fire-fighting, *etc.*[125] The products, mainly manufactured through a casting and machining process, are exported to numerous countries and regions.[126]

---

[113] *See* Ningbo Tuoxing's RFI response, "EAPA Case No. 8183 – Response to the Request for Information Issued to Ningbo Tuoxing Precision Casting Co., Ltd.," dated September 29, 2025.
[114] *Id.*
[115] *Id.*
[116] *Id.* at 3.
[117] *See* Rizhao Jintai's RFI response, "Answers to the Questions About CBP," dated October 12, 2025.
[118] *Id.*
[119] *Id.*
[120] *Id.*
[121] *Id.*
[122] *See* Sichuan Y&J's RFI response, "RE: EAPA 8183- Request for Information," dated October 10, 2025.
[123] *Id.*
[124] *Id.* at 1.
[125] *Id.*
[126] *Id.* at 3.

According to Sichuan Y&J, the parts it supplied to Greenbrier Central were produced by Yuhuan Haixu Machinery Co., Ltd.[127] The annual production capacity supplied to Greenbrier Central is [ #s ] parts.[128] The annual production capacity is calculated based on the maximum monthly output ([ #s ] units per month over ten months) of the company's production lines under normal operating conditions during the POI.[129] Sales to Greenbrier during the POI totaled [#s ] units valued at $[ #s ], with [#s ] units valued at $[#s ] sold to Greenbrier Mexico.[130] On November 14, 2025, CBP issued an SFRI to Sichuan Y&J; however, CBP did not receive a response.[131]

Supplier IV: ASF-K (subsidiary of Amsted Rail)

On October 20, 2025, CBP sent an RFI to Supplier IV.[132] On December 1, 2025, CBP received ASF-K's timely response to the RFI, affirming that it is wholly owned by Amsted Rail.[133] ASF-K participates in Mexico's IMMEX Program whereby Amsted Rail sells subject merchandise to OEMs in Mexico also operating under the IMMEX program that then incorporate the freight rail couplers into a finished freight car and ultimately, a freight train.[134] ASF-K manufactures parts for the heavy-haul rail market, and the goods it manufacturers are for customers of and with the guidance and supply of raw materials from Amsted Rail.[135]

Regarding its relationship with Greenbrier: "Specifically, with respect to Gunderson GIMSA, the Company is a long-term customer of Amsted Rail.[136] ASF-K notes that it ships covered merchandise to other Greenbrier entities in Mexico but has limited this portion of its response to Gunderson GIMSA….[137] All sales which physically transit between ASF-K and Gunderson GIMSA are made by Amsted Rail to Greenbrier (in the United States), which results in the couplers to be sent to Gunderson GIMSA's maquiladora in Gimsa, Mexico from ASF-K's facility in Mexico.[138] … {A}t the time of sale, the coupler is **not** shipped from the United States to Gunderson GIMSA's maquiladora but shipped within Mexico."[139]

Greenbrier Affiliate [ Name ]

On December 9, 2025, CBP sent an RFI to a Greenbrier affiliate, [ Name and Locations ].[140] On December 29, 2025, CBP received the Greenbriar affiliate's

---

[127] *Id.* at 17.
[128] *Id.* at 21.
[129] *Id.*
[130] *Id.* at 24.
[131] *See* CBP's SRFI questionnaire, "EAPA 8183 – Supplemental Request for Information," dated November 14, 2025.
[132] *See* CBP letter, "RE: EAPA 8183 – Revised Request for Information," dated October 20, 2025.
[133] *See* Amsted Rail's RFI response, "EAPA Case No. 8183 – Request for Information Response Parts I through IV," dated December 1, 2025.
[134] *Id.* at 1-2.
[135] *Id.*
[136] *Id.* at 18.
[137] *Id.*
[138] *Id.*
[139] *Id.*
[140] *See* CBP letter to [ Name ], "RE: EAPA 8183 – Request for Information," dated December 9, 2025.

timely response to the RFI.[141] The RFI response indicates that the Greenbrier affiliate purchases FRCs directly from [ Names ].[142] Each railcar contains two couplers and there is one knuckle per coupler.[143] Generally, [Name ] procures finished FRCs for use on railcars; thus, it does not have information regarding the origin of knuckles that are included in such couplers.[144] Sales of railcars into the United States are [

Transaction Process

].[147] Sales of [

Name and Process ].[148] [

Name and Location Status ].[149]

*Voluntary Factual Information*

On December 1, 2025, CBP received Greenbrier's timely submission of voluntary factual information, which included expert testimony regarding its IIT qualification and maintained that the railcars are exempt from entry requirements pursuant to 19 C.F.R. § 10.41(a) and 19 C.F.R. §§ 141.4(b)(3) and (b)(4).[150] Greenbrier claimed that "CBP has long established as practice that freight railcars are released into the United States under the IIT procedure without entry requirements and not as a part of a duty-free or informal entry process.[151] Carriers provide the data for the IITs on the inward cargo manifest, which includes all required information and serves as a request for clearance of the railcars as IITs.[152] As an example, the ACE {Automated Commercial Environment} rail manifest only requires that a freight railcar, regardless of ownership, is reported on the Rail Consist with the assumption that a railcar is covered by the IIT process."[153] Greenbrier also included a copy of Customs Directive 3550-075, Instructions for Handling the Entry of Locomotives, Railcars, and Other Railroad, dated March 7, 2000, which it claimed codified this process.[154]

*Extension of the Determination as to Evasion Deadline*

---

[141] *See* Greenbrier affiliate's RFI response, "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China – [ Name ] Response To The Request For Information," dated December 29, 2025.
[142] *Id.* at 1.
[143] *Id.*
[144] *Id.*
[145] *Id.* at 2.
[146] *Id.*
[147] *Id.*
[148] *Id.*
[149] *Id.*
[150] *See* Greenbrier's voluntary submission of factual information, "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China – Greenbrier Central LLC's Voluntary Submission Of Factual Information To Negate The Allegation Of Evasion," dated December 1, 2025.
[151] *Id.* at 4.
[152] *Id.*
[153] *Id.*
[154] *Id.* for Expert Bio and Customs Directive. CBP notes that the Customs Directive provided was replaced by guidance set forth in the August 2012 CBP Informed Compliance Publication on IIT (CBP IIT Handbook).

On December 10, 2025, pursuant to 19 U.S.C. § 1517(c)(1)(B), CBP notified parties to the investigation of a sixty (60) calendar day extension for the determination as to evasion, moving the original deadline of March 11, 2026 to May 11, 2026.[155] CBP determined that the investigation was extraordinarily complicated because of the number and complexity of the transactions to be investigated.[156] This extension allowed CBP time to fully analyze the voluminous documents on the record and provided time for CBP to solicit additional information from certain parties in the investigation.[157] It also allowed for adequate time for parties to submit written arguments and responses to written arguments.[158]

*Other Documents on the Record*

On December 11, 2025, the Alleger provided comments on the ASF-K RFI response[159] and on Greenbrier's voluntary information submission.[160] On January 12, 2026, the Alleger provided comments on the Greenbriar affiliate's RFI response.[161] On March 3, 2026, CBP placed a memo to file explaining the removal of certain information inadvertently placed on the record.[162]

*Verification*

On January 16, 2026, CBP sent a verification engagement letter and agenda to Greenbrier Central, providing information on the procedures CBP would take in verifying Greenbrier's record responses.[163] This verification took place at Greenbrier Central's premises at One Centerpoint Drive, Suite 200, Lake Oswego, Oregon 97035 from January 21, 2026 through January 23, 2026.[164] On January 20, 2026, the Alleger submitted pre-verification comments.[165]

During verification, as outlined in the Verification Report,[166] CBP confirmed Greenbrier's corporate structure and operations.[167] CBP also reviewed several sales transactions, tracing the movement of railcars starting from Greenbrier's Mexican manufacturing subsidiaries through to

---

[155] *See* CBP's letter, "Notice of Extension of Determination as to Evasion," dated December 10. 2025.
[156] *Id.*
[157] *Id.*
[158] *Id.*
[159] *See* Alleger's letter, "EAPA Case No. 8183: Certain Freight Rail Couplers and Parts Thereof from Mexico & The People's Republic of China: Comments on ASF-K de Mexico S. de R.L. de C.V.'s Response to the Request for Information," dated December 11, 2025.
[160] *See* Alleger's letter, "EAPA Case No. 8183: Certain Freight Rail Couplers and Parts Thereof from Mexico & The People's Republic of China: Response to Greenbrier's Voluntary Submission," dated December 11, 2025.
[161] *See* Alleger's letter, "EAPA Case No. 8183: Certain Freight Rail Couplers and Parts Thereof from Mexico & The People's Republic of China: Comments on [ Name ] Response to the Request for Information," dated January 12, 2026.
[162] *See* CBP Memorandum to the File, "EAPA Case No. 8183 – Removal of February 13, 2026, Supplemental Document from the Administrative Record," dated March 3, 2026.
[163] *See* CBP's Verification Engagement Letter and Agenda, dated January 16, 2026.
[164] *Id.*
[165] *See* Alleger's letter, "EAPA Case No. 8183: Certain Freight Rail Couplers and Parts Thereof from Mexico and the People's Republic of China: Pre-Verification Comments for Greenbrier," dated January 20, 2026.
[166] *See* CBP'S On-Site Verification Report, dated February 27,2026 (Verification Report); *see also* Greenbrier Central Verification Exhibits, dated January 30, 2026.
[167] *Id.* at 2-4.

the final sale and delivery to the ultimate U.S. buyers.[168] CBP also reviewed the following related to FRCs: their placement on the railcars, their certification process, their sourcing, their inventory movement process, and their import process.[169] CBP validated the sales process and sales transactions between [ Transaction ] and the sources of the FRCs, namely [ Names ].[170] CBP also confirmed that new FRCs are attached to the [ Transaction Movement ][171]

*Written Arguments*

On December 5, 2025, CBP notified parties to the investigation of the extension of time for the written arguments,[172] and on February 24, 2026, CBP notified parties of the amended deadlines.[173] On March 12, 2026, CBP received timely written argument submissions from both Greenbrier and the Alleger.[174]

<u>Greenbrier Written Arguments</u>

Greenbrier contends that an EAPA investigation cannot lawfully extend to merchandise that was never formally entered and that the couplers attached to finished railcars do not evade the *FRC Orders*.[175] Greenbrier asserts that AD/CVD duties apply only to merchandise that enters for consumption, regardless of whether the merchandise falls within the written scope description.[176] Greenbrier's main arguments include: (1) EAPA authority is limited to merchandise entered for consumption, and, thus, should not encompass railcars or couplers exempt from entry requirements; (2) Couplers attached to exempt railcars are not subject to AD/CVD duties, as confirmed by pre-order discussions between Commerce and CBP, which Greenbrier relied upon in good faith; (3) Greenbrier's railcars qualify as duty-free freight cars under 19 C.F.R. § 141.4(b)(4); (4) Greenbrier's railcars also qualify as IITs and are excepted from entry under 19 C.F.R. § 141.4(b)(3); and (5) Alternatively, mounted couplers fall outside the scope of the *FRC Orders*.[177] Additionally, Greenbrier argues that no evasion exists with respect to consumption entries of loose couplers or parts because the EAPA Allegation addressed only railcars with attached couplers, not consumption entries of loose parts, and no misclassifications or unpaid duties exist on any consumption entries.[178]

---

[168] *Id*. at 4-5
[169] *Id*. at 5-8.
[170] *Id.*
[171] *Id.*
[172] *See* CBP's notification email — "EAPA 8183: CBP Extension of Written Arguments Deadline," dated December 5, 2025.
[173] *See* CBP's notification email — "EAPA 8183: Written Arguments Deadline," dated February 24, 2026.
[174] *See* Greenbrier's Written Arguments submission, "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China – Greenbrier's Submission of Written Arguments," dated March 12, 2026 (Greenbrier's Written Arguments); *see also* Alleger's Written Arguments submission, "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China: Written Arguments of the Coalition of Freight Coupler Producers," dated March 12, 2026 (Alleger's Written Arguments).
[175] *See* Greenbrier's Written Arguments.
[176] *Id.*
[177] *Id.*
[178] *Id.*

Alleger Written Arguments

The Alleger argues that the evidence on the record demonstrates: (1) Greenbrier has effectively conceded evasion by entering merchandise subject to *FRC Orders* for consumption without filing type 03 entries, thereby avoiding payment of duties;[179] (2) Greenbrier's entry of railcars are ineligible for IIT status because the railcars were admitted into the United States for sale to a third party, not for use in international traffic;[180] 3) Greenbrier is knowingly importing railcars and FRCs in such a manner as to intentionally avoid paying duties pursuant to the *FRC Orders*, and Commerce's Final Scope Decision Memorandum of May 15, 2023 settled the issue by confirming that FRCs attached to freight railcars are included in the scope of the investigations and subject to duties;[181] 4) Greenbrier's railcars entered for leasing operations are not IIT's because leasing companies cannot enter rail cars as IITs because they have no insight or control as to whether the rail car remains in compliance with IIT requirements;[182] 5) The Alleger claims that, even if railcars were IITs, FRCs are not entitled to IIT status as accessories, since Commerce determined that a freight rail coupler is a distinct product, not part of the IIT's structure, and its function is unrelated to holding cargo or securing freight;[183] 6) FRCs are subject to duties and thus do not qualify for exemption under 19 C.F.R. § 141.4(b)(4), which requires that no duties are owed.[184] The Alleger concludes that Greenbrier's failure to pay AD/CVD duties for these products, which are explicitly covered by the scope of the AD/CVD orders, constitutes unlawful duty evasion.[185]

The Alleger further urges CBP to address the following exceptions to IIT and 19 C.F.R. § 141.4(b)(4), emphasizing that Greenbrier's and its Mexican affiliates' railcar transactions are: 1) sales for consumption; 2) not part of a continuous international route; 3) involved in leasing operations; 4) are entered into the country by a party other than the one using them as an IIT; and 5) that the FRCs themselves are not accessories to an IIT.[186] The Alleger asserts that these factors must be addressed in order to withstand judicial review at the Court of International Trade.[187]

*Responses to Written Arguments*

On March 27, 2026, CBP received timely responses to written arguments from both Greenbrier and the Alleger.[188]

---

[179] *See* Alleger's Written Arguments at 4-6.
[180] *Id*. at 6-11 and 12-20.
[181] Id. at 12.
[182] *Id*. at 20-24.
[183] Id. at 24-34.
[184] *Id*. at 34-36.
[185] *Id*. at 2.
[186] *Id*. at 36-38.
[187] *Id*.
[188] *See* Greenbrier's rebuttal comments, "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China – Greenbrier's Submission of Response to Written Arguments," dated March 27, 2026 (Greenbrier's Rebuttal). *See also* Alleger's rebuttal comments, "EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China: Written Arguments Response of the Coalition of Freight Coupler Producers," dated March 27, 2026 (Alleger's Rebuttal).

Greenbrier's Responses to Written Arguments

The key points of Greenbrier's rebuttal are that there are no consumption entries of loose couplers or parts; therefore, non-consumption entries fall outside EAPA's jurisdictional scope, as EAPA's authority is limited by statute and regulation to investigating entries for consumption.[189] Greenbrier emphasizes the Commerce March 2, 2023 Memo regarding CBP and Commerce enforcement discussions and re-iterates that freight rail couplers attached to finished railcars are exempt from AD/CVD duties when the attached railcars qualify for exemption from entry requirements under 19 C.F.R. § 141.4(b)(3) (as IITs) or 19 C.F.R. § 141.4(b)(4) (as duty-free freight cars).[190]

Alleger's Responses to Written Arguments

The Alleger's key rebuttal points are that the regulatory requirements under 19 C.F.R. § 141.4(b)(3) and 19 C.F.R. § 141.4(b)(4) do not exempt rail cars with mounted FRCs from entry requirements.[191] The Alleger reiterates that the FRCs attached to the railcars are subject to duties,[192] arguing that even if rail cars were entitled to IIT status, the FRCs themselves are distinct articles of commerce (as explicitly determined by Commerce) and they are not entitled to informal entry as either an IIT or an accessory to an IIT.[193] The Alleger contests Greenbrier's claim that EAPA's authority is limited to merchandise that enters into the customs territory of the United States for consumption under 19 C.F.R. § 165.1.6, and therefore, this investigation should be limited to consumption entries.[194] The Alleger contends that evidence on the record indicates that Greenbrier entered the merchandise for consumption because Greenbrier entered the railcars for sale.[195] The Alleger concludes that an import for sale to a third party is considered an entry for consumption.[196]

## III. Analysis as to Evasion

Under 19 U.S.C. § 1517(c)(1)(A), to reach a determination as to evasion, CBP must "make a determination, based on substantial evidence, with respect to whether such covered merchandise entered into the customs territory of the United States through evasion." The term "evasion" is defined as "the entry of covered merchandise into the customs territory of the United States for consumption by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or

[189] *See* Greenbrier's Rebuttal at 8.
[190] *Id.* at 1.
[191] *See* Alleger's rebuttal.
[192] *Id.*
[193] *Id.*
[194] *Id.*
[195] *Id.*
[196] *Id.*

countervailing duties being reduced or not being applied with respect to the covered merchandise."[197]

The facts on the record of this case show that Greenbrier makes railcars, which have FRCs attached to them [ Movement ].[198] The railcars are [ Transaction ] and then [Transaction ].[199] Greenbrier has stated on the record that it does not have visibility into the ultimate U.S. customer's use of their railcars.[200] Record evidence also shows that the FRCs that [ Movement ] during the POI were primarily manufactured in either [Names ].[201] More specifically, from May 2024 through September 2025, Greenbrier purchased approximately [#s] percent of FRCs by value from [Name ] and about [#s] percent from [Name].[202]

Greenbrier maintains in its various RFI responses that it had no need to "enter" these railcars when they were imported into the United States because they qualified for exception from entry either due to IIT status or because they are freight rail cars on which no duty is owed under 19 C.F.R. §§ 141.4(b)(3) and (b)(4), respectively.[203] However, [ Noun ] seemingly believe the contrary. Per the Allegation, the [ Noun from Name ] stated: "[ Noun ] are not being entered as Type III entries at the border in order to avoid payment of antidumping and countervailing duty deposits."[204]

Nevertheless, the record also established that Commerce determined unequivocally in the *FRC Orders* that subject merchandise included FRCs, whether attached or not to railcars, despite the discussions included in various Commerce scope memoranda.[205] As Commerce stated in its Final Scope Memorandum: "Finally, while recognizing that the legal status of freight rail couplers attached to or mounted on railcars exempt from entry under 19 CFR 141.4(b)(3) and 19 CFR 141.4(b)(4) is a matter for CBP…. Consistent with our Preliminary Scope Decision Memorandum, we continue to find that these arguments pertain to the interpretation of regulations administered by CBP and, as such, are properly assessed by CBP, rather than Commerce. In these investigations, Commerce must establish the applicable scope and determine whether dumping or countervailable subsidization is occurring."[206] Further, in the Final Scope Decision Memorandum, Commerce found that "CBP's interpretation of its

---

[197] *See* 19 C.F.R. § 165.1.
[198] *See, e.g.,* Greenbrier's 1st SRFI response, Greenbrier Central's 3rd SRFI response, Gunderson-GIMSA 3rd SRFI response.
[199] *Id.*
[200] *See* Greenbrier Central's 3rd SRFI response at 7.
[201] *See* Gunderson-GIMSA 1st SRFI at 2 and exhibit S-1. *See also* Verification Exhibit 7.
[202] *See* either Greenbrier Central's 2nd SRFI response at Exhibit 2S-3&4 or Gunderson-GIMSA 2nd SRFI response at Exhibit 2S-4&5.
[203] *See, e.g.,* Greenbrier's 1st SRFI response, Greenbrier Central's 3rd SRFI response, Gunderson-GIMSA 3rd SRFI response.
[204] *See* Allegation Supplement at Exhibit 4.
[205] *See also* Commerce memos, contained in October 10th Greenbrier's EAPA Case Dismissal Request.
[206] *See* October 10th Greenbrier's EAPA Case Dismissal Request at Attachment 1.

regulations and the applicable laws governing entry requirements into the United States is within CBP's purview."[207]

Commerce determined in the *FRC Orders* that the scope includes: "Subject freight railcar couplers and parts are included within the scope whether finished or unfinished, whether imported individually or with other subject or non-subject parts, whether assembled or unassembled, whether mounted or unmounted, or if joined with non-subject merchandise, such as other non-subject parts or a completed railcar."[208] Also, "Subject merchandise includes coupler parts as defined above that have been further processed or further assembled, including those coupler parts attached to a railcar in third countries."[209]

Accordingly, CBP believes there is substantial evidence that the Greenbrier FRCs at issue should have been formally entered into the United States and AD/CVD duties should have been paid on those entries, in accordance with the *FRC Orders*. First, Greenbrier entered railcars for [ Transaction ], without regard to their intended use, making them ineligible for IIT status under 19 C.F.R. § 141.4(b)(3). Second, because FRCs are subject merchandise in accordance with the *FRC Orders*, *i.e.*, "on which duties are owed," they do not qualify for the exception under 19 C.F.R. § 141.4(b)(4). Because Greenbrier erroneously claimed an exception from the requirement to make entry based on 19 C.F.R. §§ 141.4(b)(3) and 141.4(b)(4) when the FRCs crossed the border into the United States, no cash deposits were collected. CBP's position on why Greenbrier's railcars and FRCs fail to qualify for these exceptions from entry are discussed in depth below.

*CBP's Position on 19 C.F.R. §§ 141.4(b)(3) and (b)(4)*

Greenbrier argues that its railcars and attached FRCs were exempt from entry under 19 C.F.R. §§ 141.4(b)(3) and (b)(4). Although CBP recognizes that IITs and certain railway equipment may, under limited circumstances, qualify for exemptions from entry requirements, the record evidence demonstrates that Greenbrier imported the railcars at issue as part of [ Action ] and that duties were owed. Accordingly, CBP finds that the referenced exceptions from entry are inapplicable, and that the merchandise was required to be formally entered with applicable AD/CVD duties deposited.

<u>19 C.F.R. § 141.4(b)(3)</u>

One exception from the general rule that merchandise imported into the United States is required to be entered is for "instruments of international trade described in § 10.41a and § 10.41b(b) of this chapter…"[210] CBP determines that the railcars entered into the United States for purposes of sale to U.S. consumers do not qualify as an IIT; therefore, neither the railcars themselves, nor any affixed FRCs, qualify for this exception from entry as IITs.

---

[207] Memorandum, Freight Rail Couplers from Mexico and the People's Republic of China: Final Scope Decision Memorandum (May 15, 2023).
[208] *See FRC Orders*.
[209] *See FRC Orders*.
[210] 19 C.F.R. § 141.4(b)(3).

What constitutes an instrument of international traffic is set forth in 19 C.F.R. § 10.41a(a). This includes "{l}ift vans, cargo vans, shipping tanks, pallets, caul boards, and cores for textile fabrics either loaded or empty, used in the shipment of merchandise in international traffic" and all other articles that the Secretary of Homeland Security may designate.[211] If the article *does not* appear in 19 C.F.R. § 10.41a(a), has not been designated as an IIT, nor is the normal equipment of, or accessory to, a "container as defined by the Customs Convention on Containers" to receive IIT status, "CBP requires that a *container or holder* must be substantial, suitable for and capable of repeated use, and used in significant numbers in international traffic."[212]

However, "{a}ny foreign owned locomotive or other railroad equipment… as an *element of a commercial transaction*... is subject to treatment as an importation of merchandise from a foreign country and a regular entry… will be made."[213] Pursuant to the 1972 Customs Convention on Containers, CBP generally "reserves the right not to grant temporary {duty-free} admission to containers which have been the subject of purchase, hire-purchase, lease or a contract of similar nature, concluded by a person resident or established in its territory."[214] This provision applies equally to "the temporary admission of accessories and equipment of containers."[215]

Additionally, per CBP regulations, "{e}mpty foreign railroad equipment shall be admitted to the United States without formal entry and payment of duty" if "{t}he passengers or goods to be loaded are to be transported directly to or through a foreign country."[216] Taken together, this means that freight rail car or other railroad equipment attached thereto, is not considered an IIT [ Type of Transaction ].[217]

Here, the freight railcars (attached to each other with the subject FRCs) were not intended to collect passengers or goods to be transported to or from a foreign country: they were produced in Mexico by Greenbrier's affiliates [ Type of Transaction ].[218] The [ Transaction Type ].[219] The railcars manufactured by [ Name and Location ], and by Gunderson-GIMSA in Coahuila, Mexico, are sold to [ Name ] and Greenbrier-GIMSA, respectively. These railcars are then sold by [ Name ] and Greenbrier-GIMSA to the ultimate U.S. customers immediately after crossing the United States border from Mexico.[220]

---

[211] 19 C.F.R. § 10.41a(a)(1).
[212] *See* HQ H016491 (Oct 1., 2007); HQ 114150 (Dec. 12, 1997); HQ 107545 (May 7, 1985); Treas. Dec 71-159 Cust. B. & Dec. 296 (June 18, 1971); 99 Treas. Dec 533, No. 56247 (Aug. 26, 1964) (emphasis added).
[213] 19 C.F.R. § 10.41(d) (emphasis added).
[214] Chapter 3, article 3, paragraph 2
[215] Article 11, paragraph 1
[216] 19 C.F.R. § 123.12(b)(1). This regulation also includes an exception under (b)(2) for when "{t}he equipment is exempt from entry as provided in {19 C.F.R. § 141.4(b)(4)}. Greenbrier also claims that this section exempts them from the requirement to file entry. CBP will also address this argument in this Determination and why the FRCs in this investigation do not qualify for this exception, either.
[217] *See* CBP Rul. HQ 115532 (finding that generally the courts have defined commercial activity, in its broadest sense, to include any type of business or activity which is carried on for a profit.).
[218] *See, e.g.,* Greenbrier's 1[st] SRFI response, Greenbrier Central's 3[rd] SRFI response, Gunderson-GIMSA 3rd SRFI response.
[219] *Id.*
[220] *See* Verification Report at 3-4.

The terms of the sales agreement with [ Noun ] is further evidence of Greenbrier's intention, from the moment of purchase from the Mexican manufactures, was [ Transaction ]. In determining whether property or ownership in property has been transferred from a potential seller to a potential buyer, CBP considers whether the potential buyer has assumed the risk of loss for the imported merchandise and acquired title to the imported merchandise. Under the terms of the sales agreement [ Transaction and Movement Process ] once the railcars cross into the United States.[221] This means [ Transaction Process ].[222] Thus, the sales agreement with [ Noun ] itself indicates that, from the moment Greenbrier purchased the merchandise from the Mexican manufacturers, it intended that they be brought to the United States [ Transaction ].

That [ Noun ] could use these railcars, to which FRCs are attached, as an IIT does not alter that Greenbrier entered them into the United States [ Transaction Type ]. Accordingly, the railcars are ineligible for exception from entry under 19 C.F.R. § 141.4(b)(3) and are required to be formally entered due to the AD/CVD duties owed on the affixed FRCs.

Therefore, because the freight railcars and the attached FRCs are produced in [ Names ] and were entered into the United States [ Transaction ], they do not qualify for IIT status and thus not subject to the exception under 19 C.F.R. § 141.4(b)(3) for the general requirement to file entry.

<u>19 C.F.R. § 141.4(b)(4)</u>

Greenbrier also points to another exception for the general rule that merchandise imported into the United States is required to be entered: railway locomotives and freight cars classified in HTSUS 8601, 8602, or 8606, on which "no duty is owed."[223] CBP determines that the FRCs attached to the railcars entering the United States are covered by an AD and/or CVD duty order; therefore, they do not qualify for this exception because duties are in fact owed on such railcars or freight cars.

---

[221] *See, e.g.,* Greenbrier Central's 3rd SRFI response and Gunderson-GIMSA 3rd SRFI response.
[222] *See* 19 U.S.C. § 1484 and 19 C.F.R. §§ 141.1, 141.4(a)(3) and (4) — mandates all merchandise imported into the United States is required to be entered unless specifically excepted and that duties and the liability for payment accrue upon arrival of imported and reimported merchandise. Per CBP Guidance document, "Bona Fide Sales and Sales For Exportation to the United States," dated August 2005: Noting "bona fide sale" and a "sale for exportation to the United States" requires that a sale of merchandise for exportation to the United States occurs when the transfer of property from one party to another party for consideration. In determining whether property or ownership in property has been transferred from a potential seller to a potential buyer, CBP considers whether the potential buyer has assumed the risk of loss for the imported merchandise and acquired title to the imported merchandise.
[223] 19 C.F.R. § 141.4(b)(4).

To determine whether this exception applies, CBP must first (1) determine whether railcars, to which FRCs are affixed, are classifiable under HTSUS headings 8601, 8602, or 8606. If the railcars are covered by one of these headings, then (2) CBP must determine whether AD/CVD duties qualify as a duty owed for purposes of this exception.

Turning to the first question, because the subject merchandise consists of freight cars or railcars, CBP will assess whether the railcars are classifiable under HTSUS heading 8606 for "railway or tramway freight cars, not self-propelled." There are also no subheadings under heading 8606 to differentiate railcars with couplers from railcars without couplers. However, all of the subheadings under heading 8606 correspond with a general, column one rate of duty of 14 percent *ad valorem*.[224] Accordingly, CBP determines that the railcars, to which the FRCs are affixed, are classifiable under HTSUS heading 8606.

Having established that HTSUS heading 8606 is applicable, CBP turns to the second question: whether the AD/CVD duties applicable per the *FRC Orders* are considered a "duty" owed for purposes of § 141.4(b)(4). If the AD/CVD duties are considered a duty owed under (b)(4), then this exception from entry would not apply to the railcars.

It is well-established that the term "duty" includes "antidumping duty" and "countervailing duty" (AD/CVD) unless AD/CVD is expressly excepted. The AD/CVD statutes provide that AD/CVD is a "duty" that is imposed "in addition to *any other duty* imposed" on the imported merchandise.[225] AD/CVD duties are just that, a type of duty, and nothing in the AD/CVD duty statute suggests that they otherwise should be excepted from the plain meaning of "duty" as used in 19 C.F.R. § 141.4(b)(4). Nor does § 141.4(b)(4) itself carve out an exception for AD/CVD duties. Therefore, CBP determines that the term "duty" in 19 C.F.R. § 141.4(b)(4) encompasses AD/CVD duties.[226]

To conclude, CBP determines that the railcars are classifiable under HTSUS heading 8606. Additionally, the FRCs attached to these railcars are covered by an AD/CVD duty order and thus a duty "is owed" on the railcar, based on the value of the FRCs subject to the *FRC Orders*. Therefore, the exception from entry under 19 C.F.R. § 141.4(b)(4) does not apply to the covered merchandise in this case.

*Additional Analysis*

Greenbrier interprets Commerce's March 2, 2023, Memo as stating that CBP lacks the authority to administer the *FRC Orders* on couplers attached to freight railcars (which can be exempt from

---

[224] Although HTSUS heading 8606 carries a general duty rate of 14 percent *ad valorem*, the subject railcars were entered under the United States-Mexico-Canada Agreement (USMCA) and therefore qualified for a free rate of duty upon satisfaction of the applicable USMCA requirements.
[225] *See* 19 U.S.C. §§ 1671(a) and 1673(2) (emphasis added).
[226] Greenbrier also states that its railcars produced in Mexico qualify for preferential duty-free treatment under the USMCA and therefore "no duty is owed" pursuant to § 141.4(b)(4). However, Chapter 10.10 states that "{e}ach Party reserves the right to apply its antidumping law and countervailing duty law to goods imported from the territory of any other Party. Antidumping law and countervailing law include, as appropriate for each Party, relevant statutes, legislative history, regulations, administrative practice, and judicial precedents. USMCA, art. 10.10, July 1, 2020, https://ustr.gov/sites/default/files/files/agreements/FTA/USMCA/Text/10_Trade_Remedies.pdf.

entry under IIT or 19 C.F.R. § 141.4(b)(4)).[227] However, this Memo merely addressed the practical challenges of administering AD/CVD orders on FRCs. Specifically, the Memo noted that administering the *FRC Orders* on FRCs attached to or integrated with railcars not formally entered would be very "difficult and burdensome from a legal and operational point of view."[228] However, highlighting some challenges in enforcement does not mean that CBP lacks the authority to enforce the *FRC Orders*. Therefore, Greenbrier's reliance on this Memo is misplaced. Moreover, even though Commerce noted challenges to the administration of the *FRC Orders*, Commerce still determined that FRCs attached to rail cars were subject to the *FRC Orders*. Indeed, any administrability challenges are caused by importers like Greenbrier who do not properly declare the merchandise as in scope and file required entry documentation.

Greenbrier also makes the argument that CBP's ACE Rail Consist information predisposes that all railcars are IIT.[229] Although the CBP ACE Rail Consist guidance supports identifying empty equipment as IITs, the guidance is primarily meant to instruct Rail Consist users how to enter information within the Electronic Data Interchange (EDI) environment.[230] This process does not affect or alter IIT regulations or the entry requirements for merchandise entering the United States.

Finally, Greenbrier asserts that, because they did not file entry with respect to the covered merchandise, there is nothing for EAPA to investigate and the matter falls outside CBP's authority. However, CBP finds that a material omission occurs when an importer fails to comply with the entry filing requirements which results in nonpayment of AD/CVD. The importer cannot argue that the EAPA investigation is precluded because there are no entries for consumption, when the reason there are no consumption entries is the importer's own material omission to file entries for covered merchandise. Accordingly, the failure to file an entry for consumption does not prevent CBP from a finding of evasion or absolve Greenbrier from the obligation to pay duties.

Under 19 U.S.C. § 1517(a)(5), evasion is defined as entering covered merchandise into the United States "by means of any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise."[231] CBP determines that Greenbrier was responsible for filing entry and paying applicable AD/CVD duties when importing covered merchandise into the United States, and failure to do so was a material omission that resulted in nonpayment of AD/CVD duties.[232]

---

[227] *See* October 10th Greenbrier's EAPA Case Dismissal Request at Attachment 3.
[228] *Id.*
[229] *See* Greenbrier's voluntary submission of factual information.
[230] *See* CBP guidance, "Automated Commercial Environment: 358 Customs Consist Information," dated November 2025.
[231] *See* 19 U.S.C. § 1517(a)(5).
[232] *See* Section 484(a)(1) of the Tariff Act of 1930, as amended (19 U.S.C. § 1484(a)(1)), requires the importer of record "shall, using reasonable care...make entry...." *See also* 19 C.F.R. § 171 App. B(D)(6) ("All parties, including importers of record or their agents, are required to exercise reasonable care in fulfilling their responsibilities involving entry of merchandise."). Reasonable care could include seeking guidance from the Customs Service through the pre-importation or formal ruling program; consulting with a Customs broker, a Customs consultant, or a public accountant or an attorney; or using in-house employees such as counsel, a Customs administrator, or if

## IV. **Actions Taken Pursuant to the Affirmative Determination as to Evasion**

Considering CBP's determination that Greenbrier failed to enter merchandise into the customs territory of the United States that was subject to entry requirements and on which AD/CVD duties should have been paid, CBP finds that there is substantial evidence of evasion by Greenbrier. Although the merchandise was previously admitted without formal entry, 19 C.F.R. § 10.41(d) provides that railcar equipment brought to the United States as an element of a commercial transaction is subject to treatment as an importation of merchandise for which an entry must be made. Additionally, "CBP may require a formal consumption or appraisement entry for any merchandise if deemed necessary for import admissibility enforcement purposes, revenue protection; or the efficient conduct of customs business."[233] Accordingly, CBP may require Greenbrier to file appropriate entry documentation and tender applicable AD/CVD duties for the covered merchandise admitted during the POI.

Pursuant to its authorities under 19 U.S.C. §§1484, and 19 C.F.R. § 142.13, CBP will henceforth require formal entries for FRCs subject to the *FRC Orders*, requiring the importer to file formal consumption entries for the railcars, to which the FRCs are affixed, and submit proper accompanying documentation and all AD/CVD duties. Greenbrier is required to rectify any non-compliance with provisions of admission railcars, to which FRCs are affixed, that entered the United States during the POI.

Additionally, pursuant to 19 U.S.C. § 1517(d) and 19 C.F.R. § 165.28, CBP shall suspend or continue to suspend the entries covered by this investigation, until instructed to liquidate. For those entries previously extended in accordance with the interim measures, CBP will rate adjust and change those entries to type 03 and continue suspension until instructed to liquidate these entries. CBP may also evaluate Greenbrier's continuous bond in accordance with CBP's policies. None of the above actions preclude CBP or other agencies from pursuing additional enforcement actions or penalties.

Sincerely,



Victoria Cho
Director, Enforcement Operations Division
Trade Remedy Law Enforcement Directorate
Office of Trade

valuation is an issue, a corporate controller, who have experience and knowledge of customs laws, regulations, and procedures.

233 19 C.F.R. § 143.22.

# Attachment B

90 K Street, NE
Washington, DC 20002
U.S. Customs and Border Protection

September 25, 2026

**PUBLIC VERSION**

OT:RR:BSTC:CVB H361930 LNF

Daniel B. Pickard
Buchanan Ingersoll & Rooney PC
Counsel for Coalition of Freight Coupler Producers
1700 K Street, N.W., Suite 300
Washington, DC 20006

Patrick J. Togni
King & Spalding
Counsel for The Greenbrier Companies, Inc.
1700 Pennsylvania Avenue, N.W., Suite 900
Washington, DC 20006

Re: Enforce and Protect Act ("EAPA") Case Number 8183; *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Antidumping Duty Order*, 88 Fed. Reg. 45,138 (Dep't of Commerce July 14, 2023); *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Countervailing Duty Order*, 88 Fed. Reg. 45,135 (Dep't of Commerce July 14, 2023); *Certain Freight Rail Couplers and Parts Thereof from Mexico: Antidumping Duty Order*, 88 Fed. Reg. 78,308 (Dep't of Commerce Nov. 15, 2023); 19 U.S.C. § 1517

Dear Counsel:

This is in response to the request for *de novo* administrative review of a determination of evasion dated May 18, 2026, made by the Trade Remedy Law Enforcement Directorate ("TRLED"), Office of Trade ("OT"), U.S. Customs and Border Protection ("CBP"), pursuant to 19 U.S.C. § 1517(c), in EAPA Case Number 8183 ("May 18 Determination").[1] CBP, OT, Regulations and Rulings ("RR") received an administrative review request from King & Spalding on behalf of The Greenbrier Companies, Inc. and its subsidiaries, Greenbrier Central LLC, Greenbrier Concarril S.de R.L. de C.V., Greenbrier Leasing Company LLC, Greenbrier-GIMSA, LLC, Gunderson-GIMSA S.A. de C.V., and Gunderson Concarril S.A. de C.V. (collectively, "Greenbrier" or the "Importers"), pursuant to 19 U.S.C. § 1517(f) and 19 C.F.R. § 165.41(a) on July 1, 2026. On July 17, 2026, Buchanan Ingersoll & Rooney PC filed a response to the administrative review request on behalf of the Coalition of Freight Coupler Producers (the "Alleger").

---

[1] *See* Notice of Determination as to Evasion, EAPA Case 8183 (May 18, 2026) (Public Version), *available at* https://www.cbp.gov/document/guidance/eapa-case-8183-greenbrier-companies-inc-notice-determination-evasion-may-18-2026 (last accessed Aug. 13, 2026).

**PUBLIC VERSION**

## I. Background

Unless otherwise discussed, based on our review of the administrative record, RR agrees with the recitation of facts as set forth by the May 18 Determination. As such, RR will not repeat the entire factual history herein.

On March 5, 2025, the Alleger, a coalition of domestic producers of freight rail couplers ("FRCs"), filed an EAPA allegation against the Importers.[2] On April 18, 2025, the Alleger supplemented the Allegation.[3]

The Alleger claimed that Greenbrier was "importing Mexican-origin railcars with attached Mexican and/or Chinese FRCs into the United States, without declaring the imports of FRCs, thereby allowing these imports to evade" the antidumping and countervailing duty orders on certain FRCs from Mexico and China.[4] CBP acknowledged receipt of the Allegation on April 24, 2025.[5] On May 15, 2025, TRLED initiated a formal investigation under Title IV, Section 421 of the Trade Facilitation and Trade Enforcement Act of 2015 ("TFTEA"), in response to the allegation of evasion.[6]

Specifically, the Alleger asserted that Greenbrier improperly claimed that the Mexican-origin rail cars it imported into the United States — with FRCs from Mexico and China mounted to them — qualified as instruments of international traffic ("IITs") that were excepted from entry.[7] The Alleger argued that even if the rail cars are excepted from entry as IITs, the FRCs are not because, as the U.S. Department of Commerce ("Commerce") determined, the FRCs are not incorporated into the rail cars.[8] The Alleger further averred that the Importers failed to enter into the United States the FRCs from Mexico and China that were mounted to those rail cars, that FRCs from China are subject to antidumping and countervailing duty orders under A-570-145 and C-570-146, and that FRCs from Mexico are subject to an antidumping duty order under Case No. A-201-857 (collectively, the "AD/CVD Orders").[9] As a result, the Alleger asserted that the Importers evaded the payment of antidumping and countervailing ("AD/CVD") duties on these imports.[10]

---

[2] *See* Certain Freight Rail Couplers and Parts Thereof from Mexico and the People's Republic of China: Request for an Investigation under the Enforce and Protect Act (Mar. 5, 2025) (Public Version) (the "Allegation"); May 18 Determination (Public Version), at 3.
[3] *See* Certain Freight Rail Couplers and Parts Thereof from Mexico and the People's Republic of China: Supplemental Information to Request for an Investigation under the Enforce and Protect Act (Apr. 18, 2025) (Public Version); May 18 Determination (Public Version), at 3.
[4] Allegation (Public Version), at 2.
[5] *See* EAPA Case 8183 - Official Receipt of Allegation (Apr. 24, 2025) (Public Document); May 18 Determination (Public Version), at 3.
[6] *See* Notice of Initiation and Interim Measures (Aug. 29, 2025) (Public Version) ("NOI"), *available at* https://www.cbp.gov/document/guidance/eapa-case-8183-greenbrier-companies-inc-notice-initiation-investigation-and (last visited Aug. 13, 2026).
[7] *See* Allegation (Public Version), at 2, 6–12.
[8] *See id.* at 6–7.
[9] *See generally id.*; *see also Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Antidumping Duty Order*, 88 Fed. Reg. 45,138 (Dep't of Commerce July 14, 2023); *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Countervailing Duty Order*, 88 Fed. Reg. 45,135 (Dep't of Commerce July 14, 2023); *Certain Freight Rail Couplers and Parts Thereof from Mexico: Antidumping Duty Order*, 88 Fed. Reg. 78,308 (Dep't of Commerce Nov. 15, 2023).
[10] *See generally* Allegation (Public Version).

**PUBLIC VERSION**

Commerce identically defined the scope of the AD/CVD Orders. The scope language for each of the AD/CVD Orders is as follows:

> The scope of this order covers certain freight railcar couplers (also known as "fits" or "assemblies") and parts thereof. Freight railcar couplers are composed of two main parts, namely knuckles and coupler bodies but may also include other items (*e.g.*, coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and rotors). The parts of couplers that are covered by the order include: (1) E coupler bodies, (2) E/F coupler bodies, (3) F coupler bodies, (4) E knuckles, and (5) F knuckles, as set forth by the Association of American Railroads (AAR). The freight rail coupler parts (*i.e.*, knuckles and coupler bodies) are included within the scope of the order when imported separately. Coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and rotors are covered merchandise when imported in an assembly but are not covered by the scope when imported separately.
>
> Subject freight railcar couplers and parts are included within the scope whether finished or unfinished, whether imported individually or with other subject or nonsubject parts, whether assembled or unassembled, whether mounted or unmounted, or if joined with non-subject merchandise, such as other non-subject parts or a completed railcar. Finishing includes, but is not limited to, arc washing, welding, grinding, shot blasting, heat treatment, machining, and assembly of various parts. When a subject coupler or subject parts are mounted on or to other non-subject merchandise, such as a railcar, only the coupler or subject parts are covered by the scope.
>
> The finished products covered by the scope of this order meet or exceed the AAR specifications of M-211, "Foundry and Product Approval Requirements for the Manufacture of Couplers, Coupler Yokes, Knuckles, Follower Blocks, and Coupler Parts" and/or AAR M-215 "Coupling Systems," or other equivalent domestic or international standards (including any revisions to the standard(s)).
>
> The country of origin for subject couplers and parts thereof, whether fully assembled, unfinished or finished, or attached to a railcar, is the country where the subject coupler parts were cast or forged. Subject merchandise includes coupler parts as defined above that have been further processed or further assembled, including those coupler parts attached to a railcar in third countries. Further processing includes, but is not limited to, arc washing, welding, grinding, shot blasting, heat treatment, painting, coating, priming, machining, and assembly of various parts. The inclusion, attachment, joining, or assembly of nonsubject parts with subject parts or couplers either in the country of manufacture of the in-scope product or in a third country does not remove the subject parts or couplers from the scope.
>
> The couplers that are the subject of this order are currently classifiable in the Harmonized Tariff Schedule of the United States (HTSUS) statistical reporting number 8607.30.1000. Unfinished subject merchandise may also enter under

**PUBLIC VERSION**

> HTSUS statistical reporting number 7326.90.8688. Subject merchandise attached to finished railcars may also enter under HTSUS statistical reporting numbers 8606.10.0000, 8606.30.0000, 8606.91.0000, 8606.92.0000, 8606.99.0130, 8606.99.0160, or under subheading 9803.00.50. Subject merchandise may also be imported under HTSUS statistical reporting number 7325.99.5000. These HTSUS subheadings are provided for convenience and customs purposes only; the written description of the scope of this order is dispositive.[11]

To investigate "inconsistencies in Greenbrier trade data," on June 6, 2025, CBP issued three CBP Form 28s ("CF-28s") to Greenbrier Central LLC ("Greenbrier Central") and Gunderson Concarril S.A. de C.V. ("Gunderson Concarril"), requesting supporting sales and production documentation for entry numbers (nos.) ending -9435, -3566, and -2553.[12] On July 4, 2025, Greenbrier Central and Gunderson Concarril submitted responses to the CF-28s.

On August 20, 2025, in accordance with 19 C.F.R. § 165.24, CBP issued a Notice of Initiation and Interim Measures ("NOI") to all parties to the investigation.[13] The NOI notified the parties of CBP's decision to take interim measures based upon reasonable suspicion that the Importers had entered covered merchandise into the customs territory of the United States through evasion.[14] The entries subject to the investigation are those unliquidated entries of covered merchandise entered from April 24, 2024 through the pendency of the investigation (*i.e.*, the period of investigation or "POI").[15]

On August 27, 2025, TRLED issued post-initiation Request for Information ("RFI") questionnaires to Greenbrier Central (a subsidiary of Greenbrier that manufactures rail cars in the United States) and Gunderson-GIMSA S.A. de C.V.[16] (a subsidiary of Greenbrier that manufactures rail cars in Mexico).[17] On September 4, 2025, TRLED issued RFI questionnaires to Greenbrier's Chinese suppliers of FRCs, Ningbo Tuoxing Precision Casting Co., Ltd. ("Ningbo Tuoxing"), Rizhao Jintai Machinery Manufacture Co., Ltd. ("Rizhao Jintai"), and Sichuan Y&J Industries Co., Ltd. ("Sichuan Y&J").[18] On October 20, 2025, TRLED issued an RFI questionnaire to ASF-K de Mexico S de RL de CV ("ASF-K"), a subsidiary of Amsted Rail Company, Inc., which supplies FRCs to Gunderson-GIMSA in Mexico.[19] On December 9, 2025, TRLED issued an RFI questionnaire to [ company name ], a Greenbrier affiliate [description of business activity ].[20]

On October 17, October 27, and November 21, 2025, respectively, TRLED issued first, second, and third supplemental RFI questionnaires to Greenbrier Central.[21] On October 17,

---

[11] 88 Fed. Reg. at 45,137–38, 88 Fed. Reg. 45,139–40; 88 Fed. Reg. at 78,309–10.
[12] May 18 Determination (Public Version), at 4; *see also* NOI (Public Version), at 7.
[13] *See generally* NOI (Public Version); May 18 Determination (Public Version), at 4.
[14] *See* NOI (Public Version), at 1, 7, 10–11.
[15] *See id.* at 2; May 18 Determination (Public Version), at 3.
[16] Referred to as "Gunderson-GIMSA" herein.
[17] *See* May 18 Determination (Business Confidential Version), at 5.
[18] *See id.*
[19] *See id.* at 15.
[20] *See id.*
[21] *See id.* at 7–9.

October 28, and November 21, 2025, respectively, TRLED issued first, second, and third supplemental RFI questionnaires to Gunderson-GIMSA.[22] On November 14, 2025, TRLED issued a supplemental RFI questionnaire to Sichuan Y&J.[23]

On October 10, 2025, Greenbrier Central submitted a request to dismiss the EAPA investigation.[24] Greenbrier Central contended that "the Alleger does not have standing, and there is no statutory basis for EAPA to be invoked, because the review was initiated based on inaccurate allegations and clear omissions of information by Alleger that caused CBP to conclude (erroneously) that initiation under EAPA was appropriate."[25] Greenbrier Central appended to its request to dismiss copies of Commerce's preliminary and final scope determinations for the AD/CVD Orders, a March 2, 2023 memorandum issued by Commerce reflecting video calls between Commerce and CBP, the Alleger's response to the March 2, 2023 memorandum, and a September 11, 2025 press release from counsel for the Alleger regarding CBP's initiation of the instant EAPA investigation.[26]

On October 20, 2025, the Alleger submitted a response to Greenbrier Central's request to dismiss the EAPA investigation, asking that CBP disregard the request as unsupported by law and prejudicial to the Alleger.[27] The Alleger also asserted that record evidence shows that [ company names and description of business activity ], which then [description of business activity ].[28] The Alleger further argued that "entries of items for the purpose of consumption, (i.e. items for sale to customers), do not qualify for status as instruments of international traffic ('IIT') (i.e. Type 01 entries) and are therefore subject to entry requirements and in this case, payment of duties pursuant to antidumping and countervailing duty orders."[29] Additionally, the Allegers claimed that Greenbrier Central mischaracterized the March 2, 2023 memorandum as a final agency decision of the issues underlying the instant EAPA investigation.[30]

On December 1, 2025, Greenbrier Central submitted voluntary factual information and maintained that the rail cars it imported into the United States from Mexico were excepted from entry pursuant to 19 C.F.R. §§ 141.4(b)(3) and (b)(4).[31] The submission also included an expert report prepared by a former CBP employee and a copy of Customs Directive No. 3550-075, *Instructions for Handling the Entry of Locomotives, Railcars, and Other Railroad Equipment into the U.S.*, (Mar. 7, 2000) (rev. Mar. 2002) ("Customs Directive 3550-075").[32]

On January 21 through January 23, 2026, CBP conducted an on-site verification at Greenbrier Central's facilities in Lake Oswego, Oregon.[33]

---

[22] *See id.* at 10–13.
[23] *See id.* at 15.
[24] *See* Greenbrier Central's Request To Dismiss Investigation (Oct. 10, 2025) (Public Document).
[25] *Id.* at 2.
[26] *See id.* at Attachs. 1–5.
[27] *See* Response to Request to Dismiss EAPA Investigation (Oct. 20, 2025) (Business Confidential Version), at 2.
[28] *See id.* at 3.
[29] *Id.*; *see also id.* at 7–8.
[30] *See id.* at 3–7.
[31] *See* Greenbrier Central LLC's Voluntary Submission Of Factual Information To Negate The Allegation Of Evasion (Dec. 1, 2025) (Business Confidential Version).
[32] *See generally id.*
[33] *See* May 18 Determination (Public Version), at 17–18.

**PUBLIC VERSION**

On March 12, 2026, Greenbrier and the Alleger each submitted written arguments to CBP.[34]

On May 18, 2026, TRLED found that there was substantial evidence that Greenbrier had failed to enter merchandise into the customs territory of the United States that was subject to entry requirements and on which AD/CVD payments should have been made, resulting in evasion.[35] Additionally, TRLED stated that "CBP will henceforth require formal entries for FRCs subject to the FRC Orders, requiring the importer to file formal consumption entries for the railcars, to which the FRCs are affixed, and submit proper accompanying documentation and all AD/CVD duties," and that "Greenbrier is required to rectify any non-compliance with provisions of admission railcars, to which FRCs are affixed, that entered the United States during the POI."[36]

On July 1, 2026, Greenbrier timely submitted a request for administrative review. On July 2, 2026, RR sent an email to all parties to the investigation, notifying them of the commencement of the administrative review process and the assignment of an RR case number. On July 17, 2026, the Alleger timely filed a response to the request for administrative review.[37]

## II. Law & Analysis

Section 517 of the Tariff Act of 1930, as amended (19 U.S.C. § 1517), provides, "with respect to covered merchandise, the Commissioner shall make a determination, based on substantial evidence, with respect to whether such covered merchandise was entered into the customs territory of the United States through evasion."[38] The term evasion is defined as:

> Except as provided in subparagraph (B), the term "evasion" refers to entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise.[39]

Examples of evasion include, but are not limited to, misrepresentation of the merchandise's true country of origin (*e.g.*, through false country of origin markings on the product itself or false sales), false or incorrect shipping and entry documentation, or misreporting of the merchandise's physical characteristics.[40]

---

[34] *See id.* at 18.
[35] *See id.* at 27; *see also id.* at 20–26.
[36] *Id.* at 27.
[37] The Alleger timely submitted the initial response to the request for administrative review on July 17, 2026. Per RR's instructions, the Alleger timely submitted its revised response to the request for administrative review on July 20, 2026.
[38] 19 U.S.C. § 1517(c)(1).
[39] *Id.* at § 1517(a)(5); *see also* 19 C.F.R. § 165.1.
[40] *See Investigation of Claims of Evasion of Antidumping and Countervailing Duties, Interim Regulations*, 81 Fed. Reg. 56,477, 56,478 (CBP Aug. 22, 2016).

Additionally, covered merchandise is defined as "merchandise that is subject to a CVD order issued under section 706, Tariff Act of 1930, as amended (19 U.S.C. § 1671e), and/or an AD order issued under section 736, Tariff Act of 1930, as amended (19 U.S.C. § 1673e)."[41]

While "substantial evidence" is not defined by statute, the "substantial evidence" standard has been reviewed by the courts in relation to determinations by other agencies. "Substantial evidence requires more than a mere scintilla but is satisfied by something less than the weight of the evidence."[42]

Therefore, CBP must determine whether a party has entered merchandise that is subject to an AD or CVD order into the United States for consumption by means of any document or electronically transmitted data or information, written or oral statement, or act, that is material and false, or any omission that is material, that resulted in the reduction or avoidance of applicable cash deposits or antidumping or countervailing duties being collected on such merchandise. In doing so, CBP may apply adverse inferences where they are warranted.[43] RR's determination as to evasion must be supported by substantial evidence.

### A. Greenbrier's Arguments

Greenbrier requests that RR reverse the May 18 Determination for the following reasons.[44]

First, Greenbrier argues that the May 18 Determination "deviates from and unsettles decades of agency practice and policy" and changes the scope of the AD/CVD Orders as clarified by Commerce.[45] Specifically, Greenbrier claims that its decision not to enter the rail cars in question properly "adhered to" Customs Directive 3550-075 and three memoranda issued by Commerce during the investigation proceedings for the AD/CVD Orders.[46]

Greenbrier avers that Customs Directive 3550-075 instructs that entry is not required for new locomotives, rail cars, and other railroad equipment (excluding parts) built in Mexico or Canada for use in the United States, and that this principle likewise applies to IITs.[47] Greenbrier also contends that the memoranda issued by Commerce highlight CBP's policy of excepting from entry such rail cars (and FRCs attached thereto), and that Commerce determined that FRCs attached to these rail cars are not subject to the AD/CVD Orders.[48] Greenbrier argues that TRLED "brushed aside the Customs Directive" and "openly declined to follow Commerce's 2023 memoranda, and in doing so, impermissibly changed the scope of the Orders, which Commerce explicitly said did not cover non-consumption entries."[49] Greenbrier also notes that the scope's inclusion of FRCs mounted to rail cars is an issue pending before the U.S. Court of International Trade.[50]

---

[41] 19 C.F.R. § 165.1.
[42] *See Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (internal citations and quotation marks omitted).
[43] *See* 19 C.F.R. § 165.6.
[44] *See generally* Greenbrier's Request for Administrative Review (July 1, 2026) (Business Confidential Version).
[45] *Id.* at 12; *see also id.* at 12–17.
[46] *Id.* at 12; *see also id.* at 7–9.
[47] *See id.*
[48] *See id.* at 7–9.
[49] *Id.* at 14–15 (emphases omitted).
[50] *See* Greenbrier's Request for Administrative Review (Public Version), at 14–16 (citing *Wabtec Corp. v. United States*, 815 F. Supp. 1390 (Ct. Int'l Trade 2025)).

Second, Greenbrier asserts that "TRLED's new policy flatly contradicts the governing statutory and regulatory text."[51] Citing to various legal authorities, Greenbrier alleges that the rail cars it imported into the United States from Mexico (with FRCs mounted to them) are excepted from entry as IITs "regularly imported into the United States," and as freight cars classified in heading 8606, HTSUS, on which no duty is owed because the rail cars qualify for preferential tariff treatment under the US-Mexico-Canada Agreement ("USMCA").[52] Greenbrier stresses that, per Commerce's final scope determination, FRCs that are attached to rail cars excepted from entry are outside the scope of the AD/CVD Orders, and that TRLED "reverse{s} the required analysis" by first finding the FRCs to be covered merchandise and thus subject to entry.[53] Moreover, Greenbrier proclaims that "{w}here there is no entry, the compliance question presented to Customs is distinct and, under the statute, not properly the subject of an EAPA proceeding."[54]

Third, Greenbrier contends that the May 18 Determination should be reversed as an arbitrary and capricious "dramatic change in policy" of which Greenbrier had no notice, resulting in a due process violation.[55] Greenbrier states that "{i}n this case, Greenbrier could only have presumed that the cross-border movement of exempt railcars in the same way that has occurred for years would continue to be permitted," and criticizes TRLED for not following the notice-and-comment requirements for shifts in policy.[56] Greenbrier concludes that, "TRLED's about-face upends years of settled expectations — and, if left uncorrected, would impose significant liability for conduct Greenbrier had no warning could be a source of liability. That is precisely the sort of unfair surprise the Fifth Amendment prohibits."[57]

For these reasons, Greenbrier requests that the May 18 Determination be reversed.

## B. The Alleger's Arguments

The Alleger requests that RR affirm the May 18 Determination for the following reasons.[58]

First, the Alleger argues that "CBP appropriately determined that Greenbrier was responsible for filing entry and paying AD/CVD duties on covered imports, and failure to file an entry for consumption does not exempt Greenbrier from the obligation to pay duties or prevent a finding of evasion."[59] The Alleger points out that when Greenbrier's rail cars first cross into the United States, they constitute consumption entries because they are imported into the United States for sale or lease to customers.[60] The Alleger then dismisses as "irrelevant" any potential use of the imported rail cars by Greenbrier's customers, averring that it would be "illogical" to apply an exception to entry "based on a <u>potential</u> future use which may or may not occur."[61] The Alleger also "emphasizes that Greenbrier itself is not using railcars as an IIT; rather it is the customers who

---

[51] Greenbrier's Request for Administrative Review (Public Version), at 17; *see also generally id.* at 17–26.
[52] *Id.* at 23–24; *see also generally id.* at 17–26.
[53] *Id.* at 22; *see also id.* at 2, 13, 19–20, 22.
[54] *Id.* at 26; *see also id.* at 25.
[55] *Id.* at 26; *see also generally id.* at 26–30.
[56] *Id.* at 29.
[57] *Id.* at 29–30.
[58] *See generally* Alleger's Response (July 20, 2026) (Business Confidential Version).
[59] *Id.* at 8.
[60] *See id.* at 6–7.
[61] *Id.* at 7 (emphasis in original); *see also id.* at 9–10, 12.

may potentially use the railcars in that capacity. Greenbrier's sole role is to enter the railcars for sale or lease to customers."[62] Further, the Alleger counters Greenbrier's assertion that CBP's authority under the EAPA statute does not extend to this case by citing to 19 U.S.C. § 1592, which gives CBP "explicit statutory authority to investigate the railcars which are 'introduced' into the United States by Greenbrier."[63]

Second, the Alleger asserts that the rail cars at issue do not qualify as IITs under 19 C.F.R. § 141.4(b)(3).[64] The Alleger explains that Greenbrier imports into the United States from Mexico rail cars with mounted FRCs for lease or sale and lacks insight regarding the use of those rail cars by the final customer.[65] The Alleger also questions Greenbrier's reliance on Customs Directive 3550-075 because it "was superseded," there is no record evidence that it remains active, and the rail cars in question "have not yet entered into 'common commercial use.'"[66] The Alleger additionally states that Greenbrier's rails cars are ineligible for IIT status because they are not engaged in a continuous route of international traffic.[67] Moreover, the Alleger asserts that per CBP rulings, only the party that uses the merchandise as an IIT may claim the IIT exception.[68] Greenbrier, as a lessor/seller of rail cars that lacks visibility into the use of the merchandise by the ultimate consumer, cannot use the IIT exception to entry.[69] Further, the Alleger claims that TRLED concluded that the rail cars at issue are not excepted from entry.[70] The Alleger likewise contests Greenbrier's description of a March 2, 2023 memorandum as binding authority, and states that at the time of issuance, CBP and Commerce lacked relevant information regarding the status of the rail cars that Greenbrier had imported into the United States.[71]

Third, the Alleger contends that Greenbrier's rail cars are ineligible for duty-free entry, and therefore do not meet the entry exception set forth in 19 C.F.R. § 141.4(b)(4).[72] According to the Alleger, "duties are owed here," in the form of antidumping and countervailing duties and duties pursuant to 19 U.S.C. § 1862 ("Section 232").[73] Citing to CBP Form 7501, the Alleger states that, "it is contemplated that duties outside of those listed in HTSUS are to be assessed on merchandise entering the U.S. at the time of importation."[74] The Alleger also points to a ruling where CBP determined that it would collect antidumping/countervailing duties regardless of whether the merchandise qualifies for duty-free status under an international trade agreement.[75] Additionally, the Alleger states that even if FRCs are classified under the HTSUS as a component of rail cars, duties are owed on the rail cars because AD/CVD and Section 232 duties are owed on FRCs.[76] Moreover,

---

[62] *Id.*
[63] *Id.* at 7–8.
[64] *See id.* at 8–17.
[65] *See id.* at 8–9.
[66] *Id.* at 9 (internal citation omitted); *see also id.* at 16.
[67] *See id.* at 12–13.
[68] *See id.*
[69] *See id.*
[70] *See id.* at 13, 29.
[71] *See id.* at 14–16.
[72] *See id.* at 17–24.
[73] *Id.* at 17 (emphasis in original); *see also id.* at 17–19.
[74] *Id.* at 21; *see also id.* at 20–21.
[75] *See id.* at 21–22 (internal citation omitted).
[76] *See id.* at 19–20, 23–24.

the Alleger describes Greenbrier's analysis as "flipped," which would "render the statutory phrase 'subject to duty' a surplusage as the phrase would never have an operative effect."[77]

Fourth, the Alleger argues that FRCs, by themselves, are not entitled to IIT status.[78] In particular, FRCs are not (1) containers used to hold merchandise, (2) accessories because they are used externally and separately from rail cars and do not secure merchandise inside of a container, or (3) attached to IITs.[79] The Alleger also explains that, in the final scope determination, Commerce concluded that the FRCs in question are not permanently attached to rail cars.[80]

Fifth, the Alleger maintains that "Greenbrier's attempts to evade these duties are inconsistent with the law and undermine the essential protections intended to support and safeguard U.S. industry."[81] According to the Alleger, "{u}pholding the determination of evasion will not 'hinder trade,' as Greenbrier claims, because the issue only concerns railcars that have not yet been utilized as IITs and are instead goods for sale or lease."[82] The Alleger also states that a determination of evasion is "supported by the policy considerations underlying the very purpose of the U.S. customs laws, the public policy interests in having trade remedy laws enforced, and the national security considerations incorporated into the President's 232 determination."[83] Moreover, the Alleger avers that Greenbrier's failure to demonstrate that it has established and maintained compliance procedures evidences a lack of reasonable care, undermining any of Greenbrier's arguments regarding due process.[84]

For these reasons, the Alleger requests that the May 18 Determination be affirmed.[85]

## III. Administrative Review Analysis

Pursuant to 19 U.S.C. § 1517(f)(1) and 19 C.F.R. § 165.45, upon request for administrative review, RR will apply a *de novo* standard of review under the law, based solely upon the facts and circumstances on the administrative record in the proceeding. In making our determination, RR reviewed the following materials: (1) the administrative record upon which the May 18 Determination was made; and (2) the timely filed request for review and response thereto.[86]

The purpose of this *de novo* review is to analyze the May 18 Determination and the accompanying administrative record to determine whether substantial evidence of evasion exists. As is discussed herein, to reach a determination of evasion in this administrative review, a threshold question must be answered at the outset: whether the rail cars that Greenbrier imported into the

[77] *Id.* at 23.
[78] *See id.* 24–27.
[79] *See id.* at 24–26.
[80] *See id.* at 26–27.
[81] *Id.* at 28.
[82] *Id.* at 28.
[83] *Id.* at 29.
[84] *See id.*
[85] *See id.*
[86] RR disregards Greenbrier's Motion to Strike dated July 21, 2026, and the Alleger's Opposition to the Motion to Strike dated July 22, 2026. RR reminds all parties of the requirements set forth by 19 C.F.R. § 165.41(f), including the format requirement that footnotes appear in 12-point font Times New Roman. In this instance, however, RR does not consider as prejudicial, the Alleger's use of 10-point font Times New Roman in its response to the request for administrative review.

United States from Mexico, which had FRCs from Mexico and China mounted to them, constitute merchandise subject to entry.[87]

For the reasons outlined below, RR finds that there is substantial evidence on the record that the rail cars with FRCs from Mexico and China mounted to them that Greenbrier imported into the United States from Mexico are required to be entered pursuant to 19 C.F.R. § 141.4(a). Moreover, RR finds that there is substantial evidence on the record that the FRCs from Mexico and China mounted to these rail cars fall within the scope of the AD/CVD Orders, and therefore, constitute covered merchandise under 19 U.S.C. § 1517. Greenbrier failed to file the required entry documentation, which constitutes a material omission. Greenbrier also failed to tender the applicable AD/CVD cash deposits and duties on these FRCs, thereby bringing covered merchandise into the United States through evasion.

### A. The rail cars with FRCs from Mexico and China mounted to them that Greenbrier imported into the United States were required to be entered.

In accordance with Commerce's statutory authority to impose AD/CVD duties, the AD/CVD Orders state that unliquidated entries of FRCs from Mexico and China "entered and withdrawn from warehouse for consumption" are subject to the assessment of AD/CVD duties.[88] The Final Scope Decision Memorandum likewise instructs CBP to "suspend liquidation of all <u>entries</u> of merchandise subject to the determination which are entered, or withdrawn from warehouse, for consumption," and that "determining when a consumption entry takes place, what is an IIT, and the applicability of certain exceptions from normal entry requirements falls within CBP's authority."[89]

"All merchandise imported into the United States is required to be entered, unless specifically excepted."[90] There are four exceptions to this "general rule,"[91] two of which Greenbrier claims apply here: (1) Greenbrier's rail cars are IITs that are excepted from entry under 19 C.F.R. § 141.4(b)(3); and (2) Greenbrier's rail cars are freight cars classified in heading 8606, HTSUS, on which no duty is owed as goods qualifying for preferential tariff treatment under the USMCA, and therefore, are excepted from entry under 19 C.F.R. § 141.4(b)(4).[92]

During the investigations underlying the AD/CVD Orders, Commerce memorialized CBP's explanation that the exceptions to entry for freight rail cars under 19 C.F.R. §§ 141.4(b)(3) and (4)

---

[87] *See* 19 U.S.C. § 1484 (providing entry requirements); 19 C.F.R. §§ 141.4(a), (b) (providing that "all merchandise imported into the United States is required to be entered, unless specifically excepted," and listing four exceptions to entry).

[88] 88 Fed. Reg. at 45,136; 88 Fed. Reg. at 45,138 (same); 88 Fed. Reg. at 78,308 (same); *see also* 19 U.S.C. § 1671e (stating that "entries of the merchandise subject to the countervailing duty order, the liquidation of which has been suspended under section 1671b(d)(2) of this title, shall be subject to the imposition of countervailing duties under section 1671(a) of this title"); 19 U.S.C. § 1673e (stating that "entries of the subject merchandise, the liquidation of which has been suspended under section 1673b(d)(2) of this title, shall be subject to the imposition of antidumping duties under section 1673 of this title").

[89] Greenbrier Central's Request To Dismiss Investigation (Oct. 10, 2025) (Public Document), at Attach. 1, p. 16 (enclosing F*reight Rail Couplers from Mexico and the People's Republic of China: Final Scope Decision Memorandum* (May 15, 2023) ("Final Scope Decision Memorandum") (emphasis in original)).

[90] 19 C.F.R. § 141.4(a); *see also* 19 U.S.C. § 1484 (providing requirements for entry of merchandise).

[91] 19 C.F.R. § 141.4(b).

[92] *See* Greenbrier's Request for Administrative Review (Public Version), at 17–25.

**PUBLIC VERSION**

extend to the rail car's constituent components.[93] The March 2 Memorandum further states that FRCs "are considered a constituent component of freight rail cars, rendering the couplers exempt from entry so long as the couplers are attached to, or a part of, the exempted rail cars."[94] Thus, before reaching the question of whether FRCs from Mexico and China constitute covered merchandise under 19 U.S.C. § 1517, RR first must determine whether the rail cars on which the FRCs were mounted must be entered.[95]

Here, the record evidence shows that Gunderson-GIMSA and [ company name ] manufactured rail cars in Mexico (with FRCs from Mexico and China mounted thereto), and that those rail cars were sold to Greenbrier-GIMSA and [ company name ], respectively.[96] [company name and description of business activity

].[97] [ description of business activities

].[98] Greenbrier also explained that a manifest and/or train sheet data were presented to CBP for clearance and release upon arrival from Mexico.[99]

Per 19 C.F.R. § 141.4(a), the rail cars must be entered unless they meet a specific regulatory exception. In its submissions to CBP, Greenbrier concedes that it did not formally declare or file entry documentation for these rail cars or tender AD/CVD cash deposits or duties for the mounted FRCs from Mexico and China.[100] Yet, as discussed below, RR finds that neither Greenbrier nor the record evidence demonstrates that the claimed exceptions to entry apply to the rail cars (or, by function, to the mounted FRCs) subject to this EAPA proceeding. Therefore, RR continues to find that entry should have been and must be made for these rail cars.[101]

---

[93] Greenbrier Central's Request To Dismiss Investigation (Public Document), at Attach. 3, p. 2 (enclosing Memorandum from P. Zukowski, Program Manager, Office III, Antidumping and Countervailing Duty Operations, to File, *Certain Freight Rail Couplers and Parts Thereof from Mexico and the People's Republic of China: Video Calls with Customs and Border Protection* (Mar. 2, 2023) ("March 2 Memorandum")).
[94] March 2 Memorandum at 2.
[95] *See also* Final Scope Decision Memorandum at 11, 16; Greenbrier's Request for Administrative Review (Public Version), at 22–23.
[96] *See* Greenbrier Central LLC's Response To The Amended Importer Third Supplemental Request For Information (Dec. 5, 2025) (Business Confidential Version) ("Greenbrier Central SRFI 3 Response"), at 9; Verification Report (Feb. 27, 2026) (Business Confidential Version), at 3–4.
[97] *See* Greenbrier Central SRFI Response (Business Confidential Version) ("Greenbrier Central SRFI 3 Response"), at 1, 9; Gunderson GIMSA S.A. de C.V.'s Response To The Manufacturer First Supplemental Request For Information (Nov. 10, 2025) (Business Confidential Version) ("Gunderson-GIMSA SRFI Response"), at 5–6.
[98] *See* Greenbrier Central SRFI 3 Response (Business Confidential Version), at 9; Gunderson-GIMSA SRFI Response (Business Confidential Version), at Ex. S-8c & 10 (including sample rail car purchase and sale agreement); Gunderson GIMSA S.A. de C.V.'s Response To The Amended Manufacturer Third Supplemental Request For Information (Dec. 5, 2025) (Business Confidential Version) (Gunderson-GIMSA SRFI 3 Response"), at 9; Verification Report (Business Confidential Version), at 3–4.
[99] *See* Greenbrier Central SRFI 3 Response (Public Version), at 2; Greenbrier Central SRFI 3 Response (Business Confidential Version), at 9; Gunderson-GIMSA SRFI Response (Business Confidential Version), at 5–6.
[100] *See* Greenbrier Central SRFI 3 Response (Public Version), at 1; Gunderson GIMSA S.A. de C.V.'s Response To The Manufacturer Request For Information (Oct. 6, 2025) (Business Confidential Version) ("Gunderson-GIMSA RFI Response"), at 3, 27–28; Greenbrier's Submission of Written Arguments (Public Version), at 3–5, 11–12.
[101] *See* Verification Report Determination (Public Version), at 22.

**PUBLIC VERSION**

### 1. The rail cars with FRCs from Mexico and China mounted to them that Greenbrier imported into the United States are not excepted from entry as IITs.

Vehicles and other IITs may be imported without entry and payment of duty under 19 U.S.C. § 1322, "to such extent and subject to such terms and conditions as may be prescribed in regulations or instructions of the Secretary of the Treasury."[102] Pursuant to 19 C.F.R. § 10.41(a), locomotives and other railroad equipment "used in international traffic" may qualify as IITs, "subject to the treatment provided for in part 123 of this chapter," which sets forth, *inter alia*, regulations regarding the entry of foreign locomotives and equipment in international traffic.[103]

IIT status is not automatic.[104] Rather, the "onus is on the importer" to provide evidence to CBP demonstrating that the merchandise at issue qualifies as an IIT.[105] Here, Greenbrier has failed to meet this burden.

First, there is record evidence that Greenbrier "does not have visibility into the ultimate U.S. customer's use of their rail cars."[106] As such, Greenbrier does not know how the ultimate customer uses the rail cars, and thus, cannot even confirm or point to record evidence that the rail cars are "used in international traffic" as required by 19 C.F.R. § 10.41(a) to qualify as IITs.

Second, Greenbrier openly acknowledges that it manufactured freight rail cars in Mexico for sale and/or lease to customers in the United States.[107] The record evidence confirms Greenbrier's statements.[108] Thus, based on the record evidence, the rail cars in question crossed the U.S./Mexico border for sale or lease, meaning that they were not "used in international traffic" at the time of importation.[109] Accordingly, pursuant to 19 C.F.R. § 141.4(a), they are required to be entered.

---

[102] 19 U.S.C. § 1322(a).
[103] *See also What Every Member of the Trade Community Should Know About: Instruments of International Traffic* (Aug. 2012) ("IIT Informed Compliance Publication"), at 18, *available at* https://www.cbp.gov/document/guidance/instruments-international-traffic ("Although formal entry and payment of duty are not required for domestic locomotives and railroad equipment that are used in international traffic, certain repairs made in foreign countries are dutiable at the time they are withdrawn from international traffic."); Greenbrier's Request for Administrative Review (Public Version), at 25 (citing HQ 223423 (Dec. 2, 1991) (concluding that entry would be required it the aircraft was diverted from its "use in international traffic"); HQ 224192 (Oct. 13, 1992) (same)).
[104] *But see* Greenbrier's Request for Administrative Review (Public Version), at 23 (stating that, "Greenbrier's railcars are IITs because the HTSUS says they are").
[105] *See* HQ H266818 (May 23, 2016); HQ H300587 (July 5, 2019) (same).
[106] Greenbrier Central SRFI 3 Response (Public Version), at 7; *see also* Gunderson-GIMSA SRFI 3 Response (Public Version), at 7; May 18 Determination (Public Version), at 10, 13, 21.
[107] *See* Gunderson-GIMSA SRFI Response (Business Confidential Version), at 2 ("During the POI, Gunderson GIMSA de CV ("GIMSA") manufactured [number] freight rail cars in Mexico for sale and/or lease to the United States."); Greenbrier's Request for Administrative Review (Public Version), at 2 ("In addition to railcars built in the United States, Greenbrier manufactures railcars in Mexico that are brought by rail into the United States for sale or lease to customers.").
[108] *See, e.g.*, Gunderson-GIMSA SRFI Response (Business Confidential Version), at Ex. S8c & 10 (providing sales agreements with U.S. customer); Greenbrier-Central Verification Exhibits (Business Confidential Version) (same); Greenbrier Central LLC's Response To The Importer Request For Information (Oct. 2, 2025) (Business Confidential Version) ("Greenbrier Central RFI Response"), at Ex. II-2a (providing Greenbrier Central's chart of accounts).
[109] *See supra* at 13 nn.107–108.

**PUBLIC VERSION**

Greenbrier cannot escape the "used in international traffic" requirement even where the rail cars are "regularly imported into the United States" and are therefore "domestic" under 19 C.F.R. § 123.12.[110] CBP's Informed Compliance Publication makes clear that the "used in international traffic" requirement also applies to domestic locomotives and railroad equipment.[111] Thus, the status of Greenbrier's rail cars for purposes of 19 C.F.R. § 123.12 neither affects nor removes the requirement under 19 C.F.R. § 10.41(a) that locomotives and railroad equipment (domestic and foreign) must be "used in international traffic" to qualify as IITs.[112]

In sum, RR concludes that the evidence on the record does not demonstrate that the rail cars (with FRCs from Mexico and China mounted to them) that Greenbrier imported into the United States from Mexico are "used in international traffic" to qualify as IITs under 19 C.F.R. § 10.41(a).

**2. The rail cars with FRCs from Mexico and China mounted to them that Greenbrier imported into the United States are not excepted from entry as freight cars on which no duty is owed under the USMCA.**

Pursuant to 19 C.F.R. § 141.4(b)(4), "freight cars classified in heading 8606, HTSUS, on which no duty is owed" are excepted from entry.[113]

Greenbrier misses the mark in arguing that the imported rail cars qualify as merchandise "on which no duty is owed." Specifically, Greenbrier claims that "railcars that qualify as USMCA-Originating Goods (like Greenbrier's) are entitled to a "free" rate of duty{.}"[114] However, Greenbrier fails to identify (and RR has also not identified) any record evidence that Greenbrier's railcars with FRCs from Mexico mounted to them qualify for preferential treatment under the USMCA.[115] In addition, there is substantial evidence on the record that the rail cars Greenbrier imported into the United States during the POI had FRCs from China mounted to them and also contained other Chinese-origin components.[116]

---

[110] Greenbrier's Request for Administrative Review (Public Version), at 23–24.
[111] *See* IIT Informed Compliance Publication at 18.
[112] *See also id.*
[113] *See also* Chapter 86, Additional U.S. Note 1, HTSUS ("Railway locomotives (provided for in headings 8601 and 8602) and railway freight cars (provided for in heading 8606) on which no duty is owed are not subject to the entry or release requirements for imported merchandise set forth in Sections 448 and 484 of the Tariff Act of 1930.").
[114] Greenbrier's Request for Administrative Review (Public Version), at 19; *see also id.* at 2.
[115] *See generally id.* RR notes, however, that the record includes a [ description of document ] the POI of this EAPA investigation. *See* Greenbrier-Central SRFI 3 Response (Business Confidential Version), at Ex. 3S-3-2.
[116] *See, e.g.*, Verification Report (Feb. 27, 2026) (Business Confidential Version), at 5 ("[ company name ] and Gunderson-GIMSA purchase complete FRC systems from ASF-K de Mexico S. de R.L. de C.V. (ASF-K; a subsidiary of Amsted) and from [ company name ] locations in Mexico. FRCs supplied by ASF-K are manufactured by ASF-K in Mexico. [Name] supplies Chinese-origin FRCs that were imported into Mexico."); Gunderson-GIMSA SRFI Response (Business Confidential Version), at 3 ("GIMSA [ description of business activity ]."); Greenbrier Central LLC's Response To The Importer Second Supplemental Request For Information (Nov. 21, 2025) (Business Confidential Version) ("Greenbrier Central SRFI 2 Response"), at Exs. 2S-3 & 4 (spreadsheet showing [company names and description of business activity]); Gunderson GIMSA S.A. de C.V.'s Response To The Manufacturer Second Supplemental Request For Information (Nov. 21, 2025)

In sum, there is no evidence on the record that demonstrates that Greenbrier's rail cars meet the USMCA requirements for duty-free treatment; accordingly, they are subject to entry requirements. Furthermore, as discussed elsewhere herein, there is substantial record evidence that the FRCs attached to rail cars are subject to the payment of antidumping and countervailing duties. Consequently, Greenbrier's rail cars are not freight cars "on which no duty is owed" under 19 C.F.R. § 141.4(b)(4).[117] As discussed herein, the fact that subject FRCs are attached to a rail car does not take them outside the scope of the AD/CVD Orders. Thus, RR finds that Greenbrier's rail cars are not excepted from entry pursuant to 19 C.F.R. § 141.4(b)(4), and entry must also be filed for the FRCs couplers attached thereto.

**B. There is substantial evidence on the record that the FRCs from Mexico and China mounted to the rail cars that Greenbrier imported into the United States are covered merchandise.**

Having determined that Greenbrier's rail cars must be entered for consumption, RR now addresses whether the FRCs from Mexico and China mounted to these rail cars constitute covered merchandise subject to the AD/CVD Orders.

There is no dispute here that the products that Greenbrier imported into the United States are rail cars with FRCs mounted to them.[118] There is also no dispute that those FRCs were manufactured in Mexico and China.[119] The dispute is whether those FRCs, which are mounted to non-subject merchandise rail cars, constitute covered merchandise under the AD/CVD Orders.

The evidence shows that Greenbrier's affiliates purchased FRCs from Mexico and China that were mounted to the rail cars [ description of manufacturing process ].[120] For example, during the POI, Gunderson-GIMSA manufactured freight rail cars in Mexico for sale

---

(Business Confidential Version) ("Gunderson-GIMSA SRFI 2 Response"), at 10 ("As indicated in Exhibit 2S-4 & 5, [company name and description of business activity ]"); Gunderson-GIMSA SRFI 2 Response (Business Confidential Version), at Ex. 2S-7 (enclosing Gunderson-GIMSA's [ Date ] Updated Purchase Order No. [ number ] (and the related invoice and bill of lading), and [ Date ] Purchase Order No. [ number ], related invoice, bill of lading for [descript. of goods and company name]); ASF-K Request for Information Response Parts I through IV (Dec. 1, 2025) (Business Confidential Version) ("ASF-K RFI Response"), at Ex. P3-Q9.1 (chart, [ description of documents and related identifying information ] showing that ASF-K, Gunderson-GIMSA's supplier of FRCs from Mexico, purchased [goods and origin]); Rizhao Jintai Machinery Manufacture Co., Ltd. RFI Response (Dec. 10, 2025) (Business Confidential Version), at App. 3 (enclosing purchase orders of various rail car components sold to Greenbrier).

[117] To be clear, satisfaction of the requirements for duty-free status under the USMCA does not somehow dissolve the AD/CVD Orders on FRCs from Mexico and China. Indeed, the USMCA explicitly states that, "{e}ach Party reserves the right to apply its antidumping law and countervailing duty law to goods imported from the territory of any other Party." USMCA, art. 10.10 (July 1, 2020), *available at* https://ustr.gov/sites/default/files/files/agreements/FTA/USMCA/Text/10_Trade_Remedies.pdf; *see also* May 18 Determination (Public Version), at 25 n.226.

[118] *See, e.g.*, May 18 Determination (Public Version), at 21; Greenbrier's Request for Administrative Review (Public Version), at 12, 23, 30; Greenbrier Central SRFI 2 Response (Business Confidential Version), at 7 ("[descript. of business activity and company names]."); Gunderson-GIMSA RFI Response (Business Confidential Version), at 15 ("GIMSA sells finished railcars to [company name], which then [ description of business activity ], and [ description of business activity ].").

[119] *See, e.g.*, May 18 Determination (Public Version), at 21; Verification Report (Public Version), at 5–6.

[120] *See, e.g.*, Verification Report (Business Confidential Version), at 3, 5–6; May 18 Determination (Business Confidential Version), at 12, 21.

**PUBLIC VERSION**

and/or lease to the United States as follows: "[ description of merchandise

]."[121] Gunderson-GIMSA clarified that it "[ description of business activity ]," and explained the [ description of manufacturing process ][122] The evidence also shows that [ company names and description of business activity ].[123] Additionally, ASF-K confirmed that during the POI, it sold [ merchandise ] from Mexico to Gunderson-GIMSA during the POI, *i.e.*, merchandise listed in the scope of the AD/CVD Orders.[124]

The plain language of the scope clearly states that FRCs from Mexico and China that are mounted to rail cars are subject merchandise under the AD/CVD Orders:

> Subject freight railcar couplers and parts are included within the scope whether finished or unfinished, whether imported individually or with other subject or nonsubject parts, whether assembled or unassembled, whether mounted or unmounted, or if joined with non-subject merchandise, such as other non-subject parts or a completed railcar. Finishing includes, but is not limited to, arc washing, welding, grinding, shot blasting, heat treatment, machining, and assembly of various parts. When a subject coupler or subject parts are mounted on or to other non-subject merchandise, such as a railcar, only the coupler or subject parts are covered by the scope.[125]

In addition, mounting in-scope Mexican- or Chinese-origin FRCs to rail cars in a third country does not remove those FRCs from the scope of the AD/CVD Orders. In fact, Commerce recently confirmed that, "FRCs that are attached to railcars, whether that attachment occurs in the same or a third country, remain covered by the scope, as intended by the petitioner seeking relief."[126] Thus, Chinese-origin FRCs that were mounted to the rail cars [ country ], which Greenbrier then imported into the United States, remain in-scope and subject to the AD/CVD Orders.

Further, the evidence demonstrates that for entry no. [ number ]636-5, Greenbrier imported in-scope FRC parts — [ product ] — from Mexico into the United States, which fit squarely within the plain scope language.[127] Indeed, Greenbrier acknowledged that such

---

[121] Gunderson-GIMSA SRFI Response (Business Confidential Version), at 2.
[122] *Id.* at 3–4, Ex. S-9.
[123] *See*, *e.g.*, Greenbrier-Central SRFI Response 2 (Business Confidential Version), at Exs. 2S-3 &4; Gunderson-GIMSA SRFI 2 Response (Business Confidential Version), at Exs. 2S-3 & 4.
[124] ASF-K RFI Response (Business Confidential Version), at 22–23; *see also* 88 Fed. Reg. at 45,137; 88 Fed. Reg. 45,139; 88 Fed. Reg. 78,309.
[125] 88 Fed. Reg. at 45,137 (emphases added); 88 Fed. Reg. 45,139 (same); 88 Fed. Reg. at 78,310 (same).
[126] *Final Results of Redetermination Pursuant to Court Remand* (Apr. 14, 2026) (Public Document), at 22–23, *available at* https://access.trade.gov/FinalRemandRedetermination (issued by Commerce pursuant to *Wabtec Corp.*, 815 F. Supp. 1390); *see also* Greenbrier's Request for Administrative Review (Public Version), at 15 (stating that the issue as to whether FRCs mounted to rail cars are in-scope merchandise under the AD/CVD Orders "is currently before the Court of International Trade").
[127] *See* 88 Fed. Reg. at 45,137 (providing scope language regarding FRC parts); 88 Fed. Reg. 45,139 (same); 88 Fed. Reg.

merchandise falls in the scope of the AD/CVD Orders, and submitted a post-summary correction for this entry.[128]

Therefore, RR concludes that there is substantial evidence that the FRCs from Mexico and China, which were mounted to the rail cars that Greenbrier imported into the United States fit within the plain scope language of the AD/CVD Orders. Accordingly, those FRCs constitute "covered merchandise" under the EAPA statute.[129]

### C. There is substantial evidence on the record that Greenbrier entered covered merchandise by evasion.

The evidence shows that Greenbrier entered covered merchandise into the customs territory of the United States by means of material omissions of information that resulted in AD/CVD cash deposits not being applied with respect to the covered merchandise. These violations constitute evasion as defined by 19 U.S.C. § 1517:

> {T}he term "evasion" refers to entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, <u>or any omission that is material</u>, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise.[130]

Here, covered merchandise, *i.e.*, the FRCs from Mexico and China that were mounted to Greenbrier's rail cars, constructively entered[131] into the customs territory of the United States when the merchandise physically arrived at the U.S. port of entry and were subsequently released.[132] As detailed above, the "finished railcars" Greenbrier imported into the United States had FRCs from Mexico and China mounted to them.[133] Moreover, the rail cars in question crossed the U.S./Mexico border for sale or lease to U.S. customers, meaning that covered merchandise constructively entered into the customs territory of the United States for consumption by U.S. customers.[134]

---

78,309 (same); Greenbrier Central RFI Response (Business Confidential Version), at 19 ("Greenbrier Central has determined that Entry No. [ number ]636-5 included [ descript. of goods ] Gunderson GIMSA S.A. de C.V. ('GIMSA') [ description of business activity and company name ] Entry No. [ number ]636-5 included [ description of merchandise ]."); Gunderson-GIMSA RFI Response (Business Confidential Version), at Ex. 111-10.1.

128 *See* Greenbrier's Request for Administrative Review (Public Version), at 10–11.

129 19 U.S.C. § 1517(a)(3).

130 19 U.S.C. § 1517(a)(5)(A) (emphasis added).

131 RR uses the term "constructively entered" to indicate that, although Greenbrier imported the railcars with FRCs attached, and the merchandise was released, Greenbrier failed to file the appropriate entry documentation.

132 Gunderson-GIMSA RFI Response (Business Confidential Version), at 15 ("GIMSA sells finished railcars to [company name], which then [ description of business activity ].").

133 *See supra* at 18.

134 *See* Gunderson GIMSA S.A. de C.V.'s Response To The Manufacturer First Supplemental Request For Information

**PUBLIC VERSION**

As discussed above, however, Greenbrier failed to properly file entry documentation for the rail cars it imported into the United States, which had covered merchandise mounted thereto.[135] Specifically, Greenbrier did not submit entry documentation or entry summaries (CBP Form 7501), thereby omitting material information, such as the correct entry type (type "03" for the FRCs) and Case Nos. A-201-857, A-570-145, and/or C-570-146 from the required entry documentation. Such material omissions of information fall within the definition of "evasion" under 19 U.S.C. § 1517(a)(5)(A), as they resulted in AD/CVD cash deposits and duties not being applied with respect to covered merchandise.[136] Additionally, the omission of Case Nos. A-201-857, A-570-145, and C-570-146 interfered with the government's ability to accurately track imports of FRCs from Mexico and China, to collect the applicable AD/CVD deposits due, and to determine and assess future AD/CVD payments.

Therefore, RR concludes that there is substantial evidence that Greenbrier entered covered merchandise into the customs territory of the United States by evasion.

### D. Greenbrier's other claims lack merit.

First, Greenbrier argues that CBP lacks authority to conduct an EAPA investigation and issue a finding of evasion for merchandise that is not entered for consumption.[137] Specifically, Greenbrier states that, "{w}here there is no entry, the compliance question presented to Customs is distinct and, under the statute, not properly the subject of an EAPA proceeding."[138] In effect, Greenbrier suggests that CBP does not have authority under the EAPA statute to investigate and find evasion where an importer has failed to comply with entry requirements and evaded its obligations to tender applicable AD/CVD cash deposits and duties on covered merchandise.

Contrary to Greenbrier's suggestion, non-compliance with entry requirements does not remove CBP's authority to conduct an EAPA investigation and find evasion where an importer has effectively, albeit improperly, entered covered merchandise into the customs territory of the United States by evasion, as that term is defined in the EAPA statute.[139] To find otherwise, would lead to absurd results and would create a massive loophole in CBP's enforcement of the EAPA statute.[140]

Second, Greenbrier's claim that the May 18 Determination constitutes an arbitrary and capricious "dramatic change in policy" of which Greenbrier had no notice, in violation of

---

(Nov. 10, 2025) (Business Confidential Version) ("Gunderson-GIMSA SRFI Response"), at 2; Greenbrier's Request for Administrative Review (Public Version), at 2 ("In addition to railcars built in the United States, Greenbrier manufactures railcars in Mexico that are brought by rail into the United States for sale or lease to customers.").

135 *See generally* Greenbrier's Request for Administrative Review (Public Version); Greenbrier Central's Request To Dismiss Investigation (Public Document), at 4–10.

136 *See* May 18 Determination (Public Version), at 26 (stating that "a material omission occurs when an importer fails to comply with the entry filing requirements which results in nonpayment of AD/CVD.").

137 *See* Greenbrier's Request for Administrative Review (Public Version), at 25–26.

138 *Id.* at 26.

139 19 U.S.C. § 1517(a)(5)(A) (emphasis added).

140 *See, e.g.*, *EEOC v. Com. Off. Prods. Co.*, 486 U.S. 507, 120–21 (1988) (stating that "respondent's interpretation of the language of § 706(c) leads to absurd or futile results . . . plainly at variance with the policy of the legislation as a whole, which this Court need not and should not countenance") (internal citations and quotation marks omitted); *CPC Int'l v. United States*, 20 C.I.T. 806, 821 n.11 (1996) ("Fundamentally, statutory interpretation should avoid reaching absurd results, as presumably Congress would not have intended such results.").

Greenbrier's rights to due process, is without merit.[141] To be clear, neither this final administrative review determination nor the May 18 Determination alters the "general rule" that all merchandise must be entered, "unless specifically excepted."[142] As detailed above, the record lacks substantial evidence that the merchandise is excepted from entry.[143] Further, Greenbrier's contention of an "unfair surprise" of potential AD/CVD duty liability is belied by its repeated acknowledgement that FRCs mounted to rail cars that are entered for consumption are, in fact, subject merchandise.[144]

## IV. Decision

Based upon our *de novo* review of the administrative record in this case, including the administrative review request and response thereto, the May 18 Determination of evasion under 19 U.S.C. § 1517(c) is **AFFIRMED**.

This decision does not preclude CBP or other agencies from pursuing additional enforcement actions or penalties. Pursuant to 19 C.F.R. § 165.46(a), this final administrative determination is subject to judicial review pursuant to section 421 of TFTEA.

Moreover, CBP notes that any analysis herein of exceptions to entry is based on the administrative record, which was developed on information submitted by the parties as part of the EAPA investigative process. Therefore, this decision does not constitute a ruling under 19 C.F.R. Part 177.

Sincerely,

JACINTO P JUAREZ
Digitally signed by JACINTO P JUAREZ
Date: 2026.09.25 08:41:41 -04'00'

Jacinto P. Juarez, Jr.
Supervisory Attorney-Advisor
Regulations and Rulings, Office of Trade
U.S. Customs and Border Protection

Approved by:

JENNIFER L PETELLE
Digitally signed by JENNIFER L PETELLE
Date: 2026.09.25 08:47:45 -04'00'

Jennifer L. Petelle
Director, Border Security and Trade Compliance
Regulations and Rulings, Office of Trade
U.S. Customs and Border Protection

[141] Greenbrier's Request for Administrative Review (Public Version), at 26; *see also id.* at 26–30.
[142] 19 C.F.R. § 141.4(b) (listing four exceptions to entry); *see also id.* at § 141.4(a); May 18 Determination (Public Version), at 22.
[143] *See supra* at 13–14.
[144] Greenbrier's Request for Administrative Review (Public Version), at 30; *see also id.* at 2, 13, 19–20, 22 (stating that "AD/CVD orders apply only if products are entered for consumption").

# Attachment C

Barcode:4348934-01 A-201-857 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-857; A-570-145; C-570-146
Investigations
**Public Document**
E&C/Office III: PZ

March 2, 2023

**MEMORANDUM TO:** The File

**FROM:** Peter Zukowski PZ
Program Manager, Office III
Antidumping and Countervailing Duty Operations

**RE:** Certain Freight Rail Couplers and Parts Thereof from Mexico and the People's Republic of China: Video Calls with Customs and Border Protection

---

On February 2, 2023, and February 14, 2023, officials from the U.S. Department of Commerce (Commerce) participated in video calls with officials from U.S. Customs and Border Protection (CBP) regarding the scope of the antidumping (AD) and countervailing duty investigations of certain freight rail couplers and parts thereof (freight rail couplers) from the People's Republic of China (China) and the AD investigation of freight rail couplers from Mexico.

In the initial meeting, Commerce and CBP officials discussed instruments of international traffic (IITs) and rail cars, in particular: the framework that applies to IITs in the U.S.; associated record keeping; tracking of IITs once they are in the United States; and their exemption from entry. CBP stressed that due to IITs being exempt from entry, no entry of any kind occurs, to include an entry for consumption. We also discussed whether the correct, applicable HTSUS numbers are currently listed in the scope.

Following the first meeting, on February 9, 2023, Commerce provided to CBP a copy of the *Initiation Notice*[1] in the above referenced antidumping investigations and the associated customs instructions. On February 13, 2023, CBP sent an email to Commerce providing comments on the scope of the investigations, *see* Attachment 1.

In the second meeting, on February 14, 2023, CBP officials further explained any freight rail cars (and their attached or integrated components) which are exempt from entry under 19 C.F.R. § 141.4(b)(3) (*i.e.*, IITs) or (b)(4) (*i.e.*, certain duty-free locomotives and freight cars) are admitted to the United States, but are not entered for consumption as long as they continue to qualify for the exemption. As a result, qualifying freight rail cars transit the United States, but their admittance does not result in an entry (to include an entry for consumption). The admittance of qualifying railcars is accompanied by a manifest, which includes the locomotive and freight rail

---

[1] *See Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China and Mexico: Initiation of Less-Than-Fair-Value Investigations*, 87 FR 64444 (October 25, 2022).



INTERNATIONAL TRADE ADMINISTRATION

cars' registration numbers, and details on the goods carried within the cars, but does not include any details on the components that are integrated into or attached to the freight rail cars. The manifest also does not include any associated HTS codes, as admittance to the United States under 19 C.F.R. § 141.4(b)(3) or (4) does not constitute an entry. CBP officials noted that if freight rail cars were to lose their status under (b)(3) (*e.g.*, the rail car does not exit the United States within 365 days of admission) or (b)(4) (*e.g.*, the required bond was not obtained), then the freight rail cars (and thus, the attached freight rail couplers) would then be subject to entry for consumption.

CBP officials explained that if a freight rail car is exempt from entry under 19 C.F.R. § 141.4(b)(3) and (b)(4), the exemption extends to the rail car's constituent components. Freight rail couplers are considered a constituent component of freight rail cars, rendering the couplers exempt from entry so long as the couplers are attached to, or a part of, the exempted rail cars. However, if freight rail couplers are imported independently of a freight car, they are generally subject to entry unless imported to repair an IIT which is already within the United States. If imported to repair an IIT, the IIT owner must file a declaration with CBP to account for the freight rail couplers being utilized as a part for the freight rail car. Further, CBP explained that freight rail cars that are imported without being exempt from entry under 19 C.F.R. § 141.4(b)(3) or (b)(4) are subject to entry for consumption. If a freight rail car is subject to entry, and an attached coupler is within the scope of an AD/CVD order, then a formal (type 03) consumption entry is required to enter the rail car specifically to assess and collect AD/CVD on the coupler.

CBP officials concluded by stating that administrability of an AD/CVD order on freight rail couplers that are attached to or integrated with a freight rail car that is not entered into the United States would be very difficult and burdensome from a legal and operational point of view. CBP officials indicated they lacked the legal authority to subject freight rail couplers to AD/CVD if the couplers are attached to freight rail cars which are exempt from entry under 19 C.F.R. § 141.4(b)(3) or (b)(4). From an operational perspective, CBP officials speculated that the administration of such an order would require new procedures to be established to identify couplers attached or integrated with freight rail cars and would likely require manual procedures to review records on the equipment of each individual train. Additionally, CBP officials noted the significant administrative challenges of tracking a component of a good that by its nature travels continuously within and outside of the United States and is not identified on any entry documents or a manifest.

Pursuant to 19 CFR 351.301(c)(4), parties are provided one opportunity to submit factual information to rebut, clarify, or correct factual information placed on the record as part of this memo. The deadline for parties to submit this information is **5:00 pm ET on Tuesday, March 7, 2023**. Please file all submissions to all three of the case records included in the heading of this memorandum.

The following individuals participated in the calls:

U.S. Department of Commerce – Enforcement and Compliance:

| | |
|---|---|
| Michael Walsh | Director, AD/CVD Operations, Customs Liaison Unit |
| Yasmin Bordas | Acting Associate Director, AD/CVD Operations, Customs Liaison Unit |
| Nabil Hoq | Analyst, Office of Policy |
| Erin Begnal | Director, AD/CVD Operations, Office III |
| Peter Zukowski | Program Manager, AD/CVD Operations, Office III |
| Samuel Brummitt | International Trade Compliance Analyst, AD/CVD Operations, Office III |
| Jonathan Hall-Eastman | International Trade Compliance Analyst, AD/CVD Operations, Office III |
| Shelby Anderson | Assistant Chief Counsel, Office of Chief Counsel for Trade Enforcement and Compliance |
| Brishailah Brown | Attorney, Office of Chief Counsel for Trade Enforcement and Compliance |

U.S. Customs and Border Protection:

| | |
|---|---|
| Alexander Amdur | Director, AD/CVD Policy and Programs Division |
| Richmond Beevers | Chief, Cargo Security, Carriers & Restricted Merchandise Branch, Regulations and Rulings |
| Bradley Dauble | International Trade Analyst, AD/CVD Policy Branch |
| Jazmine Edwards | Attorney-Advisor, Cargo Security, Carriers & Restricted Merchandise Branch, Regulations and Rulings |
| Kristina Frolova | Acting Chief, Entry Process & Duty Refunds Branch, Regulations & Rulings |
| Joseph Shuler | International Trade Analyst, AD/CVD Policy Branch |
| Robert Thommen | Chief, AD/CVD Policy Branch |
| Amanda Makhoul Zucker | Attorney-Advisor, Cargo Security, Carriers & Restricted Merchandise Branch, Regulations and Rulings |

# ATTACHMENT 1

## February 13, 2023 Email From CBP to DOC

## PUBLIC DOCUMNET

**From:** AMDUR, ALEXANDER <Alexander.Amdur@cbp.dhs.gov>
**Sent:** Monday, February 13, 2023 8:36 AM
**To:** Yasmin Bordas (Federal) <Yasmin.Bordas@trade.gov>; THOMMEN, ROBERT <ROBERT.THOMMEN@cbp.dhs.gov>
**Cc:** Michael Walsh (Federal) <Michael.Walsh@trade.gov>; FROLOVA, KRISTINA <kristina.frolova@cbp.dhs.gov>; MAKHOUL ZUCKER, AMANDA <AMANDA.F.MAKHOULZUCKER@cbp.dhs.gov>
**Subject:** RE: Urgent Request for Second Meeting with CBP - Freight Rail Couplers from Mexico

Yasmin,
CBP provides the additional comments below to the scope of the investigation. We recommend the following edits:

The couplers that are the subject of this investigation are currently classifiable in the Harmonized Tariff Schedule of the United States (HTSUS) statistical reporting number 8607.30.1000. Unfinished subject merchandise may also enter under HTSUS statistical reporting number 7326.90.8688. Subject merchandise attached to finished railcars may also enter under HTSUS statistical reporting numbers 8606.10.0000, 8606.30.0000, 8606.91.0000, 8606.92.0000, 8606.99.0130, 8606.99.0160, or under subheading 9803.00.50~~00 if imported as an Instrument of International Traffic~~. Subject merchandise may also be imported under HTSUS statistical reporting number 7325.99.5000. These HTSUS subheadings are provided for convenience and customs purposes only; the written description of the scope of this investigation is dispositive.

As background, goods entered under HTS 9803.00.50 are not imported as instruments of international traffic.

Best,

Alexander Amdur
Director, AD/CVD Policy and Programs Division
Office of Trade
U.S. Customs and Border Protection
1331 Pennsylvania Avenue, NW
9th Floor-Mail Stop 1142
Washington, DC 20229
202-384-8937

# Attachment D

Barcode:4358402-01 A-201-857 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-857, A-570-145,
C-570-146
Investigations
**Public Document**
E&C/OIII: JHE

March 28, 2023

**MEMORANDUM TO:** James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**FROM:** Erin Begnal
Director, Office III
Antidumping and Countervailing Duty Operations

**SUBJECT:** Freight Rail Couplers from Mexico and the People's Republic of China: Preliminary Scope Decision Memorandum

---

## I. SUMMARY

The U.S. Department of Commerce (Commerce) has preliminarily determined to modify the scope of these investigations. *See* the appendix to this memorandum for the current scope. Interested parties are invited to comment on scope issues following the briefing schedule outlined below.

## II. BACKGROUND

On September 28, 2022, Commerce received antidumping duty (AD) petitions concerning imports of certain freight rail couplers and parts thereof (freight rail couplers) from the People's Republic of China (China) and Mexico and a countervailing duty (CVD) petition concerning imports of freight rail couplers from China filed on behalf of the Coalition of Freight Coupler Producers (the petitioner).[1]

On October 25, 2022, Commerce published the initiation of the AD and CVD investigations in *the Federal Register*.[2] In accordance with the *Preamble* to our regulations,[3] Commerce set aside

[1] *See* Petitioner's Letter, "Certain freight Rail Couplers and Parts Thereof from the People's Republic of China and the United Mexican States: Petitions for the Imposition of Antidumping and Countervailing Duties," dated September 28, 2022 (Petitions). The members of the Coalition of Freight Coupler Producers are McConway & Torley LLC and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union.
[2] *See Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China and Mexico: Initiation of Less Than-Fair-Value Investigations*, 87 FR 64444, 644445 (October 25, 2022) (*AD Initiation Notice*); and *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 87 FR 64440, 64441 (October 25, 2022) (*CVD Initiation Notice*).
[3] *See Antidumping Duties; Countervailing Duties*, 62 FR 272296, 27323 (May 19, 1997) (*Preamble*).

Filed By: Jon Hall-Eastman, Filed Date: 3/28/23 8:21 AM, Submission Status: Approved
INTERNATIONAL TRADE ADMINISTRATION

a period of time for parties to raise issues regarding product coverage and scope in the *AD Initiation Notice* and *CVD Initiation Notice*.[4]

On November 17, 2022, Commerce received timely scope comments from four parties: Amsted Rail Company, Inc. and its affiliate ASF-K de Mexico S. de R.L. de C.V. (collectively, Amsted), the Government of Mexico (GOM), Wabtec Corporation (Wabtec), and Strato, Inc (Strato).[5] On November 28, 2022, the petitioner submitted timely rebuttal comments.[6]

On December 21, 2022, Commerce issued a supplemental questionnaire to the petitioner regarding the scope of the investigations.[7] The petitioner submitted a timely response to this questionnaire on December 29, 2022.[8] On January 12, 2023, Amsted, Wabtec, and Strato submitted timely rebuttal factual information and comments regarding the petitioner's questionnaire response.[9]

On January 31, 2023, the petitioner submitted comments rebutting Amsted's and Strato's rebuttal factual information and comments; the petitioner's submission did not contain new factual information.[10]

On February 6, 2023, the petitioner submitted timely new factual information and comments regarding the scope, then on February 15, 2023 resubmitted those comments without business proprietary information as instructed by Commerce.[11] On February 8, 2023, Wabtec, Amsted, and Strato submitted joint rebuttal comments regarding petitioner's February 6, 2023 scope comments.[12]

On February 3 and 14, 2023, Commerce officials met with officials from U.S. Customs and Border Protection (CBP) regarding the scope of the investigations and placed a memorandum on

[4] *See AD Initiation Notice*, 87 FR at 64445; *see also CVD Initiation Notice*, 87 FR at 64441.
[5] *See* GOM's Letter, "Government of Mexico Comments on the Scope of the Investigation," dated November 17, 2022 (GOM's Scope Comments); Strato's Letter, "Scope Comments," dated November 17, 2022 (Strato's Scope Comments); Wabtec's Letter, "Comments on Proposed Scope," dated November 17, 2022 (Wabtec's Scope Comments); and Amsted's Letter, "Scope Comments," dated November 17, 2022 (Amsted's Scope Comments).
[6] *See* Petitioner's Letter, "Rebuttal Scope Comments," dated November 28, 2022 (Petitioner's Rebuttal Scope Comments).
[7] *See* Commerce's Letter, "Scope Supplemental Questions," dated December 21, 2022.
[8] *See* Petitioner's Letter, "Supplemental Scope Questionnaire Response," dated December 29, 2022 (Petitioner's Scope Clarification Response).
[9] *See* Amsted's Letter, "Amsted Rebuttal Factual Information Regarding Petitioner's Supplemental Scope Questionnaire Response," dated January 12, 2023 (Amsted's Comments on Petitioner Scope Response); *see also* Strato's Letter, "Comments on Petitioner's Supplemental Scope Questionnaire Response," dated January 12, 2023 (Strato's Comments on Petitioner Scope Response); and Wabtec's Letter, "Wabtec's Comments and Rebuttal Factual Information," dated January 12, 2023 (Wabtec's Comments on Petitioner Scope Response).
[10] *See* Petitioner's Letter, "Supplemental Scope Questionnaire Response Rebuttal to Strato and Wabtec," dated January 31, 2023.
[11] *See* Petitioner's Letter, "Resubmission of New Factual Information Submission," dated February 15, 2023.
[12] *See* Wabtec, Strato, and Amsted's Letter, "Rejection of Petitioner's Recent Filings," dated February 8, 2023 (Joint Rebuttal to Petitioner IIT Comments).

the record of the investigations on March 2, 2023 detailing these meetings.[13] Amsted,[14] Strato,[15] and the petitioner[16] submitted new factual information and comments regarding Commerce's March 2, 2023 memorandum on March 7, 2023.

On March 16, 2023, Amsted submitted comments rebutting the Petitioner's Comments on CBP Memorandum; these comments by Amsted did not contain new factual information.[17] On March 23, 2023, the petitioner submitted comments rebutting Amsted's and Strato's comments on the CBP memorandum.[18] Due to the proximity with which these comments were submitted to the date of this preliminary scope determination, we have not considered the arguments therein for this preliminary scope determination. As noted directly below, interested parties will have an opportunity to submit comments on this preliminary scope determination in scope briefs. Commerce will consider arguments included in scope briefs in the final scope determination.

## III. BRIEFING SCHEDULE FOR FINAL SCOPE DETERMINATION

Interested parties may address this preliminary scope determination in scope briefs, which may be submitted no later than 10 days after the issuance of this preliminary scope determination memorandum; *i.e.*, 5 p.m. Eastern Time on April 7, 2023. Rebuttal scope briefs, limited to issues raised in the scope case briefs, may be submitted no later than seven days after the deadline for the scope case briefs. These deadlines, apply for the ongoing AD investigations of freight rail couplers from Mexico and China and CVD investigation of freight rail couplers from China. There is only one briefing schedule for scope issues in these investigations. For all scope issues, parties must file separate and identical documents on the records of all of the ongoing AD and CVD investigations. No new factual information should be included in scope case briefs or rebuttal scope briefs, and no proprietary information should be submitted in the scope case briefs and rebuttal scope briefs.

---

[13] *See* Memorandum, "Video Calls with Customs and Border Protection," dated March 2, 2023 (CBP Memorandum).
[14] *See* Amsted's Letter, "New Factual Information Supporting CBP Video Call Memo," dated March 7, 2023 (Amsted's Comments on CBP Memorandum).
[15] *See* Strato's Letter, "Factual Information in Response to CBP Memo," dated March 7, 2023 (Strato's Comments on CBP Memorandum).
[16] *See* Petitioner's Letter, "Response to Memorandum Regarding Video Calls with U.S. Customs and Border Protection," dated March 7, 2023 (Petitioner's Comments on CBP Memorandum).
[17] *See* Amsted's Letter, "Response to Petitioner's March 7, 2023 Letter Regarding Memorandum of Video Calls With U.S. Customs and Border Protection," dated March 16, 2023.
[18] *See* Petitioner's Letters, "Certain Freight Rail Couplers and Parts Thereof from Mexico: Comments on Strato's Information in Response to CBP Memo," and Certain Freight Rail Couplers and Parts Thereof from China and Mexico: Response to Amsted's Comments of March 7, 2023, both dated March 23, 2023.

## IV. DISCUSSION OF THE ISSUES

### Comment 1: Whether Freight Rail Couplers Become Non-Subject Merchandise When Mounted or Joined to Freight Railcars

*Strato's Scope Comments:*[19]

- AD law applies only to subject merchandise sold for exportation to the United States. Freight rail coupler systems and freight rail coupler components that are exported to other countries and then incorporated into other products before exportation to the United States are not the same class or kind of merchandise as freight rail coupler systems and freight rail coupler components entering the United States on their own. As the merchandise concerned here is not being exported directly to the United States, it is impossible for Commerce to compare the normal value of the subject merchandise with the export price or constructed export price.
- Freight rail coupler systems and freight rail coupler components attached to railcars do not fall within any of the three exceptions to AD law, as they:
  - Do not constitute a separate and distinct article of commerce when exported to the United States. Freight rail coupler systems and freight rail coupler components are among thousands of separate parts of a completed railcar and cannot be considered an individual article of commerce after being incorporated into such a large and complex final product.
  - Are being substantially transformed in the third country and no longer qualify as products of China subject to AD/CVD investigations on imports of Chinese coupler systems.
    - Railcars with freight rail coupler systems and freight rail coupler components attached are not the same class or kind of merchandise as coupler systems alone.
    - Railcar production is much more sophisticated than the production of freight rail coupler systems or freight rail coupler components.
    - Freight rail couplers and railcars do not have the same end use or the same essential components or properties.
    - The cost of a freight rail coupler is only one to three percent of the cost of a railcar, meaning that significant value is added when the systems are attached to a completed railcar.
    - Railcar production in third countries involves a high level of investment.
  - Are not circumventing potential AD/CVD orders on coupler systems. In Strato's case, the freight rail coupler systems and freight rail coupler components are undergoing significant processing in the third country, and, therefore, they do not fit the legal definition of circumvention. Furthermore, treating such minor components of a completed railcar as separate, identifiable products would set a dangerous precedent, as it would mean there are essentially no limits on the potential scope of Commerce's investigations (even components as small as screws could theoretically be seen as separate and distinct from a final product,

[19] *See* Strato's Scope Comments at Attachment at 2-13. Strato refiled its scope comments from the prior investigations of freight rail couplers from China, and thus, these comments reference the scope of those investigations rather than of the instant investigations.

meaning that any product containing screws could potentially be subject to an AD/CVD investigation on screws).

- To attach a freight rail coupler to a railcar, the coupler yoke, follower block, and a non-subject component called the "draft gear" are inserted and secured within a pocket at the end of the car known as a "draft sill." However, the fact that certain freight rail coupler components are not bolted into place does not mean they are easily removed, as evidenced by the need for heavy equipment and a team of skilled workers to remove components other than the knuckle.
- The four subject freight rail coupler components are not sold to railcar producers, or replaced, at the same time and do not constitute a "coupler system." Strato often sells "coupler assemblies," composed of coupler bodies, knuckles, knuckle pins, throwers, and locks along with non-subject merchandise, to railcar producers in Mexico with unitary prices for the entire assembly. Coupler yokes are sometimes sold along with this assembly, but are more often sold separately as an individual component.
- Each freight rail coupler component has its own independent useful life, and some parts are rarely replaced.
- The ability to move is not relevant in determining whether freight rail coupler systems or components retain individual identity or have become part of a larger machine.

*GOM's Scope Comments*:[20]

- Freight railcars and freight couplers are separate products. Commerce wrongly proceeded with a scope that ignores this by including freight rail couplers mounted to railcars. To start, couplers and railcars are clearly identified by different Harmonized Tariff Schedule of the United States (HTSUS) codes.
- When a coupler is attached to a railcar, it no longer is a distinct individual product and becomes part of the railcar. That a railcar should pay customs duties not only for itself, but also for its components and materials (*e.g.*, wheels, doors, wood, steel) flies in the face of AD and customs law.
- Imposing ADs on couplers mounted to railcars has the effect of imposing duties on railcars. Such a step should require that <u>railcars</u> be investigated, not merely included in the scope and never examined.
- The petitioner may include as subject merchandise any product it considers is being dumped in the U.S. market. However, U.S. law requires that the petitioner produce identical or similar to those produced by the allegedly dumped imports. The petitioner and Commerce are expanding the scope of the AD law by applying duties on a component that has been substantially transformed. Rail couplers are only a very small share of the value of railcars. This theory that Commerce is applying here would vastly expand the scope of the AD law.
- The petitioner's claims are further flawed because they target freight rail couplers from Mexico being sold in the <u>Mexican</u> market for assembly onto railcars. This is a different market with different channels of distribution and of course a different country. The AD law is not meant to protect the petitioner against lost <u>export</u> sales. While the petitioner claims that these "sales" take place, in fact this refers to couplers mounted onto railcars, which as explained above are a separate product.

---

[20] *See* GOM's Scope Comments at PDF pages 1-7 and 9-12.

*Amsted's Scope Comments:*[21]

- While Commerce typically defers to a petitioner's preferred scope language, the U.S. Court of International Trade (CIT) has held that Commerce may modify a scope to ensure that it is administrable and consistent with the law. The current scope is not administrable and contravenes existing U.S. trade and customs laws, and thus, must be changed.
- Freight rail couplers attached to railcars have been substantially transformed into a new product and are no longer freight rail couplers. By including couplers attached to railcars in the scope, the petitioner is in effect asking Commerce to address *input* dumping without any legal basis; rather, the only remedy that U.S. law provides for input dumping calls for a petition to the Office of the U.S. Trade Representative (USTR) rather than Commerce. In fact, Congress explicitly considered the possibility of adding language addressing "diversionary dumping" of inputs to the Tariff Act of 1930, as amended (the Act), but ultimately declined to do so and instead enacted the provision calling for the domestic industry to petition USTR in such a situation. The petitioner cannot rewrite the Act to change this.
- Based on the criteria traditionally used by Commerce, freight rail couplers are clearly not the same class or kind of merchandise are completed railcars, as they differ dramatically in physical characteristics, expectations of ultimate users and ultimate, channels of trade, and manner of advertising and display.
- The petitioner attempts to get around the difference in class or kind by including substantially transformed merchandise in the scope, but this is contrary to law. Commerce has applied a five-factor substantial transformation test considering the class or kind of merchandise, nature of the processing, product properties and end use, cost of production/value-add, and level of investment. In addition to the differences in class or kind noted above, there is also a dramatic difference in the other four factors.
    - Freight couplers are produced by a simple forging and casting process, while railcars require the assembly of thousands of different pieces. Freight rail couplers might be removed for service or replacement, but not regularly so, and generally are linked to a specific railcar for their entire useful life.
    - The essential components of a freight rail coupler are forged metal, whereas the essential components of the freight car are the wheels and container attached to the wheels.
    - In the prior investigations, Strato noted that coupler systems cost between one to three percent of the entire value of the railcar, which is also the case for freight rail couplers produced in Mexico.
    - Given the dramatic differences between the industries, the level of investment is not comparable.
- In the predecessor investigations, Commerce found that even when incorporated into a railcar, freight rail couplers systems or components do not undergo physical changes or further processing, and thus, are not substantially transformed.[22] However, this analysis

---

[21] *See* Amsted's Scope Comments at 2-7 and 17-30.

[22] *See* Amsted's Scope Comments at 27-28 and Exhibit 7 (containing "Memorandum Antidumping and Countervailing Duty Investigations of Freight Rail Coupler Systems and Certain Components Thereof from the

misconstrues the law in an untenable way by characterizing what crosses the border as a set of freight rail couplers and a set of railcars rather than a complete freight train.

- Calling for duties on freight rail couplers attached to railcars is akin to demanding that Commerce impose duties on all automobiles from China because those automobiles contain tapered roller bearings, which are themselves subject to duties. Even though the roller bearings are not physically transformed, they are part of a unitary finished product.
- This also applies with respect to wheels, which are clearly removable and have not been physically transformed, but nonetheless have been substantially transformed once mounted to a car body.
- In the predecessor investigations, Commerce relied on the freight rail coupler being inserted into the draft sill and sitting atop carrier plates to claim that they are not permanently mounted. However, this fails to conceptualize the freight railcar as a whole, which is made up of many subassemblies that undergo multiple transformations before becoming the final merchandise. The coupler system is attached to a yoke that itself is connected to a shock absorber. This subassembly is fastened to the car structure, and during new car construction, they are applied at early stages of construction, as the coupler is required to position the car at various assembly stations.
- A freight rail coupler is a subassembly of a subassembly of an item with a new name, character, and use. Characterizing it as an individual component entering the United States is contrary to Commerce's substantial transformation regulations.

*Amsted's Comments on CBP Memorandum:*[23]

- Freight rail couplers are an integral part of a railcar that performs multiple functions beyond merely joining separate railcars together. Freight rail couplers have an independent role in protecting a railcar from a sudden change in direction or speed, with the knuckle for example serving as the "fuse" that would absorb energy. Couplers are not welded or fused to railcars for safety reasons, as doing so would limit the ability of the coupler to protect the railcar in the event of the sudden events noted above.
- The coupler is part of a system embedded in the railcar, and it is connected to multiple other parts of the railcar and not merely to another coupler.
- While freight rail couplers are designed to be removable to allow for safety inspections, this removal is a process that requires skilled labor. Furthermore, a coupler is permanently connected to a specific railcar during the useful life of the coupler (which is shorter than the railcars' useful life).

*Wabtec's Comments:*[24]

- There are two main markets for freight rail couplers: Class I railroads replacing worn couplers, and original equipment manufacturers (OEMs) constructing new railcars. The current scope wrongly includes freight rail couplers mounted on new railcars built in third countries.
- Freight rail couplers cannot cause injury as understood under U.S. AD law when the lost sales are in a non-U.S. market. The U.S. trade laws contain provisions for domestic

---

People's Republic of China: Final Scope Memorandum," dated May 23, 2022 (Predecessor Investigations Final Scope Memorandum), at 11).

[23] *See* Amsted's Comments on CBP Memorandum at PDF pages 6-13.

[24] *See* Wabtec's Scope Comments at 2-6.

industries to file a petition with USTR in such cases. Furthermore, even assuming the new railcar enters the United States, there is no injury. This is because, once mounted, freight rail couplers will normally be joined to railcars until the end of their useful life, and thus, will not be competing with other freight rail couplers. In fact, the presence of these railcars will expand the replacement market.

- The petitioner will argue that the railcars joined with freight rail couplers in Mexico are bound for the United States, but this merely underscores that to the extent the U.S. industry has lost sales it is export sales to OEMs in Mexico.
- Commerce has previously included merchandise mounted in third countries, but these were distinguishable scenarios. In both cases, the subject merchandise was a large portion of the downstream product's value, thus increasing the risk that companies would import more of the downstream product to evade the order. Freight rail couplers, however, are akin to tires, a small fraction of the total cost of a railcar, and OEMs have no incentive to increase railcar production simply to evade freight rail coupler duties. In previous investigations of tires, Commerce made clear that tires entering attached to a vehicle were not covered by the scope.

*Petitioner's Rebuttal Scope Comments*:[25]

- While Commerce has the authority to define a scope, that authority cannot be used to deprive the petitioner of relief unless the resulting order would be otherwise not administrable. Removing mounted freight rail couplers would be contrary to the petitioner's intent and, as explained below, there is no evidence that the scope is otherwise not administrable.
- The respondents' claims that any potential injury from mounted freight rail couplers is due to third country dumping are appropriately examined not by Commerce, but by the U.S. International Trade Commission (ITC), which has preliminarily determined that there is reasonable indication of injury to the domestic freight rail coupler industry.
- In the prior investigations, Commerce declined to address injury in its final scope memorandum, saying that "the question of injury to the domestic {freight rail coupler} industry is within the purview of the concurrent investigation conducted by the ITC." As 80 percent of freight rail couplers are sold via the new car channel, *i.e.*, mounted to railcars; excluding mounted freight rail couplers from the scope would effectively doom the domestic industry.
- The respondents' arguments that mounted freight rail couplers are a different class or kind of product conflate the subject merchandise, freight rail couplers, with the railcars. The railcars themselves are not part of the scope. Regarding substantial transformation, this analysis is only needed if the scope of the investigation is not clear; if the scope is clear, there is no need for this analysis. Further, freight rail couplers are not further manufactured or altered into a different product, but are marked and identifiable products only mounted onto non-subject merchandise.
- The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) and the CIT have confirmed that Commerce need not apply a further manufacturing analysis where scope language is clear about third country processing. In this case, the scope is unambiguous that couplers attached to railcars are within the scope. The Act gives Commerce

[25] *See* Petitioner's Rebuttal Scope Comments at 2-14.

discretion to craft a scope to remedy the domestic industry's injury. There are numerous existing orders that cover merchandise further assembled or attached to non-subject merchandise. Again, there is no need to perform a substantial transformation analysis, because freight rail couplers are not further manufactured, but simply mounted and remain easily visible with clear manufacturing marks and are intended to be replaced on a regular basis.

*Petitioner's Comments on CBP Memorandum:*[26]

- If Commerce were to exclude mounted freight rail couplers from the scope of the Petitions it would undermine the intent of the Petitions. The Federal Circuit, CIT, and Commerce's own precedent are that Commerce owes deference to the petitioner's intended scope.[27]
- Freight rail couplers are not an attached or integrated component of freight railcars. CBP's assertion in the CBP Memorandum is not factually correct, as freight rail couplers are not a constituent part of a railcar, but instead are a mechanism to join two freight railcars. Freight rail couplers are not directly attached to railcars. Rather, a coupler is pinned to yokes, and the yokes are held to the railcar by bolted plates. By removing the pin, the coupler detaches from the yoke and, accordingly, the railcar. Detachment of couplers is relatively easy and is common. Additionally, common industry depictions of railcars often do not include freight rail couplers.
- In the predecessor investigations, Commerce found that freight rail couplers are distinct articles of commerce and of a distinct class or kind from railcars.

**Commerce's Position:** As an initial matter, we note that many of the comments on this issue repeat those made in the prior AD and CVD investigations (the prior investigations) into freight rail coupler systems and certain components thereof from China.[28] In the prior investigations, Commerce rejected arguments from interested parties that freight rail couplers from China were no longer in-scope merchandise once they were attached to freight railcars in a third country.[29] As detailed below, Commerce's evaluation of the record in the instant investigations does not raise any additional information that would lead to a different finding from the prior investigations. Accordingly, we continue to find that attachment to freight railcars does not turn freight rail couplers into a new article of commerce, and thus, we have not modified the scope to exclude freight rail couplers attached to freight railcars.

---

[26] *See* Petitioner's Comments on CBP Memorandum at 1-4.
[27] *Id.* at 2 (citing *Ad Hoc Shrimp Trade Action Committee v. United States*, 637 F. Supp. 2d 1166, 1169-71, 1175-75, 1181 (Fed. Cir. 2009) (*Ad Hoc Shrimp*); and *NTN Bearing Corp. of America v. United States*, 747 F. Supp. 726, 730 (CIT 1990)).
[28] *See Freight Rail Coupler Systems and Certain Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less-Than-Fair Value,* 87 FR 14511 (March 15, 2022), unchanged in *Freight Rail Coupler Systems and Certain Components Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less-Than-Fair Value*, 87 FR 32121 (May 27, 2022); *see also Freight Rail Coupler Systems and Certain Components Thereof: Preliminary Affirmative Countervailing Duty Determination*, 87 FR 12662 (March 7, 2022), unchanged in *Freight Rail Coupler Systems and Certain Components Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 87 FR 30869 (May 20, 2022). In addition to the different name for subject merchandise there are differences in the scope of the current and predecessor investigations. The scope of the prior investigations, but not of the current investigations, includes yokes and follower blocks.
[29] *See* Predecessor Investigations Final Scope Memorandum at 11-12.

While Commerce has the ultimate authority to define or clarify the scope of an investigation, as we noted in the prior investigations, Commerce's well-established practice is to defer to the petitioner with respect to scope language, and there is extensive precedent for scopes covering subject merchandise imported together with or commingled with non-subject merchandise.[30]

In the prior investigations, Commerce found that freight rail couplers are not permanently affixed to freight railcars and that freight rail couplers do not undergo further processing or physical changes when attached to or removed from railcars.[31] This understanding of freight rail couplers is also supported by the record of the current investigations.[32] Evidence added to the record by the petitioner indicates that within the freight railcar industry, it is common for designs and schematics to depict freight railcar designs without any couplers.[33] Additionally, both Amsted and the petitioner have confirmed that freight rail couplers have a shorter useful life than freight railcars, indicating that couplers are not a permanent part of the railcar, even if they may help protect the safety of the railcar.[34] Accordingly, consistent with the prior investigations, we preliminarily find that freight rail couplers do not undergo further processing or physical changes when attached to or removed from railcars. As a result, freight rail couplers mounted on railcars in third countries are not substantially transformed into a separate class or kind of merchandise from freight rail couplers imported on their own, and, thus, meet the physical description of the merchandise in the scope of these investigations.

Having concluded that freight rail couplers attached to or mounted on to railcars are the same class or kind as merchandise covered by the scope of the investigations, we disagree with Amsted that Commerce lacks the statutory authority to include such merchandise within the scope of its investigations to the extent that such railcars entered the United States for consumption. Section 772(a) of the Act defines "export price" as the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States … ." To the extent that railcar manufacturers are purchasing freight rail couplers and exporting finished railcars with attached or mounted freight rail couplers, the dumping law authorizes Commerce to examine such sales if they enter the United States for consumption because they are the parties exporting (*i.e.*, are the price discriminators) the freight rail couplers to the United States.

---

[30] *Id.* at 9-10 (citing *Ad Hoc Shrimp*, 637 F. Supp. 2d at 1174-75; and *Hydrofluorcarbon Blends and Components Thereof from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 42314 (June 29, 2016), and accompanying Issues and Decision Memorandum at Comment 2). Commerce may diverge from its practice in cases where there exists an overarching reason to modify the scope of an investigation such as concerns regarding administrability. Interested parties argue that the inclusion of freight rail couplers mounted on railcars in a third country poses administrability concerns for both Commerce and CBP. These arguments are addressed in Comment 2, *infra*.
[31] *See* Petitioner's Scope Clarification Response at Exhibit 3 (containing Memorandum, "Antidumping and Countervailing Duty Investigations of Freight Rail Coupler Systems and Certain Components Thereof from the People's Republic of China: Post-Preliminary Scope Decision Memorandum," dated April 11, 2022 (Predecessor Investigations Post-Preliminary Determination Scope Memorandum), at 9).
[32] *See, e.g.*, Amsted's Scope Comments at 22-26.
[33] *See* Petitioner's Comments on CBP Memorandum at 5-7 and Exhibits 1 through 3.
[34] *Id*. at 6; *see also* Amsted's Comments on CBP Memorandum at PDF page 13.

Amsted and the GOM criticize the scope language including freight rail couplers attached to railcars on the basis that this sets a precedent for duties to be imposed, for example, on the individual screws, nails, flooring, *etc.* used to construct a freight railcar or on tapered roller bearings or wheels that have been incorporated into a car.[35] Amsted also argues that a car's wheels are not physically changed when attached to the car's body and are easily removable, yet still form an integral part of the car. Likewise, Amsted contends that freight rail couplers are an integral part of a freight railcar and perform functions beyond merely joining two railcars together.[36] However, our scope determination is based on our evaluation of the facts on the record of these investigations, more specifically the characteristics of freight rail couplers, rather than hypothetical scopes involving different products that are not at issue in this case. Accordingly, we find Amsted's and the GOM's arguments unpersuasive.

Interested parties also question the validity of the petitioner's claims of injury by imports of freight rail couplers attached to freight railcars. The GOM argues that imposing duties on freight rail couplers attached to freight railcars is equivalent to imposing duties on freight railcars, which should require a separate petition and demonstration of injury, as well as a demonstration that the petitioner produces freight railcars.[37] The GOM and Wabtec further claim that to the extent that the petitioner is injured, they are being injured by lost *export* sales, which do not fall under the purview of the AD law.[38]

However, as stated in the prior investigations, the question of injury to the domestic freight rail coupler industry is within the purview of the concurrent investigation conducted by the ITC.[39] The ITC will make its final injury determination with regard to imports of subject freight rail couplers following the completion of Commerce's investigations if affirmative. That said, we note that contentions by interested parties that any injury to the petitioner is limited to lost export sales are based on the contention that freight rail couplers lose their distinct identity when mounted or joined to freight railcars, an argument that, as noted above, we find unpersuasive.

**Comment 2: Whether Scope Language Covering Freight Rail Couplers Attached to Railcars Is Administrable**

*Strato's Scope Comments:*[40]

- Including freight rail coupler systems, or components thereof, attached to railcars in third countries would be very difficult to administer for various reasons.
- Freight rail coupler components are designed to be interchangeable, and railcars imported into the United States could have freight rail coupler systems with components from many different countries. The origins of knuckles, yokes, and follower blocks are not traceable, and the markings on yokes and follower blocks are not visible after the parts have been installed onto a railcar. Freight rail coupler systems can include many non-

[35] *See* GOM's Scope Comments at PDF page 3; *see also* Amsted's Scope Comments at 29-30.
[36] *See* Amsted's Comments on CBP Memorandum at PDF pages 8-9.
[37] *See* GOM Scope Comments at PDF pages 3-6; *see also* Wabtec Scope Comments at 2-5.
[38] *See* GOM Scope Comments at PDF pages. at 9-10.
[39] *See* Predecessor Investigations Final Scope Memorandum at 12.
[40] *See* Strato's Scope Comments at Attachment at 13-15.

subject components (such as pins and locks), complicating the ability of railcar importers to assess the value of subject components as compared to the entire assembled system.
- Railcars imported into the United States may include refurbished or secondhand freight rail coupler components that are technically of Chinese origin but were previously imported into the United States. A producer might not be able to distinguish the origin of these older components.

*Strato's Comments on Petitioner Scope Response:*[41]
- The petitioner's contention that it is rare for railcars manufactured in Mexico to re-enter Mexico and then cross back into the United States is incorrect. The United States-Mexico border crossing at Laredo sees 23 to 24 trains cross daily, which, given the number of freight railcars per train and couplers per railcar, means that over 1.7 million couplers cross the border at this one port of entry alone.
- The petitioner also ignores United States-Canada border crossings, which pose analogous administrability issues involving railcars that enter and re-enter the United States. U.S. Department of Transportation data indicate that there were 2.4 million freight railcars that crossed the United States-Canada border.
- Freight railcars that cross the border may come from a private "pool," and the train's operator may not have information on the parts added or removed from such railcars.

*Strato's Comments on CBP Memorandum:*[42]
- Scope memoranda from prior Commerce proceedings clearly show examples where Commerce has modified scopes, even against the express intentions of the petitioner, due to administrability concerns raised by CBP.
- In the scope memorandum accompanying the investigations of shrimp from various countries, when faced with a claim by the petitioner that certain comments by CBP regarding administrability were incorrect, Commerce stated that "we will not second-guess the judgment of the agency that would be tasked with administering the exclusion at the border."[43]

*Amsted's Scope Comments:*[44]
- ADs/CVDs can only be imposed on entries for consumption, as has been upheld by the CIT. CBP's regulations allow for freight cars to cross the border without requiring entry if there is no duty owed, and the reference to "duty" in this case refers to customs duties rather than ADs. Thus, even if ADs were imposed, this regulatory language would apply. Therefore, Commerce should remove from the scope the language that couplers attached to railcars are still within the scope, because such railcars will never be subject to entry requirements, and thus, ADs. At a minimum, Commerce should clarify that couplers attached to railcars exempt from entry requirements are not subject to ADs.

---

[41] *See* Strato's Comments on Petitioner Scope Response at 2-7.
[42] *See* Strato's Comments on CBP Memorandum at 1-3.
[43] *Id.* at 3 and Exhibit 4 (containing Memorandum, "Certain Frozen Warmwater Shrimp from Ecuador, India, Indonesia, Malaysia, People's Republic of China, Thailand, Socialist Republic of Vietnam – Final Scope Memorandum Regarding Onboard Brine-Frozen Shrimp," dated August 12, 2013)).
[44] *See* Amsted's Scope Comments at 7-17.

- Separate from the specific exemption for freight cars under 19 CFR 141.4(b)(4), there is the general exemption for instruments of international traffic under 19 CFR 141.4(b)(3). This exemption is based on Congressional intent, enacted via statute, to expedite customs procedures and allow for the free flow of international traffic across contiguous borders. Commerce should not defer to a scope that attempts to defeat the customs framework established based on clear Congressional intent.
- Even if there were no legal bar on imposing ADs/CVDs on railcars that do not enter for consumption, the scope is not administrable. While there are certain manifesting procedures for international carriers, these requirements are not akin to a formal entry for consumption and only pertain to the container and not the subassemblies such as freight rail couplers. Thus, there is no way of tracking or paying duties on couplers. Notably, the Act itself explicitly describes the suspension of liquidation in terms of merchandise for consumption, which instruments of international traffic (IITs) are not.

*Amsted's Comments on Petitioner's Scope Response:*[45]

- The petitioner misleadingly minimizes the logistical problem of determining the "first entry" of a freight rail coupler crossing the border from Mexico into the United States as part of a finished railcar. However, in 2022, over 6.7 million freight car couplers crossed the border, and the scope of the investigations includes not just freight rail coupler fits, but also certain components. Thus, importers will have to track and declare thousands of components per train, which may contain a unique blend of components. Each railcar entering could itself have couplers made in two different countries entering. Freight rail couplers are also sent by bond from Mexico to Canada and are then incorporated into railcars in Canada, without a U.S. consumption entry occurring.
- *Dry Containers from China* does not support the petitioner's claim that IITs are subject to ADs/CVDs. Rather, the scope simply mentions that IITs are not subject to entry requirements or payment of duty as long as they remain in compliance with IIT rules.[46]
- Likewise, a CBP ruling concerning stainless steel kegs noted that such kegs were exempt from entry as IITs and only could be subject to ADs/CVDs if they entered domestic commerce.[47]
- The petitioner has also failed to offer a legal rationale for imposing duties on railcars from Mexico entered under HTSUS heading 8606. Certain railcars entering from Mexico are clearly exempted from entry requirements under 19 CFR 141.4(b)(4). This applies regardless of whether the railcars are later re-exported. The petitioner's argument that an AD/CVD order would render this regulatory provision irrelevant because it applies for railcars "exempt from duty" is incorrect, because this stipulation has been found by CBP to refer specifically to *customs* duties, not ADs/CVDs.[48] Thus, even an order is imposed on freight railcars from Mexico, this provision would still be operative because no regular customs duties are owed.

---

[45] *See* Amsted's Comments on Petitioner Scope Response at 2-10.
[46] *Id.* at 3-5 (citing *53-Foot Domestic Dry Containers from the People's Republic of China: Final Determination of Sales at Less Than Fair Value; Final Negative Determination of Critical Circumstances*, 80 FR 21203, 21204 (April 17, 2015) (*Dry Containers from China*)).
[47] *Id.* at 5-6 (citing Petitioner Scope Clarification Response at Exhibit 2 (containing CBP Headquarters Ruling HQ H303749 (June 13, 2019) (CBP Kegs Ruling), at 3)).
[48] *Id.* at 9 (citing Amsted Scope Comments at Exhibit 1 (containing CBP Ruling HQ H244253 (September 4, 2014)).

- The petitioner cites incorrectly to several sources such as the CBP Kegs Ruling discussed above and certain provisions of Commerce's regulations to argue that ADs are owed upon entry of the subject merchandise to the United States regardless of the entry requirements; the quoted sources do not actually substantiate this claim.
- The petitioner wrongly argues that a train entering the United States consists of a reportable non-IIT freight rail couplers entering at the same time as an IIT railcar. However, an IIT railcar and its corresponding in-scope freight rail coupler are a single unique article of commerce. The replacement of couplers after being attached to railcars occurs only infrequently, in most cases due to mechanical failure.

*GOM's Scope Comments:*[49]
- Railcars do not make formal entries to the U.S. border when they are IITs. In fact, they go back and forth across the border many times. Under the approach Commerce is taking, they would have to pay a duty each time they cross the border.

*Wabtec's Comments on Petitioner Scope Response:*[50]
- Extensive publicly available data disprove the petitioner's claim that the great majority of railcars do not return to Mexico once they have entered the United States. Bureau of Transportation Statistics data show over a million border crossings of empty and loaded railcars from Mexico into the United States in 2021, and the volume is even larger for the United States-Canada border. The petitioner's own data also do not support this claim.
- The petitioner's claim that imposing duties would not pose administrability issues because railcar producers are "sophisticated" is both lightly substantiated and misleading, because it ignores that railroads, not railcar producers, are responsible for operating trains in service, and manufacturers' expertise is irrelevant to administrability. The petitioner also ignores that the railroad is not always the owner of the freight railcar, and thus, the railroad may not have information on the railcar's parts.
- The CBP Kegs Ruling referenced by the petitioner states that the kegs at issue would qualify for entry-free and duty-free treatment as IITs, and would only be subject to duties under existing AD/CVD orders if they entered domestic commerce. This clearly contradicts the petitioner's claims.

*Joint Rebuttal to Petitioner's IIT Comments:*[51]
- There is no conflict between CBP's regulations regarding IITs and the Act because the Act specifies that ADs/CVDs are levied on entries for consumption and railcars entering as IITs are not entered for consumption. Nonetheless, the petitioner incorrectly casts this issue as pitting statute against regulations, as IITs are exempted from formal entry procedures through section 681 of the North American Free Trade Act (NAFTA). Likewise, the exemption of entry requirements for freight railcars from Canada or Mexico under 19 CFR 141.4(b)(4) is implementing a directive contained in NAFTA.

[49] *See* GOM's Scope Comments at PDF pages 7-8.
[50] *See* Wabtec's Comments on Petitioner Scope Response at 2-5.
[51] *See* Joint Rebuttal to Petitioner IIT Comments at 4-9.

*Petitioner's Rebuttal Scope Comments*:[52]

- Claims that including mounted freight rail couplers makes the scope not administrable are incorrect. Railcar producers must track all components used in a railcar, including the country of origin (for warranty purposes). Because they have ready access to information on country of origin for each part, it will not be difficult for them to comply, as is shown by no railcar manufacturer claiming that they cannot provide information on coupler component country of origin. Additionally, there is a clearinghouse service that is a central repository for rail equipment that includes manufacturer and facility information for couplers and knuckles that can be queried by railcar owners.
- In the AD and CVD investigations of vertical shaft engines from China, Commerce rejected arguments that the scope would be not administrable because CBP would have to take apart third country lawn mower entries with Chinese engines and examine the parts, finding that the scope was administrable because OEMs match engines to lawn mowers, and in fact, have precise information on the parts.[53] The same is true here and even more so because the freight industry is heavily regulated.
- The customs regulation cited by Amsted applies to duty-free entries, meaning that it would be inoperable if ADs are imposed. Furthermore, Amsted's claim is fundamentally flawed in that it relies on a regulation regarding entry paperwork to negate the AD/CVD law.
- CBP has experience assessing duties only on components for which duties are owed, rather than on an entire larger article to which the components are attached. Moreover, CBP has extensive experience administering AD/CVD orders on items that enter the United States, leave the country, and are re-imported (*e.g.*, under temporary import bond or in a foreign trade zone).

*Petitioner's Scope Clarification Response:*[54]

- CBP has previously found that merchandise covered by the scope of an AD order, even when entered as an IIT, is subject to ADs.
- ADs would be collected on initial importation of subject freight rail couplers.
- 19 CFR 141.4(b)(4) is conditional upon there being "no duty owned" on relevant merchandise, and thus, is not applicable to merchandise that is subject to an AD order.
- Even if CBP considered the railcar to which a freight rail coupler is attached to be an IIT, freight rail couplers are not permanently joined to railcars and should be declared as a Type 03 consumption entry when they enter the United States.
- In the vast majority of cases, railcars do not return to Mexico after re-entering the United States. The small percentage of freight rail couplers that re-enter Mexico and then enter the United States are handled by sophisticated multinationals that have extensive logistical capabilities such that filing Type 03 entries would not be burdensome. Moreover, this would only be applicable to merchandise found to have been sold at dumped prices.

---

[52] *See* Petitioner's Rebuttal Scope Comments at 14-17.

[53] *See* Petitioner's Scope Comments at 15 (citing Petitioner's Scope Clarification Response at Exhibit 6 (containing Memorandum, "Antidumping and Countervailing Duty Investigations of Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof from the People's Republic of China: Scope Comments Decision Memorandum for the Final Determination," dated March 5, 2021)).

[54] *See* Petitioner's Scope Clarification Response at 2-6.

*Petitioner's IIT's Comments:*[55]

- That freight railcars may be considered IITs does not exempt freight rail couplers from payment of ADs/CVDs. While the respondents have cited 19 CFR 141.4(b)(4), this is a regulation, and regulations do not supersede statutes passed by Congress. The Act does not specify anywhere that IITs are exempt from ADs/CVDs and nor do the accompanying regulations.
- Freight rail couplers are neither IITs, nor are they accessories to IITs. Accessories to IITs are only accorded IIT status when attached to a container. While CBP has not specifically examined whether railcars are containers, in an analogous case, CBP found that truck trailers were not containers even though they were vehicles.
- Regardless, the respondents are confusing special rules for entry with the scope definition.
- Regarding arguments over the frequency of border crossings and re-crossings of railcars with subject freight rail couplers mounted to them, the petitioner has taken the position that duties would only be imposed on first entry, and thus, arguments concerning the repeated levying of duties in fact a distraction. However, to the extent the issue of crossing and re-crossing the border is considered relevant, data show that comparatively few railcars cross the United States-Mexico border.

*Petitioner's Comments on CBP Memorandum:*[56]

- Freight railcars can be exempt from entry without freight rail couplers being exempt from entry. Even if a freight railcar enters as an IIT, freight rail couplers are not directly attached to or integrated into railcars and, accordingly, are not IITs in and of themselves. CBP evidently made this assumption, but has never directly issued a ruling on this matter.
- CBP has previously found that items added to an IIT are not IITs themselves. For example CBP previously determined that because battery cut-off switches are not holders or containers, they are not IITs.[57] As with battery cut-off switches, freight rail couplers are not holders or containers and, therefore, are not IITs themselves.
- Freight rail couplers are not accessories to IITs. Even if CBP determined that freight railcars are IITs, they are properly classified as vehicles, not containers. Accordingly, freight rail couplers cannot be afforded IIT status as accessories to containers, even if freight railcars would be afforded IIT status. However, even if freight railcars are deemed to be "containers" rather than "vehicles," there are limitations on whether container accessories can be afforded IIT status. Specifically, accessories to an IIT must be attached to the IIT itself, and couplers are not affixed to the railcar itself.
- Commerce's scope determinations do not typically address CBP entry issues, such as whether an article is an instrument of international traffic or if merchandise is to be entered under bond.
- Not all freight railcars are necessarily exempt from entry, and even if a freight railcar is initially exempt from entry, it may lose this status. Therefore, Commerce should not

---

[55] *See* Petitioner's IIT Comments at PDF pages 4-9.
[56] *See* Petitioner's Comments on CBP Memorandum at 4-21.
[57] *Id.* at 8 (citing Petitioner's Scope Clarification Response at Exhibit 5 (containing CROSS Ruling H116451: "Instruments of International Traffic; Battery Cut-Off Switches; Subheading 9803.00.50, HTSUSA; 19 U.S.C. § 1322; 19 CFR § 10.41a" (May 31, 2005)).

exclude mounted freight rail couplers from the scope of the investigations solely because they are mounted.

- Freight railcar producers must track all components used in constructing a freight railcar or that are used in conjunction with a railcar, including the country of origin of those components.
- CBP's concerns about administrability are based on several incorrect assumptions.

**Commerce's Position:** Following our review of comments on this issue, we are preliminarily not removing freight rail couplers mounted or joined to railcars from the scope of the investigations. However, we are preliminarily making a modification suggested by CBP to change Harmonized Tariff Schedule (HTS) subheading 9803.00.5000 to 9803.00.50 and also deleting the rest of the sentence that follows that number, specifically "if imported as an Instrument of International Traffic," based on CBP's input that merchandise entered under HTS subheading 9803.00.50 is not imported as an IIT.[58]

At the outset, we note that that the question of whether to include a product in the scope of an investigation is distinct from the question of the universe of sales to which any affirmative determination should be applied. Thus, we begin by addressing the threshold scope question raised by parties and next address arguments regarding the legal status of freight rail couplers shipped to the United States attached to or mounted on railcars.

With respect to the threshold scope question, the petitioner has indicated that it intends for the scope of these investigations to cover freight rail couplers that are attached to or mounted on railcars. While Commerce has the ultimate authority to define or clarify the scope of an investigation, Commerce's well-established practice is to defer to the petitioner with respect to scope language. Commerce may diverge from its practice of giving deference to the petitioner's request in cases where there exists an overarching reason to modify the scope of an investigation such as when there are concerns about the ability of the agency and CBP to administer the scope as written.[59]

Interested parties have raised and responded to arguments about treatment of freight rail couplers as IITs and administrability issues associated with including freight rail couplers mounted or joined to railcars in the scope. In particular, Amsted and the GOM argue that the HTS codes in the scope referring to IITs and exempt railcars will never have corresponding formal entries for consumption, and thus, should not be included in the scope. However, CBP has indicated, that railcars may initially cross the U.S. border as IITs or may be exempt from entry under 19 CFR 141.4(b)(4), but could in some instances later lose their exempt status.[60] Additionally, freight railcars may be imported without being exempt from entry under 19 CFR 141.4(b)(3) or (b)(4) and, in that scenario, are subject to entry for consumption.[61]

[58] *See* CBP Memorandum at Attachment 1.
[59] *See NTN Bearing Corp.*, 747 F. Supp. at 731 (citing *Torrington Co. v. United States*, 745 F. Supp. 718 (1990), *aff'd*, 938 F.2d 1276, 1278 (Fed. Cir. 1991)).
[60] *See* CBP Memorandum at 1-2.
[61] *Id.* at 2.

Amsted, Wabtec, and Strato also highlight purported administrability issues that are associated with including freight rail couplers mounted or joined to railcars in the scope. Strato and Amsted both comment on the challenges for importers of tracking the country of origin and manufacturer of individual components, when a freight train crossing the border can be composed of numerous freight railcars and couplers, each of which may have a distinct combination of components.[62] In the prior investigations, Commerce considered and rejected similar arguments from Strato and Wabtec.[63] In those investigations, Commerce explained that the petitioner had added to the record information clearly showing that railcar manufacturers and owners track all of the components that are part of a railcar for warranty purposes, and thus, that importers would have access to the information needed at the time of import. Furthermore, Commerce also noted the freight rail industry also operates a database where information on the manufacturer and physical characteristics of railcars and associated products such as freight rail couplers are uploaded.[64] In the current investigations, as in the prior investigations, the petitioner has added to the record extensive evidence showing that the components going into freight railcars are tracked by manufacturer and country of origin and also regarding the Umler database used to track information on freight railcar parts, as well as highlighting the extensive registration requirements for freight railcar components.[65] Additionally, CBP has not identified overarching administrability concerns with assessing ADs/CVDs on freight rail couplers attached to freight railcars that enter the United States for consumption.[66]

As such, we continue to find that the information necessary to administer the scope of these investigations, assuming there is an entry for consumption, is tracked in the ordinary course of business and that there is no overarching reason to modify the scope of the investigations beyond making the modification proposed by CBP and outlined above.

Separate from the description of the merchandise covered by the scope of the investigations, interested parties have made multiple arguments about the circumstances in which freight rail couplers attached to railcars enter the United States for consumption, including whether it is appropriate to treat freight rail couplers attached to or mounted on railcars as IITs under 19 CFR 141.4(b)(3)[67] and the conditions under which railcars are exempt from entry under 19 CFR 141.4(b)(4).[68] We find that these arguments pertain to the interpretation of regulations administered by CBP and, as such, are properly assessed by CBP, rather than Commerce. In these investigations, Commerce must establish the applicable scope and determine whether dumping or countervailable subsidization is occurring. In the event of affirmative preliminary determinations in the investigations, Commerce will instruct CBP to suspend "liquidation of all

---

[62] *See* Amsted's Comments on Petitioner Scope Response at 2-3 and Exhibit 1; *see also* Strato's Comments on Petitioner Scope Response at 6-7 and Exhibits 12 through 13.
[63] *See* Predecessor Investigations Post-Preliminary Determination Scope Memorandum at 9, unchanged in Predecessor Investigations Final Scope Memorandum at 10-11.
[64] *See* Predecessor Investigations Final Scope Memorandum at 10.
[65] *See* Petitioner's Rebuttal Scope Comments at 14-16 and Exhibits 4 through 6; *see also* Petitioner's Comments on CBP Memorandum at Exhibits 12, 15 through 25, and 36.
[66] CBP did identify administrability concerns with an order that applies to freight rail couplers attached to freight railcars that do not enter the United States for consumption. However, as discussed below, we are not instructing CBP to apply ADs/CVDs to freight rail couplers that do not enter the United States for consumption.
[67] *See* 19 U.S.C. § 1322(a)
[68] *See, e.g.*, Amsted's Scope Comments at 7-15; *see also* Petitioner's Comments on CBP Memorandum at 7-13.

*entries* of merchandise subject to the determination which are entered, or withdrawn from warehouse, *for consumption* … ."[69] In the event of affirmative final determinations, Commerce will, as applicable, require the posting of cash deposits "for each *entry* of the subject merchandise … ."[70] Additionally, if both Commerce and the ITC reach affirmative determinations, Commerce will publish AD/CVD orders requiring deposits of estimated duties "pending liquidation of *entries* of merchandise at the same time as estimated normal customs duties on that merchandise are deposited."[71] As a matter of law and practice, Commerce does not regulate whether, and at what point, merchandise enters the United States for consumption. Rather determining when a consumption entry takes place, what is an IIT, and the applicability of certain exceptions from normal entry requirements falls within CBP's authority.

Although the petitioner acknowledges that entry questions are within CBP's purview,[72] the petitioner also asserts that CBP's regulations cannot negate AD/CVD law, and as such, freight rail couplers covered by the scope of the investigations should be considered to enter the United States for consumption regardless of the legal status of the freight railcar into which the coupler is incorporated.[73] As noted above, CBP's interpretation of its regulations and the applicable laws governing entry requirements into the United States is within CBP's purview. Therefore, Commerce does not consider it appropriate to instruct CBP to collect cash deposits of ADs/CVDs on all freight rail couplers meeting the physical description of the scope as subject merchandise regardless of whether a formal entry for consumption occurs. Indeed, as the petitioner recognizes, Commerce often encounters merchandise imported into the United States without formal entry (*e.g.*, under a temporary import bond (TIB) or into a foreign trade zone), and Commerce does not direct CBP to apply ADs/CVDs to such merchandise regardless of its legal status. Here, likewise, any duties would be imposed to the extent that consumption entries occur and whether or not a consumption entry occurs is, as discussed above, determined by CBP.

Amsted also requests that Commerce "clarify that couplers attached to railcars exempt from entry requirements are not subject to AD duties."[74] We do not find such a clarification appropriate because Commerce does not determine the circumstances in which entry exemption requirements are (or are not) satisfied. Nonetheless, Commerce stresses that (as discussed above) it can only order the suspension of liquidation of and the posting of AD/CVD cash deposits on subject merchandise entered, or withdrawn from warehouse, for consumption into the United States, a determination of which is made by CBP.[75]

---

[69] *See* section 703(d)(2) and 733(d)(2) of the Act (emphasis added).
[70] *See* sections 705(c)(1)(B)(ii) and 735(c)(1)(B)(ii) of the Act (emphasis added).
[71] *See* sections 706 and 736 of the Act.
[72] *See* Petitioner's Comments on CBP Memorandum at 10-11.
[73] *See* Petitioner's Rebuttal Scope Comments at 16-17.
[74] *See* Amsted's Scope Comments at 10.
[75] *See, e.g.*, sections 703(d)(1)(B), 703(d) (2), 733(d)(1)(B), and 733(d)(2) of the Act.

**Comment 3: Whether to Include Scope Language Regarding Country of Origin of Non-Subject Merchandise**

*Amsted's Comments:*[76]

- The current scope includes unfinished freight rail couplers. Based on that, if a freight rail coupler is poured and cast in one country and finished in another, the country of origin should be the country in which the freight rail coupler was poured and cast, *e.g.*, a coupler poured and cast in China and finished in Mexico should have China as the country of origin.
- This should also apply to cases where Amsted pours and casts coupler bodies in the United States and then sends them to Mexico for finishing treatment. Amsted believes, and requests that Commerce clarify, that such a coupler body would not be subject to any AD order on freight rail couplers from Mexico, because the country of origin of the coupler body would be the United States and not Mexico.
- This would be consistent with Commerce's new regulation on country of origin, 19 CFR 351.225(j). Regarding the factors delineated in the regulation:
    - Because the scope covers freight rail couplers and parts that are finished or unfinished, finishing in Mexico does not change the class or kind of merchandise.
    - The basic physical characteristics, *e.g.*, chemical, dimensional, and technical characteristics do not change when finished in Mexico.
    - The intended end use of the downstream product is fixed at the timing of casting, not of finishing.
    - The cost of production of casting operations in the United States is 70 to 85 percent of the total finished coupler cost of production.
    - The nature and sophistication of the finishing operations in Mexico are modest compared to the casting operations in the United States.
    - The investment in the finishing operations in Mexico are small compared to investments in Amsted's pouring and casting in the United States.
- Thus, Commerce should clarify the scope to note that the country of origin of freight rail couplers is set by the country where the couplers are cast.

No other interested party commented on this issue.

**Commerce's Position:** The scope as written indicates that "{t}he country of origin for subject couplers and parts thereof, whether fully assembled, unfinished or finished, or attached to a railcar, is the country where the subject coupler parts were cast or forged." Thus, the language of the scope is explicit that the country of origin for subject couplers is where the coupler parts were cast or forged, and we do not find it necessary to clarify the language of the scope or conduct an analysis of Amsted's hypothetical finishing scenarios.

[76] *See* Amsted's Scope Comments at 30-33.

## V. RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting the positions described above.

☒ ☐

______________ ______________

Agree Disagree

3/28/2023

X

Signed by: JAMES MAEDER

James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

# Appendix

## Scope of the Investigations

The scope of these investigations covers certain freight railcar couplers (also known as "fits" or "assemblies") and parts thereof. Freight railcar couplers are composed of two main parts, namely knuckles and coupler bodies but may also include other items (*e.g.*, coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and rotors). The parts of couplers that are covered by the investigations include: (1) E coupler bodies, (2) E/F coupler bodies, (3) F coupler bodies, (4) E knuckles, and (5) F knuckles, as set forth by the Association of American Railroads (AAR). The freight rail coupler parts (*i.e.*, knuckles and coupler bodies) are included within the scope of the investigations when imported separately. Coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and rotors are covered merchandise when imported in an assembly but are not covered by the scope when imported separately.

Subject freight railcar couplers and parts are included within the scope whether finished or unfinished, whether imported individually or with other subject or nonsubject parts, whether assembled or unassembled, whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar. Finishing includes, but is not limited to, arc washing, welding, grinding, shot blasting, heat treatment, machining, and assembly of various parts. When a subject coupler or subject parts are mounted on or to other nonsubject merchandise, such as a railcar, only the coupler or subject parts are covered by the scope.

The finished products covered by the scope of these investigations meet or exceed the AAR specifications of M-211, "Foundry and Product Approval Requirements for the Manufacture of Couplers, Coupler Yokes, Knuckles, Follower Blocks, and Coupler Parts" and/or AAR M-215 "Coupling Systems," or other equivalent domestic or international standards (including any revisions to the standard(s)).

The country of origin for subject couplers and parts thereof, whether fully assembled, unfinished or finished, or attached to a railcar, is the country where the subject coupler parts were cast or forged. Subject merchandise includes coupler parts as defined above that have been further processed or further assembled, including those coupler parts attached to a railcar in third countries. Further processing includes, but is not limited to, arc washing, welding, grinding, shot blasting, heat treatment, painting, coating, priming, machining, and assembly of various parts. The inclusion, attachment, joining, or assembly of nonsubject parts with subject parts or couplers either in the country of manufacture of the in-scope product or in a third country does not remove the subject parts or couplers from the scope.

The couplers that are the subject of these investigations are currently classifiable in the Harmonized Tariff Schedule of the United States (HTSUS) statistical reporting number 8607.30.1000. Unfinished subject merchandise may also enter under HTSUS statistical reporting number 7326.90.8688. Subject merchandise attached to finished railcars may also enter under HTSUS statistical reporting numbers 8606.10.0000, 8606.30.0000, 8606.91.0000, 8606.92.0000, 8606.99.0130, 8606.99.0160, or under subheading 9803.00.50. Subject

merchandise may also be imported under HTSUS statistical reporting number 7325.99.5000. These HTSUS subheadings are provided for convenience and customs purposes only; the written description of the scope of these investigations is dispositive.

# Attachment E

Barcode:4377095-01 A-201-857 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-857, A-570-145
C-570-146
Investigations
**Public Document**
E&C/OIII: KJ

May 15, 2023

**MEMORANDUM TO:** James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**FROM:** Erin Begnal
Director, Office III
Antidumping and Countervailing Duty Operations

**SUBJECT:** Freight Rail Couplers from Mexico and the People's Republic of China: Final Scope Decision Memorandum

---

## I. SUMMARY

The U.S. Department of Commerce (Commerce) has not made any changes to the scope of the antidumping duty (AD) and countervailing duty (CVD) investigations of certain freight rail couplers and parts thereof (freight rail couplers) from Mexico and the People's Republic of China (China) as presented in the Preliminary Scope Decision Memorandum.[1] We continue to find that the attachment of freight rail couplers to freight railcars does not turn freight rail couplers into a new article of commerce and, thus, have not modified the scope to exclude freight rail couplers attached to freight railcars. *See* the appendix to this memorandum for the scope language, which is unchanged from the Preliminary Scope Decision Memorandum.

## II. BACKGROUND

On March 28, 2023, Commerce issued the Preliminary Scope Determination Memorandum. On April 7, 2023, we received timely filed scope comments from the Government of Mexico (GOM).[2] On April 10, 2023, we received timely filed scope case briefs from the petitioner[3] and Amsted Rail Company, Inc. and its affiliated maquiladora ASF-K de Mexico S. de R.L. de C.V. (collectively, Amsted).[4] Also on April 10, 2023, we received letters in lieu of a case brief from

---

[1] *See* Memorandum, "Freight Rail Couplers from Mexico and the People's Republic of China: Preliminary Scope Decision Memorandum," dated March 28, 2023 (Preliminary Scope Decision Memorandum).
[2] *See* GOM's Letter, "Scope Brief regarding Preliminary Scope Decision Memorandum," dated April 7, 2023 (GOM's Scope Letter). On April 21, 2023, the GOM filed its scope comments on the records of the AD and CVD investigations of freight rail couplers from China. *See* GOM's Letters, "Scope Brief Regarding Preliminary Scope Decision Memorandum," dated April 21, 2023.
[3] The petitioner is the Coalition of Freight Coupler Producers.
[4] *See* Petitioner's Letter, "Scope Case Brief," dated April 10, 2023 (Petitioner's Scope Brief); *see also* Amsted's Letter, "Scope Case Brief," dated April 10, 2023 (Amsted's Scope Brief).

Filed By: Kristen Johnson, Filed Date: 5/16/23 1:41 PM, Submission Status: Approved

INTERNATIONAL TRADE ADMINISTRATION

Strato Inc. (Strato) and Wabtec Corporation (Wabtec).[5] On April 17, 2023, we received timely filed scope rebuttal briefs from the petitioner and Amsted.[6] Also on April 17, 2023, we received letters in lieu of a rebuttal brief from Strato and Wabtec.[7]

On April 18, 2023, the petitioner requested that Commerce reject portions of Amsted's scope rebuttal brief alleging that it contains impermissible new factual information (NFI) and references to information only on the record of the AD Mexico investigation.[8] Specifically, the petitioner states that Amsted, in its brief, cites to the petitioner's response to Commerce's Multinational Corporation (MNC) Provision request for additional information and to Amsted's comments to the petitioner's MNC response.[9] The petitioner argues that, as this information is on the record of only the Mexico AD investigation, it constitutes impermissible NFI on the record of the companion China AD and CVD investigations. Additionally, the petitioner states that Amsted's rebuttal brief includes a cite to a *Federal Register* notice to support its claim that the U.S. International Trade Commission (ITC) is not collecting trade data on railcars that do not enter for consumption within its U.S. Importers and Purchaser Questionnaire.[10] The petitioner argues that the citation is NFI.

We considered the petitioner's request and determined that Amsted's rebuttal brief does not contain impermissible NFI. Therefore, we have not rejected portions of Amsted's scope rebuttal brief referencing factual information timely submitted on the record of the Mexico AD investigation. Concurrent with this final scope determination memorandum, we are placing on the record of the AD and CVD investigations of freight rail couplers from China the public versions of the Petitioner's MNC Response and Amsted's Comments to the Petitioner's MNC Response.[11] Additionally, there is no basis to reject the portion of Amsted's rebuttal brief that cites to the ITC's notice of scheduling the final phase of the investigations, as we do not consider *Federal Register* notices to be new factual information.

Scope Comments

Below is the complete list of the scope issues for which parties submitted comments and rebuttal comments with regard to the Preliminary Scope Decision Memorandum.

Comment 1: Whether Mounted Freight Rail Couplers Should Remain in the Scope

---

[5] *See* Strato's Letter, "Letter Brief—Scope," dated April 10, 2023 (Strato's Scope Letter); *see also* Wabtec's Letter, "Scope Letter Brief," dated April 10, 2023 (Wabtec's Scope Letter).
[6] *See* Petitioner's Letter, "Scope Rebuttal Brief," dated April 17, 2023 (Petitioner's Scope Rebuttal Brief); *see also* Amsted's Letter, "Scope Rebuttal Brief," dated April 17, 2023 (Amsted's Scope Rebuttal Brief).
[7] *See* Strato's Letter, "Letter Rebuttal Brief—Scope," dated April 17, 2023 (Strato's Scope Rebuttal Letter); *see also* Wabtec's Letter, "Rebuttal Scope Letter," dated April 17, 2023 (Wabtec's Scope Rebuttal Letter).
[8] *See* Petitioner's Letter, "Request to Reject Amsted Scope Rebuttal Brief," dated April 18, 2023 (Petitioner's Request to Reject Amsted's Rebuttal Brief).
[9] *See* Amsted's Scope Rebuttal Brief at 2-6; *see also* Petitioner's Letter, "Response to MNC Request for Additional Information," dated April 10, 2023 (Petitioner's MNC Response); and Amsted's Letter, "Amsted Comments Regarding Petitioner's Response to MNC Request for Additional Information," dated April 17, 2023 (Amsted's Comments to the Petitioner's MNC Response).
[10] *See* Amsted's Scope Rebuttal Brief at 7-8.
[11] *See* Memorandum, "Placing Documents on the Record of the Investigations" dated concurrently with this memorandum.

Comment 2: Whether Scope Language Covering Freight Rail Couplers Attached to Railcars Is Administrable
Comment 3: Whether the Scope Is Clear Regarding the Finishing of Freight Rail Couplers

## III. DISCUSSION OF THE ISSUES

### Comment 1: Whether Mounted Freight Rail Couplers Should Remain in the Scope

*Petitioner's Comments*:[12]

- Commerce should not change its finding that mounted freight rail couplers are covered by the scope of the investigations. Commerce's preliminary determination was based on precedent that scopes can and do cover subject merchandise imported with non-subject merchandise,[13] and the petitioner's intention is for the investigations to cover mounted freight rail couplers.
- The U.S. Court of International Trade (CIT) has noted that, when both subject and non-subject merchandise is imported together, AD duties are only owed on the subject merchandise.[14]
- Commerce's practice is to defer to the intent of the petitioner with respect to scope language, and this practice has been upheld by the court.[15] In the prior investigations of freight rail couplers from China, Commerce deferred to the intent of the petitioner and declined requests to exclude mounted freight rail couplers from the scope.[16]
- The records of the instant investigations demonstrate that freight rail couplers are not substantially transformed into a separate class or kind of merchandise when mounted onto railcars. Commerce correctly concluded that freight rail couplers are a different class or kind than freight railcars.[17] Further, freight rail couplers and freight railcars have different intended end-uses, *i.e.*, freight rail couplers join freight railcars to one another, and railcars carry merchandise.[18]
- The majority of freight rail couplers that enter the United States are mounted to railcars from Mexico and, therefore, the scope language should not be modified.

*Amsted's Comments*:[19]

- Commerce frames the issue as whether freight rail couplers mounted on railcars in third

[12] *See* Petitioner's Scope Brief at 2-9.
[13] *Id*. at 2-3.
[14] *Id*. at 2 (citing *Walgreen Co. of Deerfield, IL v. United States*, 33 C.I.T. 1620, 1622 n.2 (2009) (In an order on certain tissue paper products, only the tissue paper included in a gift bag set was subject to the order)).
[15] *Id*. at 4 (citing *Ad Hoc Shrimp Trade Action Committee v. United States*, 637 F. Supp. 2d 1166, 1169-71,1174-75, 1181 (Fed. Cir. 2009); and *NTN Bearing Corp. of America v. United States*, 747 F. Supp. 726, 730 (CIT 1990)).
[16] *Id*. at 6 (citing Preliminary Scope Decision Memorandum at 10; and Memorandum, "Antidumping and Countervailing Duty Investigations of Freight Rail Couplers Systems and Certain Components Thereof from the People's Republic of China: Final Scope Memorandum," dated May 23, 2022 (Predecessor Investigations Final Scope Memorandum) at 11 (attached to Petitioner's Letter, "Certain Freight Rail Couplers and Parts Thereof from Mexico: Rebuttal Scope Comments," dated November 28, 2022 (Petitioner's Rebuttal Scope Comments) at Exhibit 1)).
[17] *Id*. at 7-9.
[18] *Id*. at 9 (citing Amsted's Letter, "New Factual Information Supporting CBP Video Call Memo," dated March 7, 2023 (Amsted's NFI) at Attachment 1).
[19] *See* Amsted's Scope Brief at 1-12.

countries are substantially transformed into a separate class or kind of merchandise from freight rail couplers imported on their own. However, the relevant inquiry is whether a freight rail coupler is itself a separate class or kind of merchandise from a freight railcar, and whether the assembly of various railcar parts into one whole—including the freight rail couplers—substantially transforms each of those parts into a single, new, and different class or kind of merchandise, *i.e.*, a freight railcar.

- Commerce's position— that assembly of inputs into a manufactured whole does not result in a substantial transformation or change the class or kind unless the input itself undergoes some physical change other than assembly into the final product—stands the AD law on its head.
- Under the AD law, the petitioner is not entitled to protection against substantially transformed downstream imports that integrate subject merchandise before they cross the border.
- To accept the petitioner's view of the scope requires an expansion of the AD/CVD laws. For example, under this view, tapered roller bearings from China installed in finished automobiles would be covered by the scope of *Tapered Roller Bearings from China*.[20]
- Commerce preliminarily tried to dismiss this problem as "hypothetical scopes involving different products that are not at issue in this case."[21] But a principle of administrative law is that agencies should generally treat similarly situated parties alike.[22]
- Commerce has to make its determination of what constitutes a substantial transformation or a change in class or kind on the basis of an "ascertainable standard."[23] Commerce cannot lawfully apply a substantial transformation standard based on a "physical change" to the input itself without also considering substantial transformation by assembly of the input into a finished downstream product.
- The CBP Memorandum refers to freight rail couplers as components of freight railcars that are "attached or integrated"[24] by the original equipment manufacturer (OEM) railcar producers in Mexico. The integration of the coupler into the yoke, which is then attached to the railcar, constitutes integration of the freight rail coupler by the OEM in Mexico by further assembly. To cast this integration, necessary for the function of the railcar, as an impermanent separate class or kind of merchandise is wrong.
- Claims that freight rail couplers are not permanently attached to freight railcars because knuckles and coupler bodies are removable and replaceable are baseless. Such an argument means every part of a freight railcar is replaceable except for the steel plates welded together into a frame.
- The fact that freight rail couplers may be replaced does not mean that they are not a

[20] *Id*. at 4 (citing *Antidumping Duty Order: Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 52 FR 22667 (June 15, 1987) (*Tapered Roller Bearings from China*); and Tapered Roller Bearings from China, Inv. No. 731- TA-344 (Fourth Review), USITC Pub. 4824 (September 2018), at I-16 (stating that tapered roller bearings are widely used in the automotive and heavy machinery sectors)).
[21] *Id*. at 5 (citing Preliminary Scope Decision Memorandum at 11).
[22] *Id*. (citing *RHP Bearings Ltd. v. United States*, 288 F. 3d 1334, 1347 (Fed. Cir. 2002) (holding that "an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently")).
[23] *Id*. at 5 (citing *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1305 (Fed. Cir. 2013) (disapproving of ad hoc scope decision making by Commerce and insisting instead that Commerce develop an "ascertainable standard")).
[24] *Id*. at 7 (citing Memorandum, "Video Calls With Customs and Border Protection," dated March 2, 2023 (CBP Memorandum)).

permanent part of the railcar. A freight railcar consists of hundreds of replaceable parts. If none of those parts can be considered permanent, then there are virtually no permanent parts of a railcar.

- To say "it is common for designs and schematics to depict freight railcar designs without any couplers"[25] is untrue. Amsted objects to being denied the opportunity to provide factual information to rebut the declaration submitted by the petitioner.
- Additionally, to state that "freight rail couplers have a shorter useful life than freight railcars, indicating that couplers are not a permanent part of the railcar"[26] is nonsensical. A freight rail coupler—which connects to and interacts with other railcar components—is an integrated component/permanent part of the freight railcar. Further, there is record evidence that couplers are permanently connected to the end sill, or "spine" of a railcar structure, and that the end sill (which is part of the end-of-car system, including the freight rail coupler) is permanently bolted or riveted to the carrier plates.[27]
- The merchandise that is admitted into the United States is a freight train and cannot be characterized as a freight rail coupler and freight railcar. The freight rail coupler is consumed and substantially transformed into a freight railcar, and the freight railcar then is combined with other freight railcars and a locomotive to assemble a freight train that crosses the border into the United States. This is true regardless of whether the connections between the freight rail coupler and the rest of the freight railcar are characterized as permanent or temporary.

*Strato's Comments*:[28]

- Commerce erred in its preliminary decision to include freight rail couplers incorporated into railcars, and then imported into the United States, within the scope for reasons outlined in Amsted and Wabtec's submissions as well as Strato's prior filings. For the final determination, Commerce should remove freight rail couplers attached to railcars from the scope.

*Wabtec's Comments*:[29]

- The proposed scope exceeds statutory limits because freight rail couplers are not capable of causing injury to the domestic freight rail couplers industry when they are imported directly from China into a third country and mounted on and incorporated into new railcars. Any harm that the domestic industry allegedly suffers would occur at the point Chinese-origin freight rail couplers are sold to OEM in the third country.
- Freight rail couplers are a different class or kind of merchandise than freight railcars. The scope is improper because the attachment of freight rail couplers results in a substantial transformation into freight railcars.

---

[25] *Id*. at 9 (citing Preliminary Scope Decision Memorandum at 10).
[26] *Id*. at 10 (citing Preliminary Scope Decision Memorandum at 10).
[27] *Id*. at 11 (citing Amsted's NFI at Attachment 1 (1st and 2nd narrative slide); and Amsted's Letter, "Scope Comments," dated November 17, 2022 at 29 (noting that the coupler, yoke, and shock absorber, along with support plates and other attachment features, such as the integral draft sill, are fastened to the car structure)).
[28] *See* Strato's Scope Letter at 1-2. Strato reiterated these comments in its letter-in-lieu of a rebuttal brief. *See* Strato Scope Rebuttal Letter.
[29] *See* Wabtec's Scope Letter at 2-3.

*GOM's Comments*:[30]

- A freight rail coupler, when mounted onto a railcar, is non-subject merchandise. Freight rail couplers and railcars with mounted freight rail couplers are different products.
- Commerce's assertion that a freight rail coupler mounted to a railcar is a separate article of commerce is equivalent to saying that the locks, wheels, and doors of the railcars are not part of it, and should be considered independent articles of commerce. However, for a railcar to exist, it must include all the parts that compose it.
- Commerce does not consider that freight rail couplers are consumed in the production of railcars because they are assembled onto the railcar. The assertion that freight rail couplers need to change their essence to consider them as a different product is based on erroneous premises, because they must maintain their essence to be part of that new product (the railcar) to fulfill their function.
- A mounted freight rail coupler is a product that never enters the U.S. market for sale or consumption. The import is the railcar.
- The fact that a freight rail coupler can be disassembled does not make it a different product from the railcar. The only reason for disassembly is to replace the freight rail coupler with another one and not for individual sale. Further, the disassembly process does not change the fact that the freight rail coupler is an integral part of a railcar.
- Commerce does not consider that railcar manufacturers do not export freight rail couplers but, rather, export railcars, with all the parts and components.

*Petitioner's Rebuttal Comments*:[31]

- Amsted's reference to *Tapered Roller Bearings from China* is off point.[32] The fact that a product has downstream uses does not mean that the scope of an order covers subject merchandise imported as part of a downstream product. In fact, the *Tapered Roller Bearings from China* scope is silent as to whether it covers subject merchandise when imported attached to non-subject merchandise.[33]
- Amsted wants Commerce to believe that a scope which covers subject merchandise when it enters joined to non-subject merchandise is a novel issue. However, there are numerous scopes in which subject merchandise can enter attached to non-subject merchandise.[34]
- Commerce need not conduct a substantial transformation test if it determines that the scope language is clear.[35] Here, the scope is clear, expressly covers mounted freight rail couplers, and the country of origin of subject merchandise is the country in which the product was cast or forged.
- Even if Commerce did undertake such analysis, the record shows that freight rail couplers are not permanently attached to railcars and that mounting a freight rail coupler to a railcar does not constitute a substantial transformation. Freight rail couplers continue to

---

[30] *See* GOM's Scope Letter at 2-4.
[31] *See* Petitioner's Scope Rebuttal Brief at 3-11.
[32] *Id*. at 3 (citing Amsted's Scope Brief at 4).
[33] *Id*. (citing *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Review; 2020-2021*, 88 FR 1359, 1360 (January 10, 2023)).
[34] *Id*. at 4 (citing Petitioner's Scope Brief at 2-4; and Petitioner's Letter, "Rebuttal Scope Comments," dated November 28, 2022 at 12-13).
[35] *Id*. at 4-5 (citing *Bell Supply Co., LLC v. United States*, 179 F. Supp. 3d 1082, 1087-88, 1090, 1097 (CIT 2016)).

meet the physical characteristics of the merchandise under consideration and are a distinct product from railcars.[36]

- Further, evidence shows that freight rail couplers are frequently replaced throughout the life of a freight railcar.[37] For something to be permanent, it must be unchangeable and irreplaceable.
- Commerce should give no weight to Wabtec's argument that the domestic industry is not injured as a result of subject imports. Commerce only undertakes an injury analysis in determining whether to initiate an investigation.[38]
- That the scope includes freight rail couplers joined to non-subject merchandise does not make the scope overly broad.

*Amsted's Rebuttal Comments*:[39]

- The petitioner's claim that "couplers are not constituent components of a railcar but are a distinct device for joining cars"[40] is unsupported by the record. Rather, record evidence supports that freight rail couplers are more than just a simple connecting device between freight railcars, but are a vital component necessary for the function of the train.[41]
- The record also describes the freight rail coupler's role in the rolling stock connection system as part of an assembly.[42] It is this assembly, referred to as Draw Gear, performed by the OEMs that constitutes the consumption and further processing of the freight rail coupler in the third country.[43] Additional record evidence affirms that railcar producers take into account the design of the coupler when producing freight railcars,[44] demonstrating that the couplers are an integral part of a railcar.
- The petitioner's assertion that "freight rail couplers join freight rail cars to one another, while the railcars themselves carry merchandise"[45] is nonsensical. The railcar cannot carry merchandise, *i.e.*, physically move, without the freight rail couplers. The freight rail coupler also acts within the end-of-car system and serves a variety of functions including towing, braking, and shock absorption.
- Once a freight railcar is produced, its constituent components, including the freight rail coupler, lose their privilege to the substantial transformation test because they are no longer standalone items. Rather, the freight railcar is the new article of commerce.

---

[36] *Id*. at 6-7 (citing Predecessor Investigations Final Scope Memorandum at 11; and Petitioner's Letter, "Response to Memorandum Regarding Video Calls with U.S. Customs and Border Protection," dated March 7, 2023 (Petitioner's Response to CBP Memorandum) at Exhibit 1).
[37] *Id*. at 9-10 (citing Petitioner's Response to CBP Memorandum at Exhibit 1 and Exhibit 2; and Amsted's Letter, "New Factual Information Supporting CBP Video Call Memorandum," dated March 7, 2023 (Amsted's NFI at Attachment 1).
[38] *Id*. at 12 (citing *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China and Mexico: Initiation of Less-Than-Fair-Value Investigations*, 87 FR 64,444 (October 25, 2022), and accompanying Initiation Checklist at Attachment III).
[39] *See* Amsted's Scope Rebuttal Brief at 1-8. In their scope rebuttal filings, both Strato and Wabtec incorporate by reference the arguments made by Amsted in its scope rebuttal brief that freight rail couplers attached to railcars should be excluded from the scope. *See* Strato's Scope Rebuttal Letter; *see also* Wabtec's Scope Rebuttal Letter.
[40] *Id*. at 1-2 (citing Petitioner's Scope Brief at 7).
[41] *Id*. at 2-3 (citing Petitioner's MNC Response at Exhibit 5).
[42] *Id*. at 3 (citing Petitioner's MNC Response at Exhibit 5).
[43] *Id*. (citing Amsted's NFI at Attachment 1).
[44] *Id*. at 4 (citing Amsted's Comments to Petitioner's MNC Response at Attachment MNC-1).
[45] *Id*. at 5 (citing Petitioner's Scope Brief at 9).

- Further, freight railcars are generally exempt from formal entry requirements and are, therefore, not "entries for consumption." U.S. importers thus will not be reporting to the ITC trade or pricing data on couplers that enter on freight railcars that are not entries for consumption. Commerce, therefore, cannot include in the scope freight rail couplers that are attached to freight railcars manufactured in Mexico because the ITC is not including freight railcars in its final injury investigation.[46]

**Commerce's Position:** We note that the scope briefs repeat many of the arguments previously addressed in the Preliminary Scope Decision Memorandum, as well as arguments presented in the prior AD and CVD investigations of freight rail coupler systems and certain components thereof from China (the prior investigations).[47] The petitioner reiterates that it opposes any modification to the scope language and unequivocally states that it is seeking relief with respect to freight rail couplers that are attached to or mounted on railcars. The respondent interested parties continue to argue that freight rail couplers attached to railcars should be excluded from the scope. As discussed below, we do not find the respondent parties' arguments to be persuasive. Therefore, for this final determination, we continue to find that attachment to freight railcars does not turn freight rail couplers into a new article of commerce, and thus, we have not modified the scope to exclude freight rail couplers attached to, or mounted on, freight railcars.

As noted in the Preliminary Scope Decision Memorandum, while Commerce has the ultimate authority to define or clarify the scope of an investigation, Commerce's well-established practice is to defer to the petitioner with respect to scope language.[48] Further, there is precedent for scopes covering subject merchandise imported together with or commingled with non-subject merchandise.[49] Therefore, contrary to Amsted's comments, we are treating similarly situated parties alike.

---

[46] *Id.* at 7-8 (citing *Certain Freight Rail Couplers and Parts Thereof from China and Mexico; Scheduling of the Final Phase of Countervailing Duty and Anti-Dumping Duty Investigations*, 88 FR 16031 (March 15, 2023); and *PPG Indus. V. United States*, 14 CIT 522, 540 746 F. Supp. 119, 135 (1990) (stating that "in explaining its decision Commerce is entitled to draw upon its own knowledge and expertise and facts capable of judicial notice")).

[47] *See* Preliminary Scope Determination Memorandum at 4-9; *see also Freight Rail Coupler Systems and Certain Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less-Than-Fair Value,* 87 FR 14511 (March 15, 2022), unchanged in *Freight Rail Coupler Systems and Certain Components Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less-Than-Fair Value*, 87 FR 32121 (May 27, 2022); *see also Freight Rail Coupler Systems and Certain Components Thereof: Preliminary Affirmative Countervailing Duty Determination*, 87 FR 12662 (March 7, 2022), unchanged in *Freight Rail Coupler Systems and Certain Components Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 87 FR 30869 (May 20, 2022). In addition to the different name for subject merchandise there are differences in the scope of the current and predecessor investigations. The scope of the prior investigations, but not of the current investigations, includes yokes and follower blocks.

[48] *See* Preliminary Scope Determination Memorandum at 9-10 (citing *Ad Hoc Shrimp*, 637 F. Supp. 2d at 1174-75; and *Hydrofluorcarbon Blends and Components Thereof from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 42314 (June 29, 2016), and accompanying Issues and Decision Memorandum (IDM) at Comment 2). Commerce may diverge from its practice in cases where there exists an overarching reason to modify the scope of an investigation such as concerns regarding administrability.

[49] *See, e.g.*, *Utility Scale Wind Towers from Spain: Antidumping Duty Order*, 86 FR 45707, 45708 (August 16, 2021) ("Wind towers and sections thereof are included within the scope whether or not they are joined with non-subject merchandise, such as nacelles or rotor blades, and whether or not they have internal or external components

Amsted argues that Commerce has incorrectly framed the relevant question as whether freight rail couplers mounted on railcars are a distinct class or kind of merchandise from freight rail couplers imported on their own. Instead, Amsted asserts, the "legally relevant inquiry" is whether a freight rail coupler is a separate class or kind of merchandise from a freight railcar. We disagree, because the scope does not cover freight railcars; rather, the scope of the investigations covers freight rail couplers that are mounted on a railcar. Therefore, we continue to find that we have appropriately framed the scope issue presented by the parties.

We also continue to find (consistent with the prior investigations) that freight rail couplers are not substantially transformed into a distinct class or kind of merchandise when they are attached to a freight railcar. In the prior investigations, Commerce found that freight rail couplers are not permanently affixed to freight railcars and that freight rail couplers do not undergo further processing or physical changes when attached to or removed from railcars.[50] This understanding of freight rail couplers is further supported by the record of the current investigations.

Evidence submitted on the record by the petitioner indicates that freight rail couplers are not directly attached to railcars, but are attached to yokes that are attached to railcars by bolted plates.[51] We note that this description is consistent with diagrams provided by Amsted which show that there are several parts that fit between the end sill of a freight railcar and the freight rail coupler and, therefore, the coupler is not directly attached to the railcar.[52] Evidence further shows that freight rail couplers are connected to freight railcars only by a key or pin.[53] As such, a freight rail coupler is attached to an item that is itself not permanently attached to a railcar, and which is only held in place by a pin or a key. We note that, in the prior investigations, Strato described the assembly of a freight rail coupler to a railcar indicating that a freight rail coupler is not a permanently affixed component.[54]

---

attached to the subject merchandise."); *Mattresses from the People's Republic of China: Antidumping Duty Order*; 84 FR 68395, 68397 (December 16, 2019) ("Mattresses covered by the scope of this order may be imported independently, as part of furniture or furniture mechanisms... Only the mattress is covered by the scope if imported as part of furniture, with furniture mechanisms, or as part of a set in combination with a mattress foundation."); and *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order*, 85 FR 22126, 22132-33 (April 21, 2020) ("Wooden cabinets and vanities are covered by this order whether or not they are imported attached to, or in conjunction with, faucets, metal plumbing, sinks and/or sink bowls, or countertops. If wooden cabinets or vanities are imported attached to, or in conjunction with, such merchandise, only the wooden cabinet or vanity is covered by the scope.").

[50] *See* Memorandum, "Antidumping and Countervailing Duty Investigations of Freight Rail Coupler Systems and Certain Components Thereof from the People's Republic of China: Post-Preliminary Scope Decision Memorandum," dated April 11, 2022 (Predecessor Investigations Post-Preliminary Determination Scope Memorandum) at 9 (attached to Petitioner's Letter, "Supplemental Scope Questionnaire Response," dated December 29, 2022) unchanged in the Predecessor Investigations Final Scope Memorandum.

[51] *See* Petitioner's Response to CBP Memorandum at 5 and Exhibit 1.

[52] *See* Amsted's NFI at Attachment 1.

[53] *Id*.

[54] *See* Strato's Letter, "Response to Scope Questions: Antidumping and Countervailing Duty Investigation of Freight Rail Coupler Systems and Certain Components Thereof from the People's Republic of China (A-570-143 / C-570-144)," dated February 22, 2022 (Strato's Prior Investigations Scope Response) at 11-13 (attached to Strato's Response to Scope Questions: Antidumping and Countervailing Duty Investigation of Freight Rail Coupler Systems and Certain Components Thereof from the People's Republic of China (A-570-143 / C-570-144)," dated November 17, 2022 at Exhibit 6) ("Once in place, the end of the coupler body makes contact with the follower block. A draft key (21 pounds) is inserted through prefabricated slots in the yoke and coupler body to secure the coupler body to the assembly in the draft sill.").

Amsted argues that a freight rail coupler undergoes physical changes, including the attachment of uncoupling levers, when attached to a freight railcar.[55] However, evidence on the record demonstrates that knuckles and coupler bodies are designed to be removable and replaceable without undergoing physical changes when attached to or removed from railcars. For example, Amsted itself explained that "System components need to be inspected and replaced periodically due to wear or damage, so the parts need to be accessible and removable."[56] We note that, in the prior investigations, Strato agreed with Amsted that freight rail couplers are removed and replaced when their useful life has ended and added that "the physical nature of these components is not changed when they are removed from a railcar."[57]

Information provided by the petitioner and Amsted indicates that freight rail couplers have a shorter useful life than freight railcars, further supporting that couplers are not a permanent part of the railcar.[58] Amsted argues that reliance on this useful life evidence "makes no sense" because a freight railcar consists of hundreds of parts.[59] However, our determination is focused on freight rail couplers, which is the product covered by the scope of these investigations. According to Amsted, coupler knuckles have a useful life of merely five to seven years and, thus, are not a permanent component of a railcar.[60]

Further, record evidence demonstrates that within the freight railcar industry, it is common for freight rail couplers to be excluded from drawings and schematics of freight railcars.[61] Specifically, there is evidence indicating that OEMs design freight railcars without any couplers because railcars can often be used with a variety of coupler types, and couplers are replaced periodically.[62] We acknowledge that there is competing information on the record regarding whether drawings of railcars depict couplers within the designs.[63] However, in conducting our analysis of freight rail couplers, we examine the totality of the evidence rather than any one factor or information on the record in isolation.

Having examined all the submitted scope information, as discussed above, we conclude that freight rail couplers are not permanently affixed to railcars and do not undergo further processing or physical changes when attached to or removed from railcars. As a result, freight rail couplers attached to or mounted on railcars are not substantially transformed into a separate class or kind of merchandise from freight rail couplers imported on their own, and, thus, meet the physical description of the merchandise in the scope of these investigations.

Amsted additionally argues that Commerce has to make its determination of what constitutes a substantial transformation or a change in class or kind on the basis of an "ascertainable

---

[55] *See* Amsted's Scope Case Brief at footnote10 (citing Amsted's NFI at Attachment 1, first narrative slide).
[56] *See* Amsted's NFI at Attachment 1.
[57] *See* Strato's Prior Investigations Scope Response at 18.
[58] *See* Petitioner's Response to CBP Memorandum at 5-6; *see also* Amsted's NFI at Attachment 1.
[59] *See* Amsted's Scope Brief at 10
[60] *See* Amsted's NFI at Attachment 1.
[61] *See* Petitioner's Response to CBP Memorandum at 5-7 and Exhibits 1 through 4.
[62] *Id*. at 5-6 and Exhibit 1; *see also* Amsted's Letter, "Comments on Product Characteristics," dated November 7, 2022 at Exhibit 2 (coupler types).
[63] *Id*.; *see also* Amsted's Scope Rebuttal Brief at 3-4 (citing Amsted's Comments to Petitioner's MNC Response at Attachment MNC-1).

standard."[64] Amsted further argues that Commerce cannot lawfully apply a substantial transformation standard based on a "physical change" to the input itself without also considering substantial transformation by assembly of the input into a finished downstream product. According to Amsted, to do otherwise would "open the floodgates" to apply AD/CVD laws to all downstream products.

We disagree with Amsted that we are obligated to compare the finished downstream product to freight rail couplers as part of our analysis in these investigations because the scope language does not cover the downstream product (*i.e.* freight railcars) but, instead, covers only the freight rail coupler component of the downstream product. Further, we disagree with Amsted and the other respondent interested parties that freight rail couplers are substantially transformed or become a different class or kind of merchandise when attached to freight railcars. A substantial transformation occurs where, "as a result of manufacturing or processing steps . . . {,} the {product} loses its identity and is transformed into a new product having a new name, character and use."[65] Additionally, in considering whether a product constitutes a distinct class or kind of merchandise, Commerce looks for "clear dividing lines" between products. The totality of the evidence on the record indicates that when a freight rail coupler is attached to or mounted on a freight railcar, it neither loses its identity nor is transformed into a new product with a new name, character, and use. Record evidence shows that freight rail couplers are not a permanent component of a railcar and are easily removable, and thus, retain their own identity even after being attached to or mounted on a railcar.[66]

Though Amsted asserts that Commerce's analysis would dramatically expand the AD/CVD laws, these arguments are based on hypothetical scenarios (*e.g.*, related to tapered roller bearings, steel nails, *etc.*) without any developed factual record. Commerce's scope determination here is based on our evaluation of the facts on the record of these investigations, more specifically the characteristics of freight rail couplers. Moreover, Commerce has cited numerous orders covering subject merchandise imported together with or commingled with non-subject merchandise. Thus, our findings here are consistent with other cases.

Having concluded that freight rail couplers attached to or mounted on to railcars are the same class or kind as merchandise covered by the scope of the investigations, we disagree with Amsted that Commerce lacks the authority to include such merchandise within the scope of the investigations to the extent that such railcars entered the United States for consumption. Section 772(a) of the Act defines "export price" as the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States … ." To the extent that railcar manufacturers are purchasing freight rail couplers and exporting finished railcars with attached or mounted freight rail couplers, the dumping law authorizes Commerce to examine such sales if they enter the United States for consumption because they are the parties exporting (*i.e.*, are the price discriminators) the freight rail couplers to the United States.

---

[64] *See* Amsted's Scope Brief at 5.
[65] *See Bestfoods v. United States*, 165 F.3d 1371, 1373 (Fed. Cir. 1999).
[66] *See* Predecessor Investigations Final Scope Memorandum at 9-12; *see also* Petitioner's Response to CBP Memorandum at 5-6 and Exhibits 1 and 2.

Respondent interested parties also question the validity of the petitioner's claims of injury by imports of freight rail couplers attached to freight railcars. Specifically, Wabtec argues that any harm that the domestic industry suffers occurs at the point the freight rail couplers are sold to OEMs in the third country.[67] Amsted also argues that Commerce may not include freight rail couplers attached to freight railcars in the scope because the ITC is not collecting trade data on railcars that do not enter for consumption. Respondent parties also claim that imposing duties on freight rail couplers attached to freight railcars is equivalent to imposing duties on freight railcars. However, on this point the scope language is clear: "When a subject coupler or subject parts are mounted on or to other nonsubject merchandise, such as a railcar, *only the coupler or subject parts are covered by the scope*."[68]

Further, the question of injury to the domestic freight rail coupler industry and the types of data collected for an injury determination is within the purview of the ITC, which is conducting the concurrent injury investigation, a separate and distinct proceeding. The information that the ITC does or does not collect in its U.S. Importers and Purchaser Questionnaires is not a matter that Commerce must consider when making a scope determination.[69] Likewise, Commerce does not determine whether subject imports are a source of injury to the U.S. industry. Rather, as explained above, Commerce's role is to define or clarify the scope of an investigation, and its practice is to defer to the petitioner with respect to scope language. The ITC will make its final injury determination with regard to imports of subject freight rail couplers following the completion of Commerce's investigations, if affirmative. That said, we note that contentions by interested parties that any injury to the petitioner is limited to lost export sales are based on the contention that freight rail couplers lose their distinct identity when mounted or joined to freight railcars, an argument that, as noted above, we find unpersuasive.

Lastly, Commerce did not impermissibly deny Amsted the opportunity to provide factual information to rebut the declaration on freight railcar designs without couplers that was submitted by the petitioner.[70] As explained in the April 6, 2023, letter to Amsted, the NFI (*i.e.*, the petitioner's declaration) that Amsted sought to rebut was placed on the record by the petitioner as a rebuttal to factual information that Commerce placed on the record under 19 CFR 351.301(c)(4).[71] The regulations provide interested parties with *one* opportunity to rebut, correct, or clarify such factual information and does not permit surrebuttal. Amsted had already submitted factual information in response to information that Commerce placed on the record. Nonetheless, Amsted cites to other information on the record in its rebuttal brief that it claims rebuts the petitioner's declaration and Commerce has considered that information in its final determination as discussed above.[72] Therefore, Amsted's argument is be moot.

---

[67] *See* Wabtec's Scope Letter at 2-3.
[68] *See* Appendix to this memorandum.
[69] While Amsted claims that the ITC is not considering freight rail couplers attached to railcars in its injury investigation, the basis for this statement is unclear. By Amsted's own framing, the ITC has omitted freight rail couplers attached to railcars that do not enter the United States *for consumption* (while presumably requesting data on any railcars that do so enter).
[70] *See* Amsted's Case Brief at 9; *see also* Petitioner's Comments on CBP Memorandum at 5-7 and Exhibits 1 through 3.
[71] *See* Commerce's Letter, "Rejection of Amsted Request for Leave to File Scope New Factual Information," dated April 6, 2023.
[72] *See* Amsted's Scope Rebuttal Brief at 3-4.

**Comment 2: Whether Scope Language Covering Freight Rail Couplers Attached to Railcars Is Administrable**

*Petitioner's Comments*:[73]

- It is not the province of Commerce to administer customs regulations. While respondents have raised arguments regarding the administrability of orders resulting from these investigations, Commerce appropriately found that the only necessary modification to the scope language is the correction of the Harmonized Tariff Schedule of the United States (HTSUS) subheading 9803.00.5000 to 9803.0050 and removal the phrase "if imported as an Instrument of International Traffic" following that HTSUS number.[74]
- Commerce's concern is the definition of products covered by the scope. Here, the description of the subject merchandise in the scope is clear and no party has alleged otherwise.
- Matters of enforcement are for CBP after the issuance of an order. It would set a bad precedent for Commerce to limit the scope of these investigations based on a hypothetical understanding of how CBP might interpret its regulations.
- On the issue of "instruments of international traffic" (IIT), not all freight railcars are exempt from entry pursuant to 19 CFR 104.4(b)(3). Mounted freight rail couplers first enter the United States for delivery to the new railcar owner and, thus, are not yet being used as an IIT. Consequently, the first importation would be subject to entry and, as such, would be subject to AD and CVD cash deposits. However, this is not a "scope issue" but rather a question that goes to applicability of a regulation administered by CBP.
- Questions of IIT status or what duties are contemplated under 19 CFR 104.4(b)(4) are not issues for Commerce in a scope determination.

*Wabtec's Comments*:[75]

- Scope language that includes freight rail couplers attached to railcars is not readily administrable. Public information negates the petitioner's argument that the majority of railcars do not return to Mexico once they have entered the United States.[76]
- The petitioner's claim that imposing duties would not pose administrability issues is misleading, because it ignores the fact that railroads, not railcar producers, are responsible for operating trains. Moreover, the railroads that conduct cross-border movements do not necessarily own the railcars and, thus, do not have access to information about parts on the railcars.
- CBP agreed that "administrability of an AD/CVD order on freight rail couplers that are attached to or integrated with a freight railcar that is not entered into the United States would be very difficult and burdensome from a legal and operational point of view."[77]

*Petitioner's Rebuttal Comments*:[78]

---

[73] *See* Petitioner's Scope Brief at 9-13.
[74] *Id*. at 12 (citing Preliminary Scope Decision Memorandum at 17).
[75] *See* Wabtec's Scope Letter at 2-3.
[76] *Id*. at 2 (citing Wabtec's Letter, "Comments and Rebuttal Factual Information," dated January 12, 2023 at 2-5).
[77] *Id*. at 3 (citing CBP Memorandum).
[78] *See* Petitioner's Scope Rebuttal Brief at 11-12.

- The administration of customs regulations, including the IIT provisions, is the responsibility of CBP. Commerce should make no changes to its preliminary finding.

*Wabtec's Rebuttal Comments*:[79]

- The petitioner ignores CBP's concerns regarding the administrability of scope language that includes freight rail couplers attached to railcars. CBP officials recognized that "administrability of an AD/CVD order on freight rail couplers that are attached to or integrated with a freight rail car that is not entered into the United States would be very difficult and burdensome from a legal and operational point of view."[80] CBP officials also stated that administering an order in the manner proposed by the petitioner "would require new procedures to be established to identify couplers attached or integrated with freight rail cars and would likely require manual procedures to review records on the equipment of each individual train."[81]
- Commerce should acknowledge CBP's assessment of the administrability issues associated with the current scope language.

**Commerce's Position:** For this final determination, we are not removing freight rail couplers mounted or joined to railcars from the scope of the investigations and continue to modify the scope based on CBP's suggestion. The final scope language of the investigations reflects the change of HTS subheading 9803.00.5000 to 9803.00.50 and also the deletion of the sentence that follows that number, specifically "if imported as an Instrument of International Traffic," based on CBP's input that merchandise entered under HTS subheading 9803.00.50 is not imported as an IIT.[82]

As discussed at Comment 1, the petitioner intends for the scope of these investigations to cover freight rail couplers that are attached to or mounted on railcars. Although Commerce's well-established practice is to defer to the petitioner with respect to scope language, Commerce has the ultimate authority to define or clarify the scope of an investigation.[83] Commerce may diverge from its practice of giving deference to the petitioner's request in cases where there exists an "overarching reason to modify" the scope of an investigation such as when there are concerns about the ability of the agency and CBP to administer the scope as written.[84] Here, there is no reason for Commerce to not apply its practice, because the scope is clearly written to

---

[79] *See* Wabtec's Scope Rebuttal Letter at 2-3.
[80] *Id*. at 2 (citing CBP Memorandum at 2).
[81] *Id*. at 2-3 (citing CBP Memorandum at 2).
[82] *See* CBP Memorandum at Attachment 1; *see also* Appendix to this memorandum.
[83] *See*, *e.g., Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Final Determination of Sales at Less than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 80 FR 34893 (June 18, 2015), and accompanying IDM at Comment 1 ("The Department's standard practice is to provide ample deference to petitioner with respect to the definition of the product(s) for which it seeks relief during the investigation phase of a AD or CVD proceeding.").
[84] *See Aluminum Extrusions from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 FR 18524 (April 4, 2011), and accompanying IDM at Comment 3 ("Although {Commerce} has the authority to define or clarify the scope of an investigation, it must exercise that authority in a manner which reflects the intent of the petition and does not thwart the statutory mandate to provide the relief requested in the petition. Thus, 'absent an overarching reason to modify the scope in the petition, the Department accepts it.'"; *see also NTN Bearing Corp*., 747 F. Supp. at 731 (citing *Torrington Co. v. United States*, 745 F. Supp. 718 (1990), *aff'd*, 938 F.2d 1276, 1278 (Fed. Cir. 1991)).

include freight rail couplers attached to railcars that enter the United States for consumption, and we find no overarching reason to modify the scope of the investigations.

With regard to administrability of the scope language, Wabtec has not presented any new arguments to warrant a change to Commerce's preliminary determination to include freight rail couplers attached to railcars in the scope. Specifically, although Wabtec argues that CBP has identified concerns regarding the administrability of the scope language including freight rail couplers attached to railcars, this is not accurate. Rather, CBP has not identified any overarching administrability concerns with assessing ADs/CVDs on freight rail couplers attached to freight railcars that *enter the United States for consumption*.[85] CBP explained that if a freight railcar is subject to entry (*i.e.*, not exempt from entry under 19 CFR 141.4(b)(3) or (b)(4)), and an attached freight rail coupler is within the scope of an AD/CVD order, then a formal (type 03) consumption entry is required to assess and collect ADs/CVDs on the coupler for entry into the United States.[86] As such, CBP's process of collecting AD/CVD cash deposits for freight rail couplers, would be no different than collecting ADs/CVDs for subject merchandise that is not attached to another product. In both instances, an importer would need to file a type 03 entry for consumption for the subject merchandise and pay the applicable duties. Wabtec is correct that CBP *did* note administrability concerns with any scope language that applies to freight rail couplers attached to freight railcars that do not enter the United States for consumption. However, we are not instructing CBP to apply ADs/CVDs to freight rail couplers that do not enter the United States for consumption nor does the scope purport to cover non-consumption entries.[87] Furthermore, we agree with the petitioner that it is the role of CBP—not Commerce—to administer the U.S. Customs regulations and determine when and whether an entry for consumption occurs.

Further, as discussed in the Preliminary Scope Decision Memorandum, Commerce considered and rejected similar arguments on the administrability issues associated with including freight rail couplers mounted or joined to railcars in the scope of the prior investigations.[88] In those investigations, Commerce explained that the petitioner provided record evidence that clearly showed that railcar manufacturers and owners track all of the components that are part of a railcar for warranty purposes, and thus, that importers would have access to the information needed at the time of import.[89] Furthermore, Commerce also noted that the freight rail industry operates a database where information on the manufacturer and physical characteristics of the railcars and associated products such as freight rail couplers are uploaded.[90] In the current investigations, the petitioner added information to the record showing that the components going into freight railcars are tracked by manufacturer and country of origin.[91] Specifically, the

[85] *See* CBP Memorandum.
[86] *Id.*
[87] *See* Preliminary Scope Decision Memorandum at 18-19 (citing section 703(d)(2) and 733(d)(2) of the Act: In the event of affirmative preliminary determinations in the investigations, Commerce will instruct CBP to suspend "liquidation of all entries of merchandise subject to the determination which are entered, or withdrawn from warehouse, for consumption …").
[88] *See* Predecessor Investigations Post-Preliminary Determination Scope Memorandum at 9, unchanged in Predecessor Investigations Final Scope Memorandum at 10-11.
[89] *See* Predecessor Investigations Final Scope Memorandum at 10.
[90] *Id.*
[91] *See* Petitioner's Rebuttal Scope Comments at 14.

petitioner also provided information regarding the Umler database used to track information on freight railcar parts and the extensive registration requirements for freight railcar components.[92]

Concerning freight rail couplers, CBP indicated that railcars may initially cross the U.S. border as IITs or may be exempt from entry under 19 CFR 141.4(b)(4), but could later lose their exempt status.[93] Additionally, freight railcars may be imported without being exempt from entry under 19 CFR 141.4(b)(3) or (b)(4) and, in that scenario, are subject to entry for consumption.[94] Wabtec claims that in 2021 there was over one million crossings of loaded and empty railcars across the United States-Mexico and United States-Canada borders with the trains being operated by railroads not railcar producers.[95] According to Wabtec, the frequency with which railcars transit in and out of the United States underscores the administrability challenges associated with the current scope language. However, the number of railcars that cross the border is not necessarily indicative of the number of railcars that are entered into the United States for consumption. As stated above, here, the issue is whether and when a freight rail coupler enters the United States for consumption, and the evidence proffered by Wabtec does not address this issue. Moreover, as noted above, the freight rail industry has access to the necessary information regarding the railcars and their associated parts to declare the freight rail couplers if they are entries for consumption.

Finally, while recognizing that the legal status of freight rail couplers attached to or mounted on railcars exempt from entry under 19 CFR 141.4(b)(3) and 19 CFR 141.4(b)(4) is a matter for CBP, the petitioner also continues to advance its own interpretation of those provisions. Consistent with our Preliminary Scope Decision Memorandum, we continue to find that these arguments pertain to the interpretation of regulations administered by CBP and, as such, are properly assessed by CBP, rather than Commerce. In these investigations, Commerce must establish the applicable scope and determine whether dumping or countervailable subsidization is occurring. In light of the preliminary determinations in the investigations, Commerce has instructed CBP to suspend "liquidation of all *entries* of merchandise subject to the determination which are entered, or withdrawn from warehouse, *for consumption* … ."[96] In the event of affirmative final determinations, Commerce will, as applicable, require the posting of cash deposits "for each *entry* of the subject merchandise … ."[97] Additionally, if both Commerce and the ITC reach affirmative determinations, Commerce will publish AD/CVD orders requiring deposits of estimated duties "pending liquidation of *entries* of merchandise at the same time as estimated normal customs duties on that merchandise are deposited."[98] As a matter of law and practice, Commerce does not regulate whether, and at what point, merchandise enters the United States for consumption. Rather, determining when a consumption entry takes place, what is an IIT, and the applicability of certain exceptions from normal entry requirements falls within CBP's authority.

---

[92] *See* Petitioner's Rebuttal Scope Comments at 14-16 and Exhibits 4 through 6; *see also* Petitioner's Comments on CBP Memorandum at Exhibits 12, 15 through 25, and 36.
[93] *See* CBP Memorandum at 1-2.
[94] *Id.* at 2.
[95] *See* Wabtec's Scope Letter at 2.
[96] *See* sections 703(d)(2) and 733(d)(2) of the Act (emphasis added).
[97] *See* sections 705(c)(1)(B)(ii) and 735(c)(1)(B)(ii) of the Act (emphasis added).
[98] *See* sections 706 and 736 of the Act.

We, thus, continue to find that CBP's interpretation of its regulations and the applicable laws governing entry requirements into the United States is within CBP's purview. We also continue to find that the information necessary to administer the scope of these investigations, assuming there is an entry for consumption, is tracked in the ordinary course of business and that there is no overarching reason to modify the scope of the investigations beyond making the modification proposed by CBP, as outlined in the Preliminary Scope Decision Memorandum.[99]

**Comment 3: Whether the Scope Is Clear Regarding the Finishing of Freight Rail Couplers**

*Petitioner's Comments*:[100]

- Commerce properly determined that the scope of the investigations as written is clear regarding the finishing of freight rail couplers, and no modification of the scope language is necessary in that regard.
- Despite Amsted's contentions that the scope should clarify the country of origin to be the country where freight rail couplers are cast, Commerce concluded that the scope language is clear on this matter: "{t}he country of origin for subject couplers and parts thereof, whether fully assembled, unfinished or finished, or attached to a railcar, is the country where the subject coupler parts were cast or forged."[101]

No other interested party commented on this issue.

**Commerce's Position:** As we explained in the Preliminary Scope Decision Memorandum, the language of the scope is explicit that the country of origin for subject couplers and parts is where the subject coupler parts were cast or forged, regardless of whether they are fully assembled, finished or unfinished, or attached to a railcar. [102] As such, we continue to find that no clarification of the scope language is necessary for this final determination.

---

[99] *See* Preliminary Scope Decision Memorandum at 17.
[100] *See* Petitioner's Scope Brief at 13.
[101] *Id*. at 13 (citing Initiation Checklist at Attachment I).
[102] *See* Preliminary Scope Decision Memorandum at 20.

## IV. RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting the positions described above. The scope language of the freight rail coupler investigations is unchanged from that in the Preliminary Scope Determination Memorandum.

☒ ☐

____________ ____________

Agree Disagree

5/15/2023

X James Maeder

Signed by: JAMES MAEDER

James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

## Appendix

## Scope of the Investigations

The scope of these investigations covers certain freight railcar couplers (also known as "fits" or "assemblies") and parts thereof. Freight railcar couplers are composed of two main parts, namely knuckles and coupler bodies but may also include other items (*e.g.*, coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and rotors). The parts of couplers that are covered by the investigations include: (1) E coupler bodies, (2) E/F coupler bodies, (3) F coupler bodies, (4) E knuckles, and (5) F knuckles, as set forth by the Association of American Railroads (AAR). The freight rail coupler parts (*i.e.*, knuckles and coupler bodies) are included within the scope of the investigations when imported separately. Coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and rotors are covered merchandise when imported in an assembly but are not covered by the scope when imported separately.

Subject freight railcar couplers and parts are included within the scope whether finished or unfinished, whether imported individually or with other subject or nonsubject parts, whether assembled or unassembled, whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar. Finishing includes, but is not limited to, arc washing, welding, grinding, shot blasting, heat treatment, machining, and assembly of various parts. When a subject coupler or subject parts are mounted on or to other nonsubject merchandise, such as a railcar, only the coupler or subject parts are covered by the scope.

The finished products covered by the scope of these investigations meet or exceed the AAR specifications of M-211, "Foundry and Product Approval Requirements for the Manufacture of Couplers, Coupler Yokes, Knuckles, Follower Blocks, and Coupler Parts" and/or AAR M-215 "Coupling Systems," or other equivalent domestic or international standards (including any revisions to the standard(s)).

The country of origin for subject couplers and parts thereof, whether fully assembled, unfinished or finished, or attached to a railcar, is the country where the subject coupler parts were cast or forged. Subject merchandise includes coupler parts as defined above that have been further processed or further assembled, including those coupler parts attached to a railcar in third countries. Further processing includes, but is not limited to, arc washing, welding, grinding, shot blasting, heat treatment, painting, coating, priming, machining, and assembly of various parts. The inclusion, attachment, joining, or assembly of nonsubject parts with subject parts or couplers either in the country of manufacture of the in-scope product or in a third country does not remove the subject parts or couplers from the scope.

The couplers that are the subject of these investigations are currently classifiable in the Harmonized Tariff Schedule of the United States (HTSUS) statistical reporting number 8607.30.1000. Unfinished subject merchandise may also enter under HTSUS statistical reporting number 7326.90.8688. Subject merchandise attached to finished railcars may also enter under HTSUS statistical reporting numbers 8606.10.0000, 8606.30.0000, 8606.91.0000, 8606.92.0000, 8606.99.0130, 8606.99.0160, or under subheading 9803.00.50. Subject

merchandise may also be imported under HTSUS statistical reporting number 7325.99.5000. These HTSUS subheadings are provided for convenience and customs purposes only; the written description of the scope of these investigations is dispositive.

# Attachment F

KING & SPALDING

1700 Pennsylvania Avenue, N.W.
Suite 900
Washington, DC 20006
Fax: 202-626-3737
www.kslaw.com

September 14, 2026

**VIA E-MAIL (eapafad@cbp.dhs.gov)**

Office of Trade,
Regulations and Rulings,
U.S. Customs and Border Protection
Department of Homeland Security
1300 Pennsylvania Avenue, N.W.
Washington, DC 20229
eapafad@cbp.dhs.gov

HQ Case No. H361930/EAPA Case No. 8183
Administrative Review

**PUBLIC DOCUMENT**

**Re: HQ Case No. H361930/EAPA Case No. 8183: Certain Freight Rail Couplers And Parts Thereof From Mexico & The People's Republic Of China — Request for Public Rail Entry Guidance**

Dear Regulations and Rulings:

On behalf of The Greenbrier Companies, Inc. and its subsidiaries, Greenbrier Central LLC, Greenbrier Concarril S.de R.L. de C.V., Greenbrier Leasing Company LLC, Greenbrier-GIMSA, LLC, Gunderson-GIMSA S.A. de C.V., and Gunderson Concarril S.A. de C.V. (collectively, "Greenbrier"), we submit this letter to detail Greenbrier's diligent and sustained efforts to coordinate with U.S. Customs and Border Protection ("Customs" or "CBP") regarding the entry of railcars during the pendency of the administrative review process in this case.

In the May 18 determination, CBP's Trade Remedy Law Enforcement Directorate ("TRLED"), stated that "CBP will henceforth require formal entries for the railcars to which" freight rail couplers "are affixed," and will require importers to "submit proper accompanying documentation and all AD/CVD duties." However, there has been, and still is, no established method for importers to comply with these instructions. Furthermore, the stakeholders most interested in this issue, including railroads on both sides of the border, and licensed customs brokers on both sides of the border, report that formal entry of railcars currently is not possible unless programming modifications are implemented. Greenbrier has specifically been informed by CBP personnel in a key port of entry (Eagle Pass, Texas) that CBP personnel at the port *will not process railcar entries* without further instruction from CBP. In short, it is impossible to follow CBP's instructions for entering railcars at the Southern Border.

As detailed in the attached chronology, Greenbrier has worked diligently over the last three months to comply with CBP's instructions. During that period, CBP personnel have offered a shifting set of procedures, and the most recent guidance from CBP is not currently feasible for Greenbrier to follow. At least two impediments to formal entry of railcars remain. First, as stated above, entry is not possible because applicable CBP personnel at the key port of entry in Eagle Pass, Texas, have publicly stated that they will not process railcar entries until they receive further instructions from CBP headquarters. Second, formal entry is not possible at every port of entry along the Southern border because the computer systems that transmit electronic entry and manifest data at most ports of entry currently cannot transmit the required data.

Public guidance from CBP addressing how importers of railcars to which freight rail couplers are affixed must be entered may reduce many of the difficulties hindering the implementation of TRLED's May 18 entry instructions. Clear instructions may ensure that all CBP officials and third parties are aligned in how the entries should take place. Such guidance will also enable third parties such as rail carriers to plan and implement necessary changes to their systems to accommodate the new entry procedures. Public guidance is also necessary to avoid the present inequitable situation where, as a practical matter, Greenbrier is the *only* producer of railcars being asked to comply with CBP's new entry instructions.

Accordingly, Greenbrier respectfully requests CBP to publish guidance outlining the entry procedures CBP wishes importers to follow to facilitate TRLED's instruction that it will "require formal entries for the railcars to which" freight rail couplers "are affixed," and that it will require the submission of "proper accompanying documentation and all AD/CVD duties."

Respectfully submitted,

*/s/ Patrick J. Togni*
Stephen P. Vaughn
Patrick J. Togni
J. Michael Taylor
Daniel Schneiderman

*Counsel for Greenbrier*

**CERTIFICATE OF SERVICE**

I, _Patrick J. Togni__________, hereby certify that a copy of the
(name of certifying official)

foregoing submission on behalf of __The Greenbrier Companies, Inc.__,
(company name)

dated September 14, 2026, was served by EAPA CMS or email (circle the method used) on the following parties:

On Behalf of

MCCOWAN & TORLEY

AUTHORIZED RECIPIENTS:
DANIEL B. PICKARD
GRACE E. WELBORN
ANNA CARSON EASTERLING
CLAIRE M. WEBSTER
BRANDON J. CUSTARD
NATAN P.L. TUBMAN
AMANDA L. WETZEL
TANYA HARALAMPIEVA
ALLISON BURT
VICTORIA R. ATKINS
PUBLIC DOCUMENT
DESIREE JANUARY
SYLVIA HENSLEY
MILTON I. KOCH
OF:
BUCHANAN INGERSOLL & ROONEY
1700 K. STREET, N.W., SUITE 300
WASHINGTON, D.C. 20006
LEAD ATTORNEY EMAIL: daniel.pickard@bipc.com

Patrick J. Togni
(Signature of Certifying Official)

**PUBLIC VERSION CERTIFICATION & CERTIFICATE OF ACCURACY**

I, Patrick J. Togni, with King & Spalding LLP, counsel to The Greenbrier Companies, Inc., certify to the following:

i. On behalf of the party making this submission, I certify that all statements in this submission (and any attachments) are accurate and true to the best of my knowledge and belief.

ii. On behalf of the party making this submission, I certify that any information for which I have not requested business confidential treatment pursuant to 19 C.F.R. 165.4(a), may be released for public consumption.

iii. On behalf of the party making this submission, I certify that I will advise CBP promptly of any knowledge of or reason to suspect that the covered merchandise poses any health or safety risk to U.S. consumers pursuant to 19 C.F.R. 165.7(a).

iv. I certify that the information is our own information (i.e., information from their own business records and not business confidential information of another entity) or information that was publicly obtained or in the public domain.

Signature: Patrick J. Togni

Patrick J. Togni

Date: September 14, 2026

# CHRONOLOGY OF GREENBRIER'S EFFORTS TO PURSUE "FORMAL ENTRY" OF RAILCARS AND ONGOING ENGAGEMENT WITH U.S. CUTOMS, RAILROADS, AND LICENSED CUSTOMS BROKERS

This document provides a chronology of engagement by The Greenbrier Companies, Inc. and its subsidiary Greenbrier Central, LLC (collectively "Greenbrier") following the May 18, 2026, determination by U.S. Customs and Border Protection ("Customs" or "CBP") in Case No. 8183 under the Enforce and Protect Act ("EAPA"). The chronology illustrates that, even though CBP has purported to require Greenbrier to enter its railcars, there is no viable process for making such formal entries. Greenbrier has repeatedly asked CBP to clarify the procedures for entry, and it has become clear that no adequate procedures exist. Relevant stakeholders agree that formal entry at the key ports of entry along the Southern border is not possible, confirming the unreasonableness of CBP's EAPA determination and the need for CBP headquarters to take urgent action to avoid further harm and remedy the untenable situation created by the misguided EAPA determination.

## <u>Introduction and Overview</u>

In its EAPA determination, CBP's Trade Remedy Law Enforcement Directorate ("TRLED") asserts that Greenbrier evaded antidumping and countervailing duty orders on certain freight rail couplers from Mexico and the People's Republic of China (the "AD/CVD Orders"). TRLED's determination rests on its surprising conclusion that, despite long-standing policy to the contrary, Greenbrier should have formally entered its railcars at the border. TRLED's determination states that "CBP will henceforth require formal entries for the railcars to which" freight rail couplers "are affixed" and requires Greenbrier to "submit proper accompanying documentation and all AD/CVD duties."

On July 1, 2026, Greenbrier timely sought administrative review, which CBP acknowledged receipt of on July 2, 2026. As explained in that filing, TRLED's determination contains clear legal errors, exceeds the agency's lawful authority, and departs from decades of settled practice and clear agency policy. CBP is scheduled to issue its review decision by September 28, 2026.

This chronology does not revisit the many substantive flaws in TRLED's EAPA determination, as those issues have already been addressed at some length in Greenbrier's request for administrative review. Instead, this document shows the unfair and untenable situation that TRLED has created: Greenbrier has been instructed to file formal entries of new railcars transiting into the United States, but there is no established process to do so, and the relevant stakeholders—including CBP officials at the border, railroads on both sides of the border, and licensed customs

brokers on both sides of the border—all agree that formal entry of railcars currently is not possible. In short, TRLED's EAPA determination directs Greenbrier to do something that cannot be done.

As of Friday, September 11, 2026, there remains no working solution for filing formal entries at the key ports of entry for new railcars transitioning into the United States. Over the past three months, CBP has offered limited guiding procedures, but the agency's guidance remains substantially inadequate. There are at least two serious impediments to formal entry of railcars. ***First***, entry is not possible because applicable CBP personnel at the key port of entry in Eagle Pass, Texas, have publicly stated that they will not process railcar entries unless they receive further instructions from CBP headquarters. ***Second***, even if CBP port personnel receive such instructions, formal entry is not possible because the computer systems that transmit electronic entry and manifest data currently cannot transmit the required data. It is thus impossible to follow the instructions in TRLED's EAPA determination—and, indeed, Greenbrier is unaware of any company that has ever done so at the Southern border.

The reality that the entry and manifest data systems cannot process formal entries of railcars plainly confirms that there was never any proper basis for TRLED's EAPA determination. More than three months of good-faith outreach and engagement also demonstrates Greenbrier's commitment to transparently and earnestly working with CBP, the railroads, and brokers to obtain clear and actionable guidance. Greenbrier will continue its efforts, but it is absolutely vital for officials at CBP headquarters to recognize the confusion resulting from TRLED's determination.

**Initial Outreach—May and June 2026**

Over the past three months, both on its own and through counsel at King & Spalding ("K&S"), Greenbrier has repeatedly engaged with U.S. Customs to confirm the formal entry process, first, with the EAPA case team at TRLED, and second, with senior officials at the Automotive & Aerospace Center of Excellence and Expertise (the "A&A CEE"). In addition to confirming the specific entry process to be used for railcars, Greenbrier communicated with U.S. Customs about how to be certain that, if TRLED's determination is overturned, Greenbrier will be reimbursed for any duties that it was required to deposit.

Greenbrier began its outreach promptly after TRLED's determination. After initial correspondence and discussions with the EAPA team to request that the agency correctly calculate the deadline for Greenbrier to seek administrative review, K&S turned to fundamental questions regarding the entry process. After identifying an appropriate point of contact, on June 1, 2026, K&S emailed officials in the EAPA

Investigations Branch at TRLED, to discuss whether Greenbrier would be permitted to enter its railcars under protest to preserve its rights to seek duty refunds pending resolution of its legal challenges to TRLED's determination.

After a series of email exchanges, those officials arranged a call for June 9, 2026. That call was attended by K&S and various officials from the A&A CEE, the EAPA case team, and TRLED. Invitees to the call included as follows:

- Judy Staudt, Center Director, A&A CEE
- Sandy Lopez, Assistant Center Director A&A CEE
- Laura Rosenberger, Branch Chief, Validation & Compliance, A&A CEE
- Bret A. Mennella, Import Specialist
- Quoc Tran, Supervisory Import Specialist, Validation & Compliance, A&A CEE
- Tobias A. Vandall, CBP EAPA Investigations
- Mark R. Badger, Supervisory Import Specialist, Validation & Compliance, A&A CEE
- Victoria Cho, Director, Enforcement Operations Division, Trade Remedy Law Enforcement Directorate, Office of Trade
- Kristina Horgan, Principal Supervisory ITA, EAPA Investigations
- Somboun Dauble, International Trade Analyst, EAPA Investigations

During the call, K&S explained that Greenbrier needed to be certain that all funds tendered to CBP to secure the government's revenue for AD/CVD and Section 232 duties would promptly be refunded if any CBP administrative review or subsequent litigation was decided in Greenbrier's favor. In addition, Greenbrier sought to understand the technical aspects of the entry process. CBP expressed the need for additional time to consider these questions and indicated that it would reach out in a week to schedule a call to discuss next steps.

Between June 9 and 10, 2026, representatives from Greenbrier exchanged emails with representatives from rail carriers Ferromex and BNSF to discuss the logistics of how railcars might be processed for formal entry. Those discussions addressed the generation of manifests, Electronic Data Interchange ("EDI") requirements, and necessary modifications to the railroad system to facilitate formal entry processing.

K&S did not hear back from CBP within the one-week period specified on the June 9 call. On June 18, 2026, K&S called Center Director Staudt. Ms. Staudt responded by email, copying Assistant Center Director Lopez. Ms. Staudt explained

that CBP was consulting with its attorneys and needed additional time. She stated that she was out of the office next week, but that Ms. Lopez would provide an update.

On June 22, 2026, Assistant Center Director Lopez responded by email that CBP "remain{ed} engaged" but could not provide guidance at that time. She explained that CBP had raised Greenbrier's concerns with the Office of Chief Counsel and was "awaiting additional feedback."

**<u>First Guidance—July 1, 2026</u>**

On July 1, 2026, Assistant Center Director Lopez emailed K&S responses to Greenbrier's inquiries. The full responses are attached as **Exhibit A**. Unfortunately, these responses did not answer Greenbrier's questions.

Most significantly, the responses did not identify any mechanism for Greenbrier to enter its railcars and preserve its right to be reimbursed. As to whether Greenbrier could enter the railcars to protect the revenue of the United States and preserve Greenbrier's right to recover those duties should it prevail in its challenge to TRLED's determination, Ms. Lopez responded that this was "a hypothetical proposition" that "depends on a variety of factors not limited to ones within CBP's control (e.g., courts and/or other agencies may affect any potential future decision)." She stated that CBP "cannot provide any assurances about the Freight Rail Couplers (FRCs)." She further explained that "a protest could not be filed until after the entries are liquidated once the EAPA and any other relevant proceedings are complete."

On July 1, 2026, representatives from Greenbrier also exchanged emails with representatives from rail carriers Ferromex, BNSF, Canadian Pacific Kansas City ("CPKC"), and Union Pacific to discuss implementing CBP's guidance.

**<u>Second Guidance—July 16, 2026</u>**

Given the insufficiency of CBP's July 1, 2026 response, K&S sent a letter to Center Director Staudt on July 8, 2026, on behalf of Greenbrier, requesting further guidance. A copy of that letter is attached as **Exhibit B**.

On July 16, 2026, Assistant Center Director Lopez responded by email. The response is attached as **Exhibit C**.

In Ms. Lopez's response, CBP outlined a manual entry procedure for Greenbrier to follow. Specifically, for initial movements of new railcars into the United States, CBP instructed Greenbrier to file the entries manually on a prospective basis by submitting hard-copy documents directly at the border and not through the Automated Broker Interface ("ABI"), with the cash deposits required by

TRLED's determination paid at the time the entry is filed. The deposits were to be made by check to the Automotive and Aerospace Center, U.S. Customs and Border Protection, Entry Department, 380 S. Cambell, Detroit, Michigan 48209. To ensure that the deposits could be appropriately tracked, any submission of a deposit by check was also to include a copy of the hard-copy entry documents to identify each applicable entry number and include a separate breakout of the amounts provisionally attributable to the AD/CVD Orders and Section 301 duties (if applicable).

Given the complicated instructions at issue, and Greenbrier's determination to comply with CBP's direction, Greenbrier sought further clarification. On July 23, 2026, K&S sent another letter to Acting Center Director Staudt and Assistant Center Director Lopez to confirm Greenbrier correctly understood the procedures outlined in Ms. Lopez's July 16 email. That letter is attached as **Exhibit D**. The letter concluded by requesting that CBP "{p}lease advise {K&S} promptly if Greenbrier ha{d} misconstrued {Custom's} guidance in any way." CBP did not respond to this letter.

Greenbrier tried to comply with CBP's guidance. On July 23, 24, and 30, 2026, representatives from both Greenbrier and K&S spoke with representatives from Greenbrier's customs broker, Global Customs & Logistics LLC ("Global"), to discuss implementing CBP's July 23 guidance. The discussions highlighted the practical difficulties in implementing CBP's instructions. Global provided Greenbrier with a chart showing that, in Global's view, the manual process described by CBP was virtually impossible to implement. A copy of the chart is attached as **Exhibit E**.

**<u>Attempted Entries—August 2026</u>**

At the beginning of August Greenbrier attempted to enter railcars pursuant to the manual entry procedures that CBP had described (despite Global's concerns).

On August 7, 11, 13 through 16, and 18 through 21, 2026, representatives from Greenbrier, K&S, Global, and/or Greenbrier's broker Sánez had extensive discussions and correspondence about the difficulty of entering railcars pursuant to CBP's guidance. On August 14, 2026, Global stated that, as a practical matter, it could not manage the type of manual-entry process that CBP had described. In other words, Global refused to work with Greenbrier on this process.

Between August 12 and 14, 2026, representatives from Greenbrier and K&S spoke with and exchanged emails with representatives from Ferromex to discuss a process by which Greenbrier would attempt to enter railcars pursuant to the procedures CBP requested, as described in the July 23 correspondence. During these conversations, Ferromex repeatedly expressed operational concerns with the

procedures. It soon became clear that, as a practical matter, Ferromex would not support Greenbrier's efforts to use a manual-entry process.

On August 14, 2026, K&S alerted Assistant Center Director Lopez to the difficulties facing Greenbrier. K&S followed up with an email explaining that the systems for rail carriers and ports are not equipped to handle the type of manual, hard-copy documentation described by CBP. Accordingly, Greenbrier stated its intention to send the requested paperwork for hard-copy entry to the address provided by CBP: Automotive and Aerospace Center, U.S. Customs and Border Protection Entry Department, 380 S. Campbell, Detroit, Michigan 48209.

Ms. Lopez forwarded the email to Assistant Center Director Flood, who asked K&S for a call on August 17, 2026. On August 17, K&S spoke with Assistant Center Director Flood, who requested copies of the previous correspondence with Assistant Center Director Lopez (*i.e.,* the July 23 letter that memorialized Greenbrier's understanding of CBP's entry instructions). Ms. Flood informed K&S that she would need time to conduct additional research and respond further. A video conference was scheduled for August 19, 2026.

**<u>Third Guidance—August 19–20, 2026</u>**

On August 19, 2026, Assistant Center Director Flood emailed K&S with the following instructions:

> For the older entries, you will need to submit non-ABI paperwork, along with the check for duties, to the Port of Detroit as previously instructed.
>
> For the new entries, although your EAPA case is currently under administrative review, you will still need to file the entries as type 03 with the associated AD/CVD cases and make the required cash deposits.
>
> If the outcome of the administrative review is in your favor, you will be able to file protests, or the Center will be able to administratively refund the duties paid.

See **Exhibit F**. In light of this email response, Ms. Flood cancelled the video conference previously scheduled for that day.

On August 20, 2026, K&S emailed Assistant Center Director Flood to confirm receipt of the new guidance and to memorialize Greenbrier's understanding of the

guidance that future Type 03 railcar entries should be filed electronically. *See* **Exhibit G**.

**Attempted Entries—August**

Between August 20 and 21, 2026, representatives from Greenbrier had discussions with representatives from Union Pacific about the possibility of entering railcars pursuant to CBP's August 19–20 guidance. The discussions focused on technical issues with making entries pursuant to CBP's guidance and the need for close coordination between CBP and the railroads.

In the course of initial discussions, it became clear that Union Pacific had concerns about whether Ms. Flood's instructions could be followed. In an effort to advance discussions, Mr. Togni—counsel for Greenbrier at K&S—flew to Texas for meetings in Eagle Pass.

**Meetings at Eagle Pass Bridge Rail Crossing—August 25, 2026**

On August 26, 2026, Mr. Togni emailed Assistant Center Director Lopez, Assistant Center Director Flood, and Acting Center Director Staudt to update them on Greenbrier's efforts to enter railcars pursuant to the third set of procedures that CBP had provided. Mr. Togni explained that he had spent the previous day in Eagle Pass, Texas, and participated in meetings with CBP personnel, brokers, and the railroads.

During those meetings, K&S learned from CBP officials in Eagle Pass that the port was not processing railcar entries and would continue not to do so unless it received instructions from CBP headquarters in Washington. In addition, Greenbrier's broker and the rail carriers specifically told Mr. Togni that they cannot file railcar entries in ABI and that manifest data for entered railcars only could be generated if new programming were implemented in the carriers' systems. *See* **Exhibit H**. Given these facts, Mr. Togni asked if it would be possible to meet with Assistant Center Director Lopez the following day in Laredo, Texas.

On August 26, 2026, Assistant Center Director Lopez responded by email that the fact that broker and rail carriers were unable to file the railcar entries through ABI raised a new issue. She requested that Greenbrier send specific questions for her to address as well as additional details about the ABI transmission issue. Mr. Togni has continued to discuss these matters with Ms. Lopez by phone and email but further discussions have not resolved the underlying problems that continue to prevent formal entry.

**Coding Fix Required—August**

On August 28, 2026, K&S met with representatives from BNSF Railway. The BNSF representatives explained that existing systems cannot enter railcars for Greenbrier or any other entity. Such entries will require a coding fix, which BNSF is working to implement. Union Pacific has not yet implemented updated coding. Greenbrier is working with CPKC on ABI processing of entries at other ports of entry and intends to confirm the status of those efforts as they develop.

This chronology is depicted in calendar form in **Exhibit I**.

# EXHIBIT A

**From:** LOPEZ, SANDY M <SANDY.M.LOPEZ@CBP.DHS.GOV>
**Sent:** Wednesday, July 1, 2026 6:08 PM
**To:** Patrick Togni
**Cc:** Michael Taylor
**Subject:** RE: Greenbrier Next Steps

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Good afternoon Mr. Togni,

Then following up regarding the two questions raised last month and the additional clarification that was sought in response to those inquiries. We have since obtained clarification on both matters based on our understanding of the concerns raised in our last call and are providing the following:

1. **Assurances on Duties for IIT Classification:** If Greenbrier begins filing formal consumption entries and paying duties (which would include potential Anti-Dumping and Countervailing Duties (ADCVD) and Section 232 duties), what assurances can CBP provide that the Freight Rail Couplers (FRCs) will not be subject to ADCVD should a subsequent decision determine that they are, in fact, IITs?

   Given that this is a hypothetical proposition which depends on a variety of factors not limited to ones within CBP's control (e.g., courts and/or other agencies may affect any potential future decision), CBP cannot provide any assurances about the Freight Rail Couplers (FRCs). Also, CBP's role in the applicability of ADCVD is ministerial.

2. **Implications of Filing Under Protest:** Concern was expressed that even if Greenbrier filed a protest challenging the requirement for formal entry procedures for IITs, and even if CBP ultimately agrees that the FRCs should have been classified as IITs, the act of filing a formal entry might preclude the recovery of duties paid. Specifically, Greenbrier is concerned that by making a formal entry, it triggers the obligation to pay ADCVD and Section 232 duties, and that even if the protest challenge is decided in the Greenbrier's favor and the classification is changed to IIT, the importer would still owe ADCVD because a formal entry was filed. Greenbrier is therefore seeking to understand if there is a mechanism to "unwind" this situation if the protest is successful.

   To the extent Greenbrier is seeking to file a protest on the entries implicating FRCs that are suspended or extended under the EAPA investigation (whose proceeding is only applicable to the ADCVD), a protest could not be filed until after the entries are liquidated once the EAPA and any other relevant proceedings are complete. Generally speaking, if an importer protests the assessment of duties on a liquidated entry, and CBP approves the protest, CBP will refund the duties in question.

Regards,

**Sandy M. Lopez**
Assistant Center Director | Revenue Collection Branch
A&A Center | Detroit Field Office

**From:** Patrick Togni <PTogni@KSLAW.com>
**Sent:** Tuesday, June 23, 2026 5:18 PM
**To:** LOPEZ, SANDY M <SANDY.M.LOPEZ@CBP.DHS.GOV>
**Cc:** jmtaylor@kslaw.com
**Subject:** RE: Greenbrier Next Steps

You don't often get email from ptogni@kslaw.com. Learn why this is important

Dear Assistant Center Director Lopez:

Thank you. I am writing to confirm receipt. We will continue to stand by.

Sincerely,

Pat Togni

**Patrick J. Togni**
*Partner*

T: +1 202 626 2958 | E: ptogni@kslaw.com | Bio | vCard

King & Spalding LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006

kslaw.com

**From:** LOPEZ, SANDY M <SANDY.M.LOPEZ@CBP.DHS.GOV>
**Sent:** Monday, June 22, 2026 12:17 PM
**To:** Patrick Togni <PTogni@KSLAW.com>
**Cc:** Michael Taylor <JMTaylor@KSLAW.com>
**Subject:** RE: Greenbrier Next Steps

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Good afternoon Mr. Togni,

We remain engaged with the Office of Chief Counsel regarding the concerns raised in connection with the protest filing and are awaiting additional feedback. We appreciate your patience as this matter continues through the internal review process. I understand you have expressed interest in scheduling a call to discuss this matter. At this time, however, there have been no developments since our request for guidance was submitted, and therefore there is no additional information to provide beyond the status update provided here.

Upon receipt of further guidance, we will follow up.

Regards,
**Sandy M. Lopez**

Assistant Center Director | Revenue Collection Branch
A&A Center | Detroit Field Office

---

**From:** Patrick Togni <PTogni@KSLAW.com>
**Sent:** Thursday, June 18, 2026 5:22 PM
**To:** STAUDT, JUDY L <JUDY.L.STAUDT@CBP.DHS.GOV>
**Cc:** LOPEZ, SANDY M <SANDY.M.LOPEZ@CBP.DHS.GOV>; jmtaylor@kslaw.com
**Subject:** RE: Greenbrier Next Steps

You don't often get email from ptogni@kslaw.com. Learn why this is important

CAUTION: This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. If you feel this is a suspicious-looking email, please report by using the "Report Phishing" button option. If on a mobile device, please utilize the “Report Phishing” button or “Forward as Attachment” to CBPSOC@cbp.dhs.gov.

Dear Director Staudt:

Thank you for your email. Assistant Center Director Lopez – please let us know if there are good times to discuss updates next week.

Thanks again.

Sincerely,

Pat Togni

**Patrick J. Togni**
*Partner*

T: +1 202 626 2958 | E: ptogni@kslaw.com | Bio | vCard

King & Spalding LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006

kslaw.com

---

**From:** STAUDT, JUDY L <JUDY.L.STAUDT@CBP.DHS.GOV>
**Sent:** Thursday, June 18, 2026 5:22 PM
**To:** Patrick Togni <PTogni@KSLAW.com>
**Cc:** LOPEZ, SANDY M <SANDY.M.LOPEZ@CBP.DHS.GOV>
**Subject:** Greenbrier Next Steps

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Hi Patrick,

Sorry I missed your call, but I am cc'ing ACD Lopez, who was consulting with our attorneys about some of the concerns you had regarding the filing of the protest. We are waiting to hear back about that before we circle back.

I'm out of the office next week, but she can provide an update next week on where we are at and if there has been a determination on how we need to move forward.

Thank you,

Judy L. Staudt
Center Director
Automotive & Aerospace
Center of Excellence & Expertise
Seattle, WA
(206) 478-0616

---

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message or attachments and we ask that you please comply with any additional instructions from the sender regarding deletion of messages or attachments sent in error. Click here to view our Privacy Notice.

# EXHIBIT B

KING & SPALDING

King & Spalding LLP
1700 Pennsylvania Ave, NW
Suite 900
Washington, D.C. 20006-4707
Tel: +1 202 737 0500
Fax: +1 202 626 3737
www.kslaw.com

Patrick Togni
Partner
Direct Dial: +1 202 626 2958
PTogni@kslaw.com

**VIA EMAIL (judy.l.staudt@cbp.dhs.gov)**

July 8, 2026

Acting Center Director Judy Staudt
Automotive & Aerospace Center of Excellence and Expertise
U.S. Customs and Border Protection

**Re: Urgent Request to Clarify Entry Procedures Pending Administrative Review**

Dear Director Staudt:

On behalf of The Greenbrier Companies, Inc. and its subsidiaries ("Greenbrier"), I write to request immediate clarification regarding the entry procedures that apply in connection with the determination made by the Trade Remedy Law Enforcement Directorate ("TRLED") in EAPA Case No. 8183, which erroneously concludes that Greenbrier has evaded antidumping and countervailing duty orders on certain freight rail couplers from Mexico and the People's Republic of China (the "AD/CVD Orders"). As described below, Greenbrier is prepared to ensure that, if TRLED's determination is upheld, any applicable AD/CVD duties will be deposited on all railcars admitted into the United States. But it also seeks assurances that, if TRLED's determination is overturned, Greenbrier will be reimbursed for any duties that are deposited. If those assurances are not possible, U.S. Customs and Border Protection ("CBP" or "Customs") should protect against irreparable harm by staying enforcement of TRLED's decision until the appeals process concludes.

Greenbrier submitted a timely request for administrative review of TRLED's determination on July 1, 2026, and Customs acknowledged receipt of that submission on July 2, 2026. As explained in that request, TRLED's determination contains clear legal errors, exceeds the agency's lawful authority, and radically departs from decades of settled practice. Congress has long decreed that rail freight cars "on which no duty is owed" under the Harmonized Tariff Schedule of the United States, or that serve as instruments of international traffic ("IITs"), are exempt from entry and therefore the collection of AD/CVD duties. *See* Public Law No. 103-182, § 681(b)(1) & (c); 19 C.F.R. § 141.4(b)(3), (b)(4). And it has long been recognized—since at least 2000—that railcars, like Greenbrier's, that are "built in Mexico or Canada for use in the U.S., do not require that an entry be filed in order to qualify for carrying merchandise or passengers between points" in the United States. Directive No. 355-075, Instructions for Handling Entry of Locomotives, Railcars, and other Railroad Equipment into the U.S., § 4.1 (Mar. 1, 2000) (rev. Mar. 2002).

Greenbrier's new railcars manufactured in Mexico and their attached couplers fall within these exemptions because no duty is owed under the Harmonized Tariff Schedule and because they qualify as IITs. Moreover, as the Department of Commerce clarified when defining the scope of its AD/CVD Orders, the exemption that applies to railcars also "extends to the rail car's constituent components," including its couplers, "so long as the couplers are attached to, or part of, the exempted railcars." Video Calls with Customs and Border Protection (Mar. 2, 2023), at 2. As a result, Customs "lack{s} the authority" to assess AD/CVD duties on couplers that are admitted and not subject to consumption entry requirements. *See id.*; *see also* Final Scope Decision Memorandum (May 15, 2023). These clarifications regarding the scope of the AD/CVD Orders—reflected in definitive rulings made by Commerce—are binding on Customs and Greenbrier was entitled to rely on them. *See Fedmet Resources Corp. v. United States*, 755 F.3d 912, 921 (Fed. Cir. 2014); *see also* 19 C.F.R. § 351.225(k)(1).

Even though Greenbrier's request for administrative review is pending, there is a lack of clarity over Customs' current entry procedures and whether Customs will comply with legal requirements pending the outcome of the administrative process. This confusion is widespread and is causing unnecessary disruption and uncertainty across the industry. Implicitly acknowledging its break from precedent and long-standing practice, TRLED's determination states that Customs "will henceforth require" certain Mexican and Chinese couplers attached to new railcars manufactured in Mexico to be entered for consumption. But it is unclear what procedures Customs intends to follow while the administrative review process runs its course. For instance, on July 1, 2026, Union Pacific announced that "{e}ffective immediately, new railcars can no longer be processed under the 'Instruments of International Traffic' (IIT) designation 19 CFR 10.41 (a) (1). These units must now be entered as formal imports in compliance with U.S. Customs regulations." *See* https://www.up.com/announcements/customer-news/2026/CN2026-15. The next day, it reversed position, stating: "we have since learned that the information provided by local CBP personnel was incorrect. We have confirmed with CBP leadership that no changes to the importation process for new railcars will be implemented, and no action is required from customers." *See* https://www.up.com/announcements/customer-news/2026/CN2026-17.

Over the past months Greenbrier has unsuccessfully sought clarification from Customs officials regarding what process should apply for Greenbrier's new railcars made in Mexico. It appears that Customs officials are demanding that Greenbrier officially enter the railcars, as if they are being sold into the country for consumption, and to deposit AD/CVD duties on those railcars. At the same time, however, Customs has been unwilling to provide adequate assurances that, if Greenbrier's railcars are not subject to entry—and TRLED's erroneous determination is overturned—the government will refund any duties paid on those railcars. It remains unclear whether Customs has (or intends to) stay enforcement of TRLED's determination until the appeals process is completed. For its part, Greenbrier has cooperated in good faith to prevent harm by committing that if its appeal is unsuccessful and TRLED's determination is ultimately upheld, Greenbrier will agree to pay AD/CVD duties on any railcars admitted into the country during the pendency of its appeal and ensuing litigation. In addition, it has made commitments that it will follow any officially provided procedures for entering its railcars, so long as Customs provides official, binding assurances that the government will recognize Greenbrier's right to reimbursement if TRLED's decision is reversed on appeal. Instead of staying enforcement of

TRLED's determination or providing necessary assurances, however, Customs officials appear to have suggested that (1) Greenbrier must enter its railcars and deposit duties on them as a result of TRLED's determination, and (2) there is no process for reimbursing the AD/CVD duties deposited on those railcars, even if TRLED's determination is reversed and overturned. For example, in the attached correspondence from Assistant Center Director Lopez, Customs explained that (1) its "role in the applicability of AD/CVD is ministerial," which suggests that Customs may later contend that there is no protestable decision, and (2) "[g]enerally speaking" refunds of assessed duties are refundable for approved protests, which fails to address whether an importer that filed an already-liquidated entry can protest whether an entry was even required (effectively requiring nullification of the entry).

This situation is untenable. Customs cannot allow TRLED to make a legally erroneous determination that exceeds its lawful authority, contradicts Commerce's binding and public statements concerning the scope of its AD/CVD orders, and upends settled reliance interests, and then render the administrative review process meaningless by demanding that AD/CVD duties be deposited and refusing to provide adequate assurances that the deposits will be reimbursed if and when TRLED's misguided rule-of-law violations are overturned. Taking this approach threatens to cause irreparable and significant competitive harms, not only to Greenbrier and its customers but also to the industry as a whole.

Accordingly, Greenbrier respectfully requests that Customs take immediate steps to clarify the agency's position. Customs should either (1) confirm that, during the pendency of the administrative and any judicial review in EAPA Case No. 8183, the agency will not require the entry of Greenbrier's railcars (and that alternative security procedures, like an escrow account, can be used to secure the government revenue, if duties ultimately are owed, and to allow for the refund of the deposits to Greenbrier should it ultimately be confirmed that an exemption from entry existed), or (2) provide clear and official assurances that, if Greenbrier files an entry that the existing administrative protest procedure will allow for the refund of duties, despite the actual filing of a entry, should an entry exemption ultimately be found to have been available (and that Customs will not take the position that because an entry was filed, Customs cannot accept a protest challenging that an entry was not necessary).

Greenbrier is eager to discuss appropriate steps that could be taken to address these issues in the best interest of all involved. Greenbrier believes that there is a reasonable path forward that will provide clarity to the industry, ensure that Customs is able to protect potential revenue, and also allow Greenbrier to maintain its legal position during the pendency of the statutory review process. (Greenbrier will be reaching out to Customs separately on a confidential basis with respect to railcars admitted during the period of investigation to which freight rail couplers were affixed, *see* EAPA Det. at 27.) If Customs is unable or unwilling to clarify its position, Greenbrier will have no choice but to seek further legal relief—a stay of TRLED's unlawful determination and, if necessary, a temporary restraining order. Such litigation would be a waste of resources and impose unnecessary burdens on the Court and parties. Accordingly, Greenbrier urges Customs to clarify its entry procedures to avoid irreparable harm and forestall unnecessary litigation.

Thank you for your consideration of this request.

Sincerely,

Patrick J. Togni

Patrick J. Togni

cc:

Assistant Center Director Sandy M. Lopez, Automotive & Aerospace CEE (via email)

Attachment

# EXHIBIT C

**Patrick Togni**

**From:** LOPEZ, SANDY M <SANDY.M.LOPEZ@CBP.DHS.GOV>
**Sent:** Thursday, July 16, 2026 11:03 AM
**To:** Patrick Togni; STAUDT, JUDY L
**Cc:** Stephen Vaughn; Michael Taylor
**Subject:** RE: Urgent Request to Clarify Entry Procedures Pending Administrative Review

CAUTION: **MAIL FROM OUTSIDE THE FIRM**

Good morning Mr. Togni,

CBP maintains that the Freight Rail Couplers (FRC's) in question should have been formally entered into the United States, and the applicable antidumping and countervailing duties (A-570-145 and C-570-146) on couplers from the People's Republic of China (A-570-145 and C-570-146) and/or Mexico (A-201-857) should have been paid in accordance with the FRC Orders. Consequently, pursuant to 19 C.F.R. § 142.13, CBP requires formal consumption entries for FRCs subject to these orders, necessitating the filing of proper documentation and the payment of all applicable AD/CVD duties.

For entries involving the same underlying circumstances as those at issue in the pending EAPA case 8183, please :

- All entries that fall within the within the scope of the EAPA case must be filed.
- All entries will need to be filed non-ABI
- All unliquidated entries, and any entries that have liquidated but remain within the applicable protest period, must be filed with all required cash deposits paid at the time of filing.
- For entries that have liquidated and are beyond the applicable protest period will need to be filed. Payment should be made by check and sent to the Detroit address below.
    - The submission must identify each applicable entry number and include a separate breakout of the amounts attributable to antidumping duties, countervailing duties, and Section 301 duties

For the purposes of the check, the funds are intended to be maintained in suspense pending further direction associated with the resolution of this matter. These instructions are procedural in nature and intended solely to facilitate the administrative handling of these entries. They should not be construed as a determination regarding the legal treatment of any entry, the availability of protest rights, or the ultimate disposition of any submitted funds.

**Address for Remittance:**
Automotive and Aerospace Center
U.S. Customs and Border Protection
Entry Department
380 S. Cambell
Detroit, Michigan 48209

Regards,
**Sandy M. Lopez**
Assistant Center Director | Revenue Collection Branch
A&A Center | Detroit Field Office

# EXHIBIT D

KING & SPALDING

King & Spalding LLP
1700 Pennsylvania Ave, NW
Suite 900
Washington, D.C. 20006-4707
Tel: +1 202 737 0500
Fax: +1 202 626 3737
www.kslaw.com

Patrick Togni
Partner
Direct Dial: +1 202 626 2958
PTogni@kslaw.com

**VIA EMAIL (judy.l.staudt@cbp.dhs.gov; sandy.m.lopez@cbp.dhs.gov)**

July 23, 2026

Acting Center Director Judy Staudt
Assistant Center Director Sandy M. Lopez
Automotive & Aerospace Center of Excellence and Expertise
U.S. Customs and Border Protection

**Re: U.S. Customs and Border Protection's Clarification of Entry Procedures Pending Administrative Review**

Dear Director Staudt and Assistant Director Lopez:

On behalf of The Greenbrier Companies, Inc. and its subsidiaries ("Greenbrier"), thank you for your July 16, 2026 email responding to my July 8, 2026 letter, clarifying the position of U.S. Customs and Border Protection ("Customs"), and setting out the specialized procedures that Customs has decided to apply in connection with the determination made by the Trade Remedy Law Enforcement Directorate ("TRLED") in EAPA Case No. 8183.

Pursuant to the specialized procedures outlined in your email, while Greenbrier's legal challenges to TRLED's determination are being resolved, Greenbrier will file entries on a prospective basis for those Mexican and Chinese couplers attached to new railcars manufactured in Mexico moving into the United States that fall within the scope of TRLED's determination with respect to the antidumping and countervailing duty orders on certain freight rail couplers from Mexico and the People's Republic of China (the "AD/CVD Orders"). In complying with these procedures, Greenbrier expressly does not waive any of its rights or concede any legal arguments, including those set forth in its request for administrative review.

As requested, for initial movements of new railcars into the United States, Greenbrier will file the entries manually on a prospective basis by submitting hard-copy documents directly at the border and not through the Automated Broker Interface ("ABI"), with the cash deposits required by TRLED's determination paid at the time the entry is filed. The deposits will be made by check to the Automotive and Aerospace Center, U.S. Customs and Border Protection, Entry Department, 380 S. Cambell, Detroit, Michigan 48209. To ensure that they can be appropriately tracked, any submission of a deposit via check also will include a copy of the hard-copy entry documents to

identify each applicable entry number and include a separate breakout of the amounts provisionally attributable to the AD/CVD Orders, and Section 301 duties (if applicable).

Greenbrier appreciates your commitment that Customs will maintain the cash deposits made pursuant to these special procedures in suspense pending resolution of the legal challenges to TRLED's determination. Greenbrier is therefore making the entries you have requested with the express understanding that all deposits made by Greenbrier will be returned to Greenbrier in the event Greenbrier prevails on its legal challenge to TRLED's determination.

Thank you again for your email and clarification of Customs's position. Please advise us promptly if Greenbrier has misconstrued your guidance in any way.

Sincerely,

Patrick J. Togni

# EXHIBIT E

GLOBAL CUSTOMS & LOGISTICS

# WHY MANUAL ENTRY PROCESSING IS VIRTUALLY IMPOSSIBLE

The Automated System for Rail Shipments from Mexico

## THE AUTOMATED PROCESS: HOW A RAILCAR GETS CUSTOMS RELEASE (TYPE 03 LIVE ENTRY)

1. **RAIL CARRIER SENDS MANIFEST TO AMS**
   - Train ID / Trip
   - Railcar Numbers
   - Bill of Lading
   - Commodity Info
   - ETA to Border
   - Port of Entry

   Railroad System

2. **AMS MANIFEST INTO ACE**
   - Manifest Received
   - Bill Available
   - Railcar Associated
   - Arrival Tracked

   ACE / AMS

3. **GCL FILES LIVE ENTRY (TYPE 03) THROUGH ABI**
   - Entry Summary (7501)
   - AD/CVD Case Numbers
   - HTS & Commodity
   - Estimated Duties
   - Cash Deposit Amounts
   - Entry Type 03 (Live)

   GCL (Broker)

4. **STATEMENT DATE NEXT DAY (REQUIRED)**
   - Statement Date Set to NEXT DAY (Day 2)
   - Entry Will Appear on Next Day's Daily Statement
   - Payment Scheduled (or Paid via Statement)

   MUST BE DONE BEFORE CBP CAN RELEASE ENTRY

   ACL Statement System

5. **ENTRY PACKAGE UPLOADED INTO DIS**
   - Commercial Invoice
   - Packing / Rail Docs
   - AD/CVD Documents
   - Manufacturer Info
   - Supporting Docs
   - Other Required Docs

   DIS (Document Image System)

6. **CBP OFFICER REVIEWS LIVE ENTRY**
   - Reviews Entry (7501)
   - Reviews DIS Package
   - Verifies AD/CVD Info
   - Confirms Payment (Paid or Scheduled on Statement)
   - Checks for Holds

   CBP Officer (ACE)

7. **CBP RELEASES THE ENTRY**
   - Entry Released
   - ACE Matches Bill
   - Release Sent to Rail Carrier

   ACE

8. **7501/ENTRY SUMMARY POSTED & CLOSED**
   - Statement Paid Next Day (Day 2)
   - Entry Summary Posted
   - Entry Closed

   ACE / ACL

9. **RAIL CARRIER RECEIVES RELEASE**
   - Release Received
   - Railcar Cleared
   - Train Can Cross the Border

   Railroad System

10. **RAILCAR DELIVERED TO CUSTOMER**
    - Railcar Delivered
    - Customer Receives On Time

    Customer

## TIME COMPARISON: AUTOMATED vs MANUAL (PER TRAIN)

| AUTOMATED SYSTEM (TYPE 03 LIVE ENTRY) | TIME |
|---|---|
| Train Arrives at Port of Entry | DAY 1 Morning |
| Live Entry Filed (ABI) | DAY 1 + 1–2 Hours |
| Statement Date Set to NEXT DAY (Entry Scheduled for Day 2 Statement) | DAY 1 + 2–3 Hours |
| Entry Package Uploaded to DIS | DAY 1 + 3–4 Hours |
| CBP Reviews & Releases Entry | DAY 1 + 4–6 Hours |
| Release Sent to Rail Carrier | DAY 1 + 6–8 Hours |
| Railcars Cross the Border | DAY 1 Afternoon/Evening |
| Entry Appears on Statement (Payment Due/Paid) | DAY 2 (Next Day) |

TOTAL TIME (AUTOMATED): 1 DAY + 1 DAY STATEMENT = ~2 DAYS TOTAL
Railcars move same day – Payment on next day's statement

## MANUAL PROCESS (AS REQUESTED BY CBP) (NOT PRACTICAL)

| # | MANUAL PROCESS (AS REQUESTED BY CBP) | TIME |
|---|---|---|
| 1 | Identify Each Railcar & Create Entry Manually (20, 30, 50+ cars per train) | 4 – 8 HOURS |
| 2 | Print Entry Summary & All Documents | 2 – 4 HOURS |
| 3 | Organize & Create Hard-Copy Package Per Entry (Separate for Each Railcar) | 2 – 3 HOURS |
| 4 | Prepare Checks for Cash Deposits (Per Entry / Per Case) | 1 – 2 HOURS |
| 5 | MAIL CHECKS TO: CBP Financial Center Indianapolis, IN | OVERNIGHT EXPRESS (FEDEX/UPS) 1 DAY |
| 6 | MAIL HARD-COPY ENTRY PACKAGE TO: CBP – Center of Excellence & Expertise (CEE) Detroit, MI | OVERNIGHT EXPRESS (FEDEX/UPS) 1 DAY |
| 7 | CBP Receives, Opens, Reviews Manual Package (Queue Time Varies) | 1 – 3 DAYS |
| 8 | CBP Releases Entry (Then Release Sent to Rail Carrier) | SAME DAY OR NEXT DAY |
| 9 | Railcars Cross the Border (If Not Cut from the Train) | DEPENDS ON RELEASE |

TOTAL TIME (MANUAL): 6 – 14+ DAYS (PER TRAIN)
High risk of cars being cut & delayed

## WHY MANUAL PROCESSING IS NOT FEASIBLE

| Reason | Impact |
|---|---|
| **TOO MANY RAILCARS & TRAINS** A single train can have 20, 30, 50+ railcars. Multiple trains arrive every day. | VOLUME IS UNMANAGEABLE MANUALLY |
| **NEXT-DAY STATEMENT DEADLINE** Statement date must be set to the next day BEFORE CBP can release the entry. | ONE DAY WINDOW |
| **MAILING TIME (EVEN WITH EXPRESS)** Checks must be mailed to Indianapolis. Documents must be mailed to Detroit. | MINIMUM 2 DAYS JUST IN TRANSIT |
| **CBP MANUAL REVIEW QUEUE** CBP must receive, open, and review each manual package. | 1 – 3 DAYS OR MORE |
| **DOCUMENT INTENSIVE** Printing, organizing, mailing separate packages for every railcar is extremely time consuming. | 30 – 90 MINUTES PER RAILCAR (MINIMUM) |
| **HIGH RISK OF DELAY** Any delay in mailing, receipt, or review can cause railcars to be cut in the rail yard. | CARS WAIT DAYS OR WEEKS |
| **RAIL OPERATIONS IMPACT** Cut cars wait for another train. Delays can be days or even weeks. | SUPPLY CHAIN DISRUPTION & DEMURRAGE COSTS |

**KEY POINT**

CBP's automated systems (AMS, ACE, ABI, DIS, Statement) are designed to process thousands of entries electronically. Doing this manually for every railcar, with next-day statement requirements, document uploads, and officer review, is not practical, not efficient, and will cause significant delays and unnecessary costs.

## THE REAL IMPACT OF MANUAL PROCESSING DELAYS

- PLANT SLOWDOWNS & PRODUCTION INTERRUPTIONS
- DEMURRAGE & DETENTION COSTS
- CUSTOMERS WAITING DAYS OR WEEKS FOR RAILCARS
- SUPPLY CHAIN RISK & LOSS OF COMPETITIVENESS
- INCREASED COSTS FOR GUNDERSON & CUSTOMERS

Rev. 07/23/2026

# EXHIBIT F

**From:** FLOOD, CHARMION A <CHARMION.A.FLOOD@cbp.dhs.gov>
**Sent:** Wednesday, August 19, 2026 8:06 AM
**To:** Patrick Togni
**Cc:** Michael Taylor; LOPEZ, SANDY M
**Subject:** RE: Urgent Request to Clarify Entry Procedures Pending Administrative Review

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Good morning Mr. Togni:

I was able to conduct some internal research and would like to reaffirm the guidance previously provided.

For the older entries, you will need to submit the non-ABI paperwork, along with the check for duties, to the Port of Detroit as previously instructed.

For the new entries, although your EAPA case is currently under administrative review, you will still need to file the entries as entry type 03 with the associated AD/CVD cases and make the required cash deposits.

If the outcome of the administrative review is in your favor, you will be able to file protests, or the Center will be able to administratively refund the duties paid.

I know we had a meeting scheduled for later today, but I was able to get the answers needed and provide the necessary clarification. Given that, I do not believe the meeting is necessary at this time.

Thank you for your flexibility.

**Thank you,**

**Charmion Flood**
**Assistant Center Director**
Automotive & Aerospace Center of Excellence & Expertise
U.S. Customs and Border Protection
716.843.8376

**Opinions provided are not legally binding.*

"There is nothing permanent except change." – **Heraclitus**

---

**From:** Patrick Togni <PTogni@KSLAW.com>
**Sent:** Monday, August 17, 2026 8:55 AM
**To:** FLOOD, CHARMION A <CHARMION.A.FLOOD@cbp.dhs.gov>
**Cc:** jmtaylor@kslaw.com
**Subject:** FW: Urgent Request to Clarify Entry Procedures Pending Administrative Review

Dear Assistant Center Director Flood:

Per your request, attached please find the email and our written reply.

We look forward to speaking with you again soon.

Sincerely,

Patrick Togni

**Patrick J. Togni**
*Partner*

T: +1 202 626 2958 | E: ptogni@kslaw.com | Bio | vCard

King & Spalding LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006

kslaw.com

---

**From:** Patrick Togni
**Sent:** Thursday, July 23, 2026 7:06 AM
**To:** LOPEZ, SANDY M <SANDY.M.LOPEZ@CBP.DHS.GOV>; STAUDT, JUDY L <JUDY.L.STAUDT@CBP.DHS.GOV>
**Cc:** Stephen Vaughn <svaughn@kslaw.com>; Michael Taylor <JMTaylor@KSLAW.com>
**Subject:** RE: Urgent Request to Clarify Entry Procedures Pending Administrative Review

Dear Director Staudt and Assistant Director Lopez:

Thank you for your email about the procedures. I am pleased to send over the attached follow-up on behalf of The Greenbrier Companies.

Sincerely,

Pat Togni

**Patrick J. Togni**
*Partner*

T: +1 202 626 2958 | E: ptogni@kslaw.com | Bio | vCard

King & Spalding LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006

kslaw.com

**From:** LOPEZ, SANDY M <SANDY.M.LOPEZ@CBP.DHS.GOV>
**Sent:** Thursday, July 16, 2026 11:03 AM
**To:** Patrick Togni <PTogni@KSLAW.com>; STAUDT, JUDY L <JUDY.L.STAUDT@CBP.DHS.GOV>
**Cc:** Stephen Vaughn <svaughn@kslaw.com>; Michael Taylor <JMTaylor@KSLAW.com>
**Subject:** RE: Urgent Request to Clarify Entry Procedures Pending Administrative Review

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Good morning Mr. Togni,

CBP maintains that the Freight Rail Couplers (FRC's) in question should have been formally entered into the United States, and the applicable antidumping and countervailing duties (A-570-145 and C-570-146) on couplers from the People's Republic of China (A-570-145 and C-570-146) and/or Mexico (A-201-857) should have been paid in accordance with the FRC Orders. Consequently, pursuant to 19 C.F.R. § 142.13, CBP requires formal consumption entries for FRCs subject to these orders, necessitating the filing of proper documentation and the payment of all applicable AD/CVD duties.

For entries involving the same underlying circumstances as those at issue in the pending EAPA case 8183, please :

- All entries that fall within the within the scope of the EAPA case must be filed.
- All entries will need to be filed non-ABI
- All unliquidated entries, and any entries that have liquidated but remain within the applicable protest period, must be filed with all required cash deposits paid at the time of filing.
- For entries that have liquidated and are beyond the applicable protest period will need to be filed. Payment should be made by check and sent to the Detroit address below.
  - The submission must identify each applicable entry number and include a separate breakout of the amounts attributable to antidumping duties, countervailing duties, and Section 301 duties

For the purposes of the check, the funds are intended to be maintained in suspense pending further direction associated with the resolution of this matter. These instructions are procedural in nature and intended solely to facilitate the administrative handling of these entries. They should not be construed as a determination regarding the legal treatment of any entry, the availability of protest rights, or the ultimate disposition of any submitted funds.

**Address for Remittance:**
Automotive and Aerospace Center
U.S. Customs and Border Protection
Entry Department
380 S. Cambell
Detroit, Michigan 48209

Regards,

**Sandy M. Lopez**
Assistant Center Director | Revenue Collection Branch
A&A Center | Detroit Field Office

---

**From:** Patrick Togni <PTogni@KSLAW.com>
**Sent:** Wednesday, July 8, 2026 11:09 AM
**To:** STAUDT, JUDY L <JUDY.L.STAUDT@CBP.DHS.GOV>
**Cc:** LOPEZ, SANDY M <SANDY.M.LOPEZ@CBP.DHS.GOV>; Stephen Vaughn <svaughn@kslaw.com>; jmtaylor@kslaw.com
**Subject:** Urgent Request to Clarify Entry Procedures Pending Administrative Review

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. If you feel this is a suspicious-looking email, please report by using the "Report Phishing" button option. If on a mobile device, please utilize the “Report Phishing” button or “Forward as Attachment” to CBPSOC@cbp.dhs.gov.

Dear Director Staudt:

Please see the attached letter on behalf of our client, The Greenbrier Companies, Inc. and its subsidiaries (“Greenbrier”). The letter follows up on our previous communications about this matter and requests immediate clarification from U.S. Customs and Border Protection regarding the entry procedures that apply in connection with the determination made in Enforce and Protect Act (“EAPA”) Case No. 8183. As expressed in our earlier discussions, we appreciate your continued assistance in this matter.

Sincerely,

Pat Togni

**Patrick Togni**
*Partner*

T: +1 202 626 2958 | ptogni@kslaw.com | Bio | vCard

King & Spalding LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006

kslaw.com

---

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender

immediately by e-mail and delete all copies of the message or attachments and we ask that you please comply with any additional instructions from the sender regarding deletion of messages or attachments sent in error. Click here to view our Privacy Notice.

# EXHIBIT G

**From:** Patrick Togni
**Sent:** Thursday, August 20, 2026 8:45 PM
**To:** FLOOD, CHARMION A <CHARMION.A.FLOOD@cbp.dhs.gov>
**Cc:** LOPEZ, SANDY M <SANDY.M.LOPEZ@CBP.DHS.GOV>; Michael Taylor <JMTaylor@KSLAW.com>
**Subject:** RE: Urgent Request to Clarify Entry Procedures Pending Administrative Review

Dear Assistant Center Director Flood:

Thank you for your message on behalf of U.S. Customs and Border Protection ("CBP"). I am writing to confirm receipt and to memorialize our understanding of your email that future Type 03 railcar entries should be filed electronically. The Greenbrier Companies ("Greenbrier" or the "Company"), through its applicable importing entities, is working with the Company's licensed customs brokers to submit electronic entries as soon as possible.

With respect to movements of railcars during the period of investigation of EAPA Case No. 8183, please know that Greenbrier intends to coordinate with senior officials at the U.S. Department of Commerce and/or CBP to discuss the best process for dealing with any claims with respect to alleged duties on railcar movements that occurred before the EAPA determination was released.

Thank you again for your email.

Sincerely,

Pat Togni

**Patrick J. Togni**
*Partner*

T: +1 202 626 2958 | E: ptogni@kslaw.com | Bio | vCard

King & Spalding LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006

kslaw.com

**From:** FLOOD, CHARMION A <CHARMION.A.FLOOD@cbp.dhs.gov>
**Sent:** Wednesday, August 19, 2026 8:06 AM
**To:** Patrick Togni <PTogni@KSLAW.com>
**Cc:** Michael Taylor <JMTaylor@KSLAW.com>; LOPEZ, SANDY M <SANDY.M.LOPEZ@CBP.DHS.GOV>
**Subject:** RE: Urgent Request to Clarify Entry Procedures Pending Administrative Review

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Good morning Mr. Togni:

I was able to conduct some internal research and would like to reaffirm the guidance previously provided.

For the older entries, you will need to submit the non-ABI paperwork, along with the check for duties, to the Port of Detroit as previously instructed.

For the new entries, although your EAPA case is currently under administrative review, you will still need to file the entries as entry type 03 with the associated AD/CVD cases and make the required cash deposits.

If the outcome of the administrative review is in your favor, you will be able to file protests, or the Center will be able to administratively refund the duties paid.

I know we had a meeting scheduled for later today, but I was able to get the answers needed and provide the necessary clarification. Given that, I do not believe the meeting is necessary at this time.

Thank you for your flexibility.

**Thank you,**

**Charmion Flood**
**Assistant Center Director**
Automotive & Aerospace Center of Excellence & Expertise
U.S. Customs and Border Protection
716.843.8376

**Opinions provided are not legally binding.*

"There is nothing permanent except change." – **Heraclitus**

**From:** Patrick Togni <PTogni@KSLAW.com>
**Sent:** Monday, August 17, 2026 8:55 AM
**To:** FLOOD, CHARMION A <CHARMION.A.FLOOD@cbp.dhs.gov>
**Cc:** jmtaylor@kslaw.com
**Subject:** FW: Urgent Request to Clarify Entry Procedures Pending Administrative Review

Dear Assistant Center Director Flood:

Per your request, attached please find the email and our written reply.

We look forward to speaking with you again soon.

Sincerely,

Patrick Togni

**Patrick J. Togni**
*Partner*

T: +1 202 626 2958 | E: ptogni@kslaw.com | Bio | vCard

King & Spalding LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006

kslaw.com

---

**From:** Patrick Togni
**Sent:** Thursday, July 23, 2026 7:06 AM
**To:** LOPEZ, SANDY M <SANDY.M.LOPEZ@CBP.DHS.GOV>; STAUDT, JUDY L <JUDY.L.STAUDT@CBP.DHS.GOV>
**Cc:** Stephen Vaughn <svaughn@kslaw.com>; Michael Taylor <JMTaylor@KSLAW.com>
**Subject:** RE: Urgent Request to Clarify Entry Procedures Pending Administrative Review

Dear Director Staudt and Assistant Director Lopez:

Thank you for your email about the procedures. I am pleased to send over the attached follow-up on behalf of The Greenbrier Companies.

Sincerely,

Pat Togni

**Patrick J. Togni**
*Partner*

T: +1 202 626 2958 | E: ptogni@kslaw.com | Bio | vCard

King & Spalding LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006

kslaw.com

**From:** LOPEZ, SANDY M <SANDY.M.LOPEZ@CBP.DHS.GOV>
**Sent:** Thursday, July 16, 2026 11:03 AM
**To:** Patrick Togni <PTogni@KSLAW.com>; STAUDT, JUDY L <JUDY.L.STAUDT@CBP.DHS.GOV>
**Cc:** Stephen Vaughn <svaughn@kslaw.com>; Michael Taylor <JMTaylor@KSLAW.com>
**Subject:** RE: Urgent Request to Clarify Entry Procedures Pending Administrative Review

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Good morning Mr. Togni,

CBP maintains that the Freight Rail Couplers (FRC's) in question should have been formally entered into the United States, and the applicable antidumping and countervailing duties (A-570-145 and C-570-146) on couplers from the People's Republic of China (A-570-145 and C-570-146) and/or Mexico (A-201-857) should have been paid in accordance with the FRC Orders. Consequently, pursuant to 19 C.F.R. § 142.13, CBP requires formal consumption entries for FRCs subject to these orders, necessitating the filing of proper documentation and the payment of all applicable AD/CVD duties.

For entries involving the same underlying circumstances as those at issue in the pending EAPA case 8183, please :

- All entries that fall within the within the scope of the EAPA case must be filed.
- All entries will need to be filed non-ABI
- All unliquidated entries, and any entries that have liquidated but remain within the applicable protest period, must be filed with all required cash deposits paid at the time of filing.
- For entries that have liquidated and are beyond the applicable protest period will need to be filed. Payment should be made by check and sent to the Detroit address below.
  - The submission must identify each applicable entry number and include a separate breakout of the amounts attributable to antidumping duties, countervailing duties, and Section 301 duties

For the purposes of the check, the funds are intended to be maintained in suspense pending further direction associated with the resolution of this matter. These instructions are procedural in nature and intended solely to facilitate the administrative handling of these entries. They should not be construed as a determination regarding the legal treatment of any entry, the availability of protest rights, or the ultimate disposition of any submitted funds.

**Address for Remittance:**
Automotive and Aerospace Center
U.S. Customs and Border Protection
Entry Department
380 S. Cambell
Detroit, Michigan 48209

Regards,
**Sandy M. Lopez**
Assistant Center Director | Revenue Collection Branch
A&A Center | Detroit Field Office

**From:** Patrick Togni <PTogni@KSLAW.com>
**Sent:** Wednesday, July 8, 2026 11:09 AM

**To:** STAUDT, JUDY L <JUDY.L.STAUDT@CBP.DHS.GOV>
**Cc:** LOPEZ, SANDY M <SANDY.M.LOPEZ@CBP.DHS.GOV>; Stephen Vaughn <svaughn@kslaw.com>; jmtaylor@kslaw.com
**Subject:** Urgent Request to Clarify Entry Procedures Pending Administrative Review

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. If you feel this is a suspicious-looking email, please report by using the "Report Phishing" button option. If on a mobile device, please utilize the "Report Phishing" button or "Forward as Attachment" to CBPSOC@cbp.dhs.gov.

Dear Director Staudt:

Please see the attached letter on behalf of our client, The Greenbrier Companies, Inc. and its subsidiaries ("Greenbrier"). The letter follows up on our previous communications about this matter and requests immediate clarification from U.S. Customs and Border Protection regarding the entry procedures that apply in connection with the determination made in Enforce and Protect Act ("EAPA") Case No. 8183. As expressed in our earlier discussions, we appreciate your continued assistance in this matter.

Sincerely,

Pat Togni

**Patrick Togni**
*Partner*

T: +1 202 626 2958 | ptogni@kslaw.com | Bio | vCard

King & Spalding LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006

kslaw.com

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message or attachments and we ask that you please comply with any additional instructions from the sender regarding deletion of messages or attachments sent in error. Click here to view our Privacy Notice.

# EXHIBIT H

**From:** Patrick Togni <PTogni@KSLAW.com>
**Sent:** Wednesday, August 26, 2026 10:24 AM
**To:** LOPEZ, SANDY M <SANDY.M.LOPEZ@CBP.DHS.GOV>; FLOOD, CHARMION A <CHARMION.A.FLOOD@cbp.dhs.gov>
**Cc:** STAUDT, JUDY L <JUDY.L.STAUDT@CBP.DHS.GOV>; jmtaylor@kslaw.com
**Subject:** Follow-Up on ABI Entry Efforts in Eagle Pass, Texas

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. If you feel this is a suspicious-looking email, please report by using the "Report Phishing" button option. If on a mobile device, please utilize the “Report Phishing” button or “Forward as Attachment” to CBPSOC@cbp.dhs.gov.

Dear Assistant Center Directors Lopez and Flood:

I wanted to update you on the current situation. Yesterday, I spent the day in Eagle Pass, Texas. While there, I participated in a regularly scheduled meeting with local U.S. Customs and Border Protection (“CBP”) personnel, brokers, and the railroads. I also met with a representative from Greenbrier’s broker and with railroad operations personnel to discuss the ABI entry situation.

The purpose of my meetings was to follow up on numerous Microsoft Teams sessions where we have tried to effectuate ABI railcar entry, to sit at the table and see if we could resolve the systemic issues relating to the transmission of railcar entries via ABI. I understand from local CBP officials that the port is not processing railcar entries and will continue not to do so, pending other instructions from Washington. Separately, the broker and rail carriers stated that they cannot file railcar entries in ABI. We are continuing the discussions.

I am in Laredo today. Would it be possible for me to stop by Assistant Center Director Lopez’s office for a discussion?

Sincerely,

Pat Togni

**Patrick J. Togni**
*Partner*

T: +1 202 626 2958 | E: ptogni@kslaw.com | Bio | vCard

King & Spalding LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006

kslaw.com

---

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message or attachments and we ask that you please comply with any additional instructions from the sender regarding deletion of messages or attachments sent in error. Click here to view our Privacy Notice.

# EXHIBIT I

## Entry Guidance — Event Calendar (May — August 2026)

**COLOR-CODED LEGEND**

| Color | Category |
|---|---|
| Red | U.S. Customs (CBP) Events |
| Green | Licensed Customs Broker Events |
| Blue | Railroad Events |

*Multi-category days are split into stacked color blocks within the cell.*

**May 2026**

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| | 18 [Customs] TRLED's EAPA determination issued | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

| June 2026 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| | 1<br>[Customs] K&S emailed TRLED re: entry under protest | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 — [Customs] Call with A&A CEE, EAPA team, TRLED<br>[Railroad] Emails with Ferromex & BNSF re: processing | 10<br>[Railroad] Ferromex & BNSF emails re: manifests, EDI | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18<br>[Customs] K&S called CD Staudt; email response | 19 | 20 |
| 21 | 22<br>[Customs] ACD Lopez: CBP 'remained engaged' | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

| July 2026 | | | | | | |
|---|---|---|---|---|---|---|
| **Sun** | **Mon** | **Tue** | **Wed** | **Thu** | **Fri** | **Sat** |
| | | | 1 — [Customs] First guidance; Greenbrier timely sought administrative review of TRLED's determination<br>[Railroad] Emails with Ferromex, BNSF, CPKC, Union Pacific | 2<br>[Customs] CBP acknowledged receipt of request for admin review | 3 | 4 |
| 5 | 6 | 7 | 8<br>[Customs] K&S letter to CD Staudt re: guidance | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16<br>[Customs] Second guidance | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 — [Customs] K&S confirmation letter to Staudt/Lopez<br>[Broker] Spoke with Global re: CBP guidance | 24<br>[Broker] Global discussions (cont'd) | 25 |
| 26 | 27 | 28 | 29 | 30<br>[Broker] Global discussions (cont'd) | 31 | |

| August 2026 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 [Broker] Broker discussions re: entry difficulties | 8 |
| 9 | 10 | 11 [Broker] Broker discussions (cont'd) | 12 [Railroad] Spoke with Ferromex re: entry | 13 — [Railroad] Ferromex discussions (cont'd)<br>[Broker] Broker discussions (cont'd) | 14 — [Customs] K&S alerted ACD Lopez re: systems<br>[Railroad] Ferromex: operational concerns<br>[Broker] Global: cannot manage manual entry process | 15 [Broker] Broker discussions (cont'd) |
| 16 [Broker] Broker discussions (cont'd) | 17 [Customs] K&S spoke with ACD Flood | 18 [Broker] Broker discussions (cont'd) | 19 — [Customs] Third guidance<br>[Broker] Broker discussions (cont'd) | 20 — [Customs] K&S confirmed guidance to ACD Flood<br>[Railroad] Union Pacific discussions re: Aug 19 guidance<br>[Broker] Broker discussions (cont'd) | 21 — [Railroad] Union Pacific discussions re: technical issues<br>[Broker] Broker discussions (cont'd) | 22 |
| 23 | 24 | 25 [Railroad] Carriers: cannot file in ABI; carriers' systems need new programming | 26 [Customs] K&S updated ACDs Lopez and Flood about trip to Eagle Pass and issues preventing entry | 27 | 28 [Railroad] BNSF: systems need coding fix | 29 |
| 30 | 31 | | | | | |

# Attachment G

CUSTOMS DIRECTIVE

ORIGINATING OFFICE: FO:TP:CP:MCA DISTRIBUTION: S-01
CUSTOMS DIRECTIVE NO. 3550-075
DATE: MARCH 7, 2000
SUPERSEDES:
REVIEW DATE: MARCH 2002

SUBJECT: INSTRUCTIONS FOR HANDLING THE ENTRY OF LOCOMOTIVES, RAILCARS, AND OTHER RAILROAD EQUIPMENT INTO THE U.S.

1 PURPOSE.

1.1 This directive establishes a uniform method to be utilized for the handling of entry of locomotives, railcars, and other railroad equipment into the U.S.

1.2 On November 10, 1999, a final ruling (Technical Amendment, T.D. 99-79) was printed in the Federal Register (Volume 64, Number 217, Pages 61204-61205), concerning Customs Regulations, 19 CFR 10.41 (a) and (d), the handling of foreign locomotives and railroad equipment that are utilized as instruments of international traffic, and to carry passengers or merchandise between U.S. points, respectively.

1.3 The Office of Regulations & Rulings (OR&R) issued this technical amendment in order to make the treatment of foreign-owned locomotives and railcars similar to that of foreign-owned trucks, buses, taxicabs, or other vehicles, aircraft or undocumented boats used for the purpose of carrying merchandise or passengers in the U.S. In order to answer questions that have arisen from that notice, the following clarification is provided.

2. AUTHORITIES. 19 CFR 10.41 (a) and (d) and 19 CFR 141.4 (b) (4).
3. RESPONSIBILITIES.

3.1 The Directors, Field Operations, Customs Management Centers are to ensure implementation of this directive

3.2 Port Directors will ensure local procedures accommodate these guidelines.

3.3 Port Directors will distribute this information through routine trade notification practices (i.e. trade notices, informational pipelines, etc.). Customs employees should be made aware of these procedures.

4. PROCEDURES.

4.1 New locomotives, railcars, and other railroad equipment (but not parts), built in Mexico or Canada for use in the U.S., do not require that an entry be filed in order to qualify for carrying merchandise or passengers between points in the U.S., per the specific cite in 19 CFR 141.4(b)(4).

4.2 This includes new locomotives or railcars arriving empty, new railcars arriving with a loaded shipment, and used equipment being sold or transferred from a foreign carrier to a domestic carrier.

4.3 If arriving with a loaded shipment, the new locomotive or railcar will not require an entry, but the shipment may.

4.4 Cars made in another country (i.e., other than Canada or Mexico.) do require an entry whether they are to be used in U.S. operations or not, unless they are instruments of international traffic pursuant to 19 CFR 123.12. This decision is based on the common industry practice that any locomotive or railcar in common commercial use will eventually be used in international traffic with Canada or Mexico during its regular use.

4.5 All locomotives, railcars, and other railroad equipment must continue to be properly identified by the arriving rail carrier. The fact that no requirement for entry exists does not change the requirement to manifest the equipment when it crosses the border.

5. MEASURES. Will be accomplished in an ongoing basis through the utilization of the Customs Self-Inspection Program as prescribed by associated directives.
Acting Assistant Commissioner
Office of Field Operation

Copyright 2009 CUSTOMS Info LLC. All Rights Reserved.